## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| | : | |
| HRP Myrtle Beach Holdings, LLC *et al.*,[1] | : | Case No. 08-12193 (KJC) |
| | : | |
| Debtors | : | Jointly Administered |
| | : | |
| | : | **Hearing Date: Requested: 2/17/2009 at 10:00 a.m.** |
| | : | **[Pending Motion to Limit and Shorten Notice]** |
| | : | |
| | : | **Objection Date: Requested: 2/17/2009 at 10:00 a.m.** |
| | : | **[Pending Motion to Limit and Shorten Notice]** |

## MOTION OF ALFRED T. GIULIANO, CHAPTER 7 TRUSTEE, FOR ENTRY OF AN ORDER (I) AUTHORIZING SALE OF HARD ROCK PARK FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS AND (II) ESTABLISHING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN DESIGNATED CONTRACTS AND UNEXPIRED LEASES

Alfred T. Giuliano, Chapter 7 Trustee (the "Trustee")[2] for the estate of HRP Myrtle

Beach Operations LLC (the "Selling Debtor," and together with the other related debtor

affiliates, the "Debtors"), hereby moves this Court for the entry of an order pursuant to sections

105(a), 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code") authorizing

the sale of the Purchased Assets (as defined herein) to FPI MB Entertainment LLC (the

"Purchaser") pursuant to an Asset Purchase Agreement, dated February 9, 2009, a copy of

which is attached hereto as Exhibit "A" (the "APA"), free and clear of all liens, claims,

---

[1]    The Debtors are the following seven entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): HRP Myrtle Beach Holdings, LLC (1546), HRP Myrtle Beach Holdings Capital Corp. (5553), HRP Myrtle Beach Operations, LLC (1625), HRP Myrtle Beach Capital Corp (4272), HRP Myrtle Beach Management, LLC (0297), HRP Global Management LLC (2138) and We Got Your Back Security Co., LLC (3877). The address of each of the Debtors is 211 George Bishop Parkway, Myrtle Beach, South Carolina 29579.

[2]    Capitalized terms used herein as defined terms and not otherwise defined shall have those meaning ascribed to them in the APA.

encumbrances and other interests and to establish procedures for the assumption and assignment of certain designated contracts and unexpired leases (the "Sale Motion"), and in support of the Sale Motion, the Trustee respectfully states as follows:

### Jurisdiction and Venue

1.      The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

### General Background

2.      The Debtors own a destination theme park located in Myrtle Beach, South Carolina (the "Park" or "Hard Rock Park").    As more fully set forth in the Affidavit of Steven Goodwin in Support of First-Day Pleadings (the "Goodwin Affidavit"), as the world's first rock-'n-roll theme park, the Park offered visitors an entertainment experience that features six unique, custom-designed zones celebrating the culture, lifestyle and legends of rock music entertainment.  The Debtors are not affiliated with Hard Rock Café International, Inc., but branded and operated the Park pursuant to a license agreement with Hard Rock Café International (USA), Inc.

3.      The Park opened in April 2008, after nearly two years of construction. Although guest satisfaction levels were reportedly strong and guests spent considerable amounts on food, beverage and retail items, overall attendance at the Park was lower than projected which is thought to be partly as a result of macroeconomic conditions that significantly depressed overall demand in the travel and leisure industry, as well as the Debtors' inability to devote sufficient resources to local, regional and out-of-market marketing in their initial year of operations.  Accordingly the Debtors were faced with significant

WILMINGTON\84588\10 099997.000
2/10/09 1:28 AM

liquidity constraints at the conclusion of their first season of operations and, in that context, a substantially overleveraged balance sheet.

4.      On September 24, 2008 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. After the Petition Date, the Debtors continued to operate their businesses as debtors and debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.

5.      On November 10, 2008, the Debtors filed a Motion to Approve an Order (I)(A) Approving Procedures in Connection With the Sale of the Debtors' Assets; (B) Scheduling the Related Auction to Consider Approval of Sale; (C) Approving Procedures Related to the Assumption of Certain Executory Contracts and Unexpired Leases; (D) Approving the Form and Manner of Notice Thereof; and (E) Granting Related Relief; and (II)(A) Authorizing the Sale of Such Assets Pursuant to the Modified Purchase Agreement Free and Clear of Liens, Claims Encumbrances, and Other Interests; (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (C) Granting Related Relief (the "Chapter 11 Sale Motion") pursuant to which the Debtors sought approval of certain procedures in connection with a proposed sale of the Debtors' assets (the "Assets") [Docket No. 146]. On November 20, 2008, the Court entered an order approving the proposed sale procedures (the "Chapter 11 Sale Motion Order") [Docket No. 194]. The Chapter 11 Sale Motion Order set a deadline of December 12, 2008 for submitting bids and scheduled an auction on December 15, 2008, if necessary. Unfortunately, the Debtors were unable to generate any qualifying offers, and were therefore unable to sell their Assets. On or about December 30, 2008, the Debtors informed the Court of their intention to seek conversion of their Chapter 11 cases to cases under Chapter 7 of the Bankruptcy Code.

WILMINGTON\84588\10 099997.000
2/10/09 1:28 AM

6.    On January 6, 2009 (the "Conversion Date"), the Court entered an Order Converting the Debtors' Chapter 11 Bankruptcy Cases to Cases under Chapter 7 of the Bankruptcy Code [Docket No. 335], and the United States Trustee appointed Alfred T. Giuliano as the interim Trustee [Docket No. 336].

### The Debtors' Debt Structure

7.    According to the Goodwin Affidavit, the Debtors' primary liabilities consist of (a) a revolving credit facility, (b) junior secured debtor-in-possession financing facility, (c) senior secured notes, (d) junior secured notes, (e) pay-in-kind notes, and (f) unsecured trade debt.  These liabilities are described in more detail below.

A.    The Revolving Credit Agreement

8.    On March 30, 2006, the Selling Debtor entered into a $15 million revolving credit agreement (the "Revolving Credit Agreement," and together with the documents, agreements and instruments executed or delivered from time to time in connection therewith, the "Revolving Credit Documents")[3] with Deutsche Bank Trust Company Americas ("DBTCA"), as agent (in such capacity, the "Revolving Credit Agent"), and various lenders thereto (the "Senior Revolving Lenders"), to fund its general corporate and working capital needs.

9.    As of the Petition Date, the Debtors were indebted to the Senior Revolving Lenders in the principal amount of not less than fifteen million dollars ($15,000,000), plus accrued and unpaid interest thereon and fees, costs and expenses (including fees and expenses of the counsel, consultants and advisors for the Revolving Credit Agent and Senior Revolving

---

[3]    The Revolving Credit Agreement has been guaranteed by HRP Myrtle Beach Holdings, LLC and HRP Myrtle Beach Capital Corp.

-4-

Lenders), and all other amounts payable (collectively, the "Revolving Credit Obligations"), under and pursuant to the Revolving Credit Agreement. The Senior Revolving Lenders have also alleged that the Debtors are indebted on account of, and as used herein the Revolving Credit Obligations also include, certain specified hedging obligations (the "Hedging Obligations") associated with the termination of an interest rate hedging agreement to which the Selling Debtor was a party, totaling approximately $3,490,000 as of the Petition Date, plus all accrued and unpaid interest, fees and other amounts related thereto. As used herein, "Revolving Lenders" shall include both the lenders from time to time under the Revolving Credit Agreement and the counterparties to the Hedging Obligations.

10.    The Senior Revolving Lenders have also alleged that, pursuant to the Revolving Credit Documents, the Revolving Credit Agent, for the benefit of the Revolving Lenders, holds, with certain exceptions to the extent set forth in the Revolving Credit Documents, perfected, valid, enforceable, and non-avoidable first-priority liens on and security interests in (the "Revolving Credit Pre-Petition Liens") all of the Debtors' now existing or hereinafter arising properties and assets of any kind or nature, including, without limitation, cash, accounts receivable, chattel paper, contracts, equipment, general intangibles, instruments, intellectual property, inventory, investment property, letter of credit rights, commercial tort claims, real property, pledged capital stock and other pledged interests of subsidiaries and other tangible and intangible personal property, together with all proceeds, products, offspring, rents, and profits thereof, whether arising prior to, on, or after the Petition Date (the "Revolving Credit Pre-Petition Collateral").

      B.      The Junior Secured DIP

11.    On September 29, 2008, the Court entered an Interim Order (A) Authorizing The Debtors To Obtain Super-Priority Senior Secured Postpetition Financing, (B) Authorizing The Debtors To Use Cash Collateral of Existing Secured Lenders, On A Limited Basis, (C) Providing Related Adequate Protection, and (D) Prescribing The Form and Manner of Notice And Setting The Time For The Final Hearing [Docket No. 37], and on October 22, 2008, the Court entered a Final Order (A) Authorizing the Debtors to obtain Super-Priority Senior Secured Post-Petition Financing, (B) Authorizing the Debtors to Use Cash Collateral of Existing Secured Creditors, on a Limited Basis, and (C) Providing Related Adequate Protection (the "Final Junior DIP Order") [Docket No. 113].

12.    Pursuant to the Final Junior DIP Order, certain holders (the "Junior Secured DIP Lenders") of the Debtors' Senior Bonds (as defined below) provided debtor-in-possession financing ("Junior Secured DIP Financing") to the Debtors, which was junior in priority, and subject, to the Revolving Credit Obligations and all related adequate protection liens and claims in favor of the Revolving Credit Lenders.

C.    Senior Secured Notes

13.    According to the Goodwin Affidavit, on March 30, 2006, the Selling Debtor and HRP Myrtle Beach Capital Corp. (collectively, the "Issuers") issued Floating Rate Senior Secured Notes due 2012 (the "Senior Bonds") in the aggregate principal amount of $155,000,000.  DBTCA is the trustee of the Senior Bonds.  Interest on the Senior Bonds accrues at a variable annual rate of the six-month LIBOR rate, plus 4.75% and is reset semi-annually.  The interest rate on the Senior Bonds as of June 30, 2008 was 7.38%.  Interest payments are due semi-annually on April 1 and October 1 of each year.  The Senior Bonds were guaranteed by HRP Myrtle Beach Holdings, LLC, We Got Your Back Security Co., LLC,

-6-

and the existing and future wholly-owned domestic subsidiaries of the Issuers (collectively, the "Bond Guarantors"). The Senior Bonds are secured by a first priority lien on all amounts on deposit in the Senior Bonds interest reserve account (the "Senior Interest Reserve Account")[4] and a second priority lien on substantially all of the Issuers' existing and future assets, including the land and improvements of the Park and equity interests in the Issuers' subsidiaries. As of the Petition Date, the Issuers were current on their interest payments and the total amount due under the Senior Bonds was $155,000,000.

### D.    Swap Agreement

14. According to the Goodwin Affidavit, in March 2006, HRP Myrtle Beach Operatings, LLC entered into an Interest Rate Swap Agreement (the "Swap") in order to manage risk associated with the variable interest rate associated with the Senior Bonds. The Swap fixed the interest rate on the Senior Bonds at a maximum of 10.5% for a three-year period. As of June 30, 2008, the Swap was recorded as a liability of $3,613,701.

### E.    Junior Secured Bonds

15. On March 30, 2006, the Issuers issued 12.5% Junior Secured Notes due 2013 (the "Junior Bonds") in the aggregate amount of $100,000,000. Interest on the Junior Bonds accrues at a fixed annual rate of 12.5% and payments are due semi-annually on April 1 and October 1 of each year. The Junior Bonds have been guaranteed by the Bond Guarantors. The Junior Bonds are secured by a first priority lien on all amounts on deposit in the interest reserve account established for the Junior Bonds (the "Junior Interest Reserve Account") and a third priority lien on substantially all of the Issuers' existing and future assets, including the land and

---

[4]    The APA does not transfer any interest, or otherwise affect the Senior Interest Reserve Account or the Junior Interest Reserve Account (as defined herein).

improvements of the Park, and equity interests in the Issuers' subsidiaries. As of the Petition Date, the Issuers were current on their interest payments and the total amount due under the Junior Bonds was $100,000,000.

       F.     PIK Notes

16.    According to the Goodwin Affidavit, on March 30, 2006, HRP Myrtle Beach Holdings, LLC, HRP Myrtle Beach Holdings Capital Corp., and HRP PIK Corp. issued 50,000 units, each consisting of (i) $1,000 aggregate principal amount of 14.5% Senior Pay-in-Kind Notes due 2014 co-issued by Holdings and Holdings Capital (the "PIK Bond Issuers"); and (ii) one share of Class B Common Stock of HRP PIK Corp. with a par value of $0.01 per share. As of the Petition Date, Holdings and Holdings Capital were current on their interest payments and the total amount due, including of all PIK Bonds issued by the PIK Bond Issuers, was $62,247,068.

       G.     Trade Debt

17.    According to the Goodwin Affidavit, as of the Petition Date, the Debtors estimated that they owed approximately $7.1 million for goods and services provided to them on an unsecured basis.

**Notice of Abandonment**

18.    On February 3, 2009, the Trustee filed a notice of abandonment of property of the estate [Docket No. 394] (the "Notice of Abandonment") by and through which the Trustee gave notice pursuant to Sections 105(a) and 554 of the Bankruptcy Code of abandonment of the Park, including but not limited to all related real property, all related equipment, all related inventory, and all related tangible personal property located at the Park and at the warehouse located at 568 George Bishop Parkway, Myrtle Beach, South Carolina from the Debtors'

-8-

bankruptcy estates as being burdensome to the estates and of inconsequential value and of no benefit to the estates given the lack of any value or equity in the Debtors' estates in excess of the liens and security interests held by creditors against the Park and related Assets. The Notice of Abandonment further provided that, if no objection or request for hearing is filed with the United States Bankruptcy Court for the District of Delaware and served on the Trustee's counsel within fifteen (15) days after the filing of the Notice of Abandonment, the Park and related Assets would be deemed abandoned by the Trustee from Debtors' bankruptcy estates.

19.     In the event that the proposed sale of the Purchased Assets as contemplated by this Sale Motion is approved, the Trustee intends to withdraw the Notice of Abandonment prior to February 18, 2009.

## Purchased Assets to Be Sold

20.     By and through the APA, the Trustee has agreed, subject to approval by the Bankruptcy Court, to sell all of the Selling Debtor's right, title and interest in, to and under, the following assets, properties and rights of the Selling Debtor located at or related to the Park (the "Purchased Assets"), to the Purchaser free and clear of all claims, liens, and encumbrances (other than encumbrances included in the Assumed Liabilities and Permitted Encumbrances):

a)     all real property owned by the Bankruptcy Estate, as set forth by legal description on Schedule 1.1(a) ("Owned Real Property") of the APA;

b)     to the extent assignable or transferable in accordance with the terms and conditions of the applicable Permits or applicable Law, all Permits and all pending applications therefor;

c)     all Documents used in respect of the Purchased Assets or Assumed Liabilities;

d)     all goodwill and other intangible assets generated or associated with the Purchased Assets;

-9-

e)    all Inventory and Equipment (including spare parts with respect thereto) (as set forth in Schedule 1.1(e)) of the APA, provided that Inventory branded with the Hard Rock Park, Hard Rock or other similar logos licensed from a third party shall not be transferred to the extent transfer of such Inventory is prohibited by the terms of the applicable license agreement and provided further that any Equipment branded with the Hard Rock Park, Hard Rock or other similar logos licensed from a third party shall be sold to the Purchaser subject to compliance with the applicable license agreement, removal of licensed materials or subsequent agreement with the applicable licensor);

f)    all rights, claims, credits, causes of action or rights of set-off against third parties relating to the Purchased Assets, including rights under vendor's, contractor's and manufacturer's warranties, indemnities and guaranties (but excluding (i) avoidance claims and causes of action under the Bankruptcy Code or similar state Law and (ii) claims and causes of action against directors, officers and employees of the Company other than any such claims or causes of action that arise out of any Contract that is a Purchased Asset);

g)    any counterclaims, setoffs or defenses that the Company may have with respect to any Assumed Liabilities;

h)    to the extent assignable or transferable in accordance with the terms and conditions of the applicable insurance policies or applicable Law, all of the Company's insurance policies and rights and benefits related to the Purchased Assets or Assumed Liabilities provided however that any coverage, rights or benefits under the liability policies with respect to claims arising out of or relating to any occurrence or event that happened prior to Closing shall continue to inure to the benefit of the Bankruptcy Estate notwithstanding the transfer under this provision; and

i)    all Contracts assigned to the Purchaser pursuant to Section 6.3 of the APA.

### Marketing of the Purchased Assets

21.    Prior to the Conversion Date, the Debtors and their professionals including Raymond James & Associates ("Raymond James"), marketed the Purchased Assets, however they were unable to find any parties willing to bid more than $20 million for the Purchased

Assets. Further, since the Conversion Date, Raymond James has continued to market the Purchased Assets to prospective purchasers.

22. Specifically, beginning in November 2008, Raymond James engaged in an extensive marketing process with regard to the sale of the Debtors' assets pursuant to section 363 of the Bankruptcy Code as follows: approximately two hundred and six (206) interested parties were contacted and confidentiality agreements were forwarded to one hundred and four (104) interested parties of which forty-six (46) interested parties returned executed confidentiality agreements. According to Raymond James, all of the interested parties were provided the opportunity to execute confidentiality agreements, and those interested parties that executed a confidentiality agreement were provided substantial information concerning, and access to, the Debtors, including, but not limited to, presentations and discussions with the Debtors' management; access to an extensive online data room containing detailed financial information, operating statistics, material agreements and other operational and financial information of the Debtors. Additionally, nine (9) of the interested parties conducted one or more on-site tours of the Park. Unfortunately, during the Chapter 11, the Debtors received no offers for the Purchased Assets which constituted qualified offers under the procedures established in the Chapter 11 Sale Motion Order.

23. Since the Conversion Date, Raymond James has worked to continue to market the Purchased Assets to interested parties as follows: forty-five (45) interested parties were contacted, including twenty-five (25) additional interested parties that were not previously contacted in the Chapter 11 sale process. Of the forty-five (45) interested parties that were contacted, thirty-nine (39) executed confidentiality agreements and were provided substantial information concerning the Debtors' assets. Additionally, thirteen (13) of the interested parties

-11-

conducted on-site tours of the Park since the conversion of the Chapter 11 cases to Chapter 7. To date, Raymond James has received formal offers from 11 of the interested parties for the Assets. The Purchaser's offer of $25,000,000 is the highest and best offer received by the Trustee for the Purchased Assets.

### Time is of the Essence

24.     The Purchaser has informed the Trustee that time is of the essence for the consummation of the sale and has required that the sale of the Purchased Assets close no later than February 20, 2009. The Senior Revolving Lenders have also required that the sale close as soon as possible.

25.     The Memorial Day holiday weekend, the first long weekend of the summer vacation season, is May 23 to 25, 2009. Many people take advantage of the three-day Memorial Day weekend to take a short vacation to a nearby destination. As a result, Memorial Day usually is a busy weekend for theme parks. Moreover, the publicity and "buzz" generated is important to marketing a theme park during the rest of the summer. The Purchaser has advised the Trustee that if the Park is not open Memorial Day weekend, the Purchaser will suffer a significant revenue loss which impacts the Purchaser's valuation model and willingness to offer the Purchase Price.

26.     The Purchaser expects that readying the Park for reopening will take at least ninety (90) days. There are numerous tasks that must be accomplished before the Park will be ready to reopen. Among other things, South Carolina safety regulations mandate annual maintenance of the Park's rides. These regulations include a requirement that the rides be disassembled, inspected and then reassembled. Selected rides must be re-vamped and new capital expenditures made. The rides and other equipment will need to be tested. Furthermore,

-12-

the Park's landscape and hardscape must be refurbished as necessary and a physical inventory of the goods and equipment made.

27.     In addition, a marketing and public relations plan must be designed and implemented. Merchandising must also be arranged. New attractions and shows must be designed and produced. Employees must be hired and trained. The food and beverage service must be planned and prepared. Systems must be planned and integrated.

28.     Finally, the Purchaser anticipates conducting a "soft opening" of the Park prior to the Memorial Day weekend. A soft opening is a private opening where friends and family and selected representative groups are invited to come experience the Park. This soft opening will permit management to test the park experience and to refine the operating strategy.

29.     In order to open the Park prior to the summer season, the Purchaser has required that the sale close no later than February 20, 2009. Section 2.1 of the APA provides that, in the event that the sale does not close by February 20, 2009, the Purchase Price shall be reduced by the sum of One Million Dollars ($1,000,000), and shall be further reduced in the amount of Fifty Thousand Dollars for each day after February 20, 2009 that the Closing does not occur.

30.     In an effort to have the sale consummated prior to February 20, 2009, contemporaneously with the filing of this motion, the Trustee has filed a motion to shorten notice to have this Sale Motion considered at a hearing on February 17, 2009 at 10:00 a.m. (the "Sale Approval Hearing"). Subject to approval of this Sale Motion, at the Sale Approval Hearing, the closing of the purchase and sale of the Purchased Assets shall take place at the offices of Cozen O'Connor, 1900 Market Street, Philadelphia, PA Philadelphia, PA 19103-3508 (or at such other place as the parties may designate in writing) no later than February 20,

-13-

2009, unless another time or date, or both, are agreed to in writing by the Trustee, the Purchaser, and the Senior Revolving Lenders.

**Sale Approval Hearing**

31.    At the Sale Approval Hearing, the Trustee will seek Court approval of the sale to the Purchaser or another party submitting the highest and best bid, free and clear of all liens, claims and encumbrances pursuant to 11 U.S.C. § 363, and except as otherwise specifically provided in the APA or the order approving the sale, all liens, claims and encumbrances to attach to the Sale Proceeds with the same validity and in the same order of priority as they attached to the Purchased Assets prior to the sale, including the assumption by the Debtors and assignment to the Prevailing Bidder(s) of the assumed Contracts and Leases pursuant to section 365 of the Bankruptcy Code.   The Trustee will submit and present additional evidence, as necessary, at the Sale Approval Hearing demonstrating that the sale to the Purchaser as provided in the APA is fair, reasonable and in the best interest of the Selling Debtor's estate and all interested parties.

**Assumption and Assignment of Certain Executory Contracts and Unexpired Leases**

32.    On January 16, 2009 and January 30, 2009, the Trustee filed motions to reject substantially all of the Selling Debtor's executory contracts and unexpired leases, including all personal property leases, real property leases, intellectual property agreements (to the extent such are executory contracts), licenses and trademark agreements (the "Motions to Reject") [Docket Nos. 364 and 389].   In the event that the Trustee does not withdraw the Motions to Reject as to any particular executory contracts and unexpired leases, such executory contracts and unexpired leases shall be rejected effective January 6, 2009.

-14-

33.    Pursuant to Section 6.3 of the APA, the Purchaser shall have until February 13, 2009, to designate the executory contracts or unexpired leases that the Purchaser desires deleted from the list of executory contracts to be rejected, in which case the Trustee shall withdraw the motion with respect to executory contracts and unexpired leases so designated by Purchaser.  On or before February 27, 2009, the Purchaser shall advise the Trustee which, if any, of the designated executory contracts and unexpired leases the Purchaser desires to have assigned to it.  The Trustee shall promptly file a motion seeking to assume and assign the designated executory contracts and unexpired leases to Purchaser and the Trustee shall use its commercially reasonable best efforts to have such motion heard by the Bankruptcy Court prior to March 7, 2009, and to file a motion requesting that any assignment to the Purchaser of any insurance policies is effective as of the Closing Date.  Further, the Purchaser may delete any executory contract or unexpired lease from the list of contracts and leases to be assigned to the Purchaser at any time prior to the assignment of such contract or lease to the Purchaser.

34.    The Purchaser shall be responsible for any payment necessary to cure any default on any contract or lease assigned to the Purchaser, and the Trustee agrees that the payment of such cure amounts is sufficient consideration for the assignment.  The Trustee agrees that Purchaser may contact any party to any of the Selling Debtor's executory contracts or unexpired leases to discuss with such party the assumption and assignment of such contract or lease to the Purchaser.  If the Purchaser designates a contract or lease for deletion from the list of executory contracts and unexpired leases to be rejected and subsequently elects not to have a designated contract(s) or lease(s) assigned to it, the Purchaser, if it is the successful purchaser of the Purchased Assets, shall pay to the Trustee the amount of any administrative expense incurred by the Bankruptcy Estate on account of such contract or lease during the

-15-

period commencing with the Conversion Date through the date of rejection of such contract or lease and in no event shall the Senior Revolving Lenders or their agents be responsible for such amounts.

### Distribution of Proceeds of Sale

35.    Upon consummation of the sale, the Trustee shall make distribution of the proceeds from the sale of the Purchased Assets, less normal and customary costs of closing, (including real estates taxes) and a net of an amount equal to (A) the amount of $1,273,250 for the benefit and use of the Bankruptcy Estate of the Selling Debtor, (B) the fees and expenses of Raymond James with respect to its role in the sale process, and (C) administrative expenses in an amount and subject to terms and documentation to be separately agreed between the Trustee and the Senior Revolving Lenders, to pay (and shall pay directly to) the Senior Revolving Lenders until their claims are paid in full, including, without limitation, claims for any and all principal, unpaid hedging obligations, interest, attorneys' fees and expenses and advances made during the Chapter 7 Case, in each case, to the fullest extent provided under the Pre-Petition Loan Documents (as defined in the APA).  In the event that any proceeds from the sale of the Purchased Assets remain after the claims of the Senior Revolving Lenders have been paid in full, such proceeds shall be delivered to the Trustee for distribution among the creditors of the Selling Debtor's bankruptcy estate in accordance with the order of priority applicable to their claims.

36.    The aforesaid distribution of proceeds from the sale of Purchased Assets (A) in the amount of $1,273,250 for the benefit and use of the Bankruptcy Estate of the Selling Debtor, (B) the fees and expenses of Raymond James with respect to its role in the sale process, and (C) administrative expenses in an amount and subject to terms and documentation

-16-

to be separately agreed between the Trustee and the Senior Revolving Lenders, are being made by the Senior Revolving Lenders as advances for the payment of expenses in accordance with the Pre-Petition Loan Documents (as defined in the APA). The expenses funded to date by the Senior Revolving Lenders since the Conversion Date which would constitute administrative expenses are in the amount of $564,000, including but not limited to items such as insurance, electric, real estate taxes, water and sewer charges, and payroll for security, maintenance and management personnel. There are additional expenses of an administrative nature which are anticipated to be incurred in the approximate amount of $300,000 prior to the Closing.

## RELIEF REQUESTED

37.    The Trustee requests entry of an order, a copy of which is attached hereto as Exhibit "B" (i) approving the sale of the Purchased Assets to the Purchaser pursuant to sections 105, 363, and 365 of the Bankruptcy Code, in accordance with the terms and conditions[5] of the APA, (ii) authorizing the Trustee to enter into the APA and take all actions necessary to consummate the sale of the Purchased Assets, and (iii) establishing a procedure for the assumption and assignment of certain executory contracts and unexpired leases designated by the Purchaser.

## BASIS FOR RELIEF REQUESTED

### A.    The Sale of the Purchased Assets is Authorized by Section 363 and is a Sound Exercise of the Trustee's Business Judgment

38.    Section 363 of the Bankruptcy Code provides that a trustee, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Although section 363 of the Bankruptcy Code does not specify a

---

[5]    Attached as Exhibit "C" hereto are the highlighted provisions of the APA as required by Local Rule 6004-1.

standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, a sale of a debtor's assets should be authorized if a sound business reason exists for doing so. See, e.g., Meyers v. Martin (In re Martin), 91 F.3d 289, 295 (3d Cir. 1996), citing Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 515 (7th Cir. 1990; In re Abbotts Dairies of Pennsylvania, Inc., 788 P.2d 143 (2d Cir. 1986); In re Titusville Country Club, 128 BR. 396 (W.D. Pa. 1991); In re Delaware & Hudson Railway Co., 124 BR. 169, 176 D. Del. 1991); see also Official Committee of Unsecured Creditors v. The LTV Corp. (In re Chateaugay Corp.), 973 P.2d 141, 143 (2d Cir, 1992); Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir, 1983); Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). The Delaware & Hudson Railway court rejected the pre-Code "emergency" or "compelling circumstances" standard, finding the "sound business purpose" standard applicable and, discussing the requirements of that test under McClung and Lionel, observed that:

> [a] non-exhaustive list of factors to be considered in determining if there is a sound business purpose for the sale include: the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the likelihood that a plan of reorganization will be proposed and confirmed in the near future; the effect of the proposed disposition of the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the property; and whether the asset is decreasing or increasing in value. 124 B.R. at 176.

39.    The business judgment rule shields a trustee from judicial second-guessing. Johns-Manville Corp., 60 B.R. at 615-16 ("a presumption of reasonableness attaches to a debtor's management decisions"). Once a debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors

-18-

of a corporation acted on an informed basis, in good faith and in the honest belief that the

action was in the best interests of the company." <u>Official Comm. of Subordinated Bondholders</u>

<u>v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)</u>, 147 B.R. 650, 656 (S.D.N.Y.

1992) (quoting <u>Smith v. Van Gorkom</u>, 488 A.2d 858, 872 (Del. 1985)).  Thus, if a trustee's

actions satisfy the business judgment rule, then the transaction in question should be approved

under section 363(b)(1).  Indeed, when applying the "business judgment" standard, courts

show great deference to a trustee's business decisions.  <u>See</u> <u>Pitt v. First Wellington Canyon</u>

<u>Assocs. (In re First Wellington Canyon Assocs.)</u>, 1989 WL 106838, at *3 (N.D. Ill. 1989)

("Under this test, the debtor's business judgment . . . must be accorded deference unless shown

that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained

discretion.").

      40.    As set forth above, the Trustee has determined that the best method of

preserving the value of the Selling Debtor's assets is through a sale.  The fairness and

reasonableness of the consideration to be paid by the Purchaser has been demonstrated after a

lengthy "market exposure" of the Purchased Assets, and an open and fair process by and

through which the Debtors and the Trustee have sought to establish the highest and best value

of the Purchased Assets.  After significant efforts, the Trustee has determined in his business

judgment, and subject to higher and better offers, that the offer of the Purchaser as set forth in

the APA realizes the highest value for the Purchased Assets.

    **B.**      **The Sale of the Purchased Assets Free and Clear of Liens and Other**
             **Interests is Authorized by Section 363(f)**

      41.    The Trustee further submits that it is appropriate to sell the Purchased Assets

free and clear of liens pursuant to section 363(f) of the Bankruptcy Code.  Section 363(f) of the

WILMINGTON\84588\10 099997.000
2/10/09 1:28 AM

Bankruptcy Code authorizes a trustee to sell assets free and clear of liens, claims, interests and encumbrances if:

a) applicable nonbankruptcy law permits sale of such property free and clear of such interests;

b) such entity consents;

c) such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

d) such interest is in bona fide dispute; or

e) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.  11 U.S.C. §363(f).

42.    This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

43.    Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free and clear" of liens and interests.  In re Dundee Equity Corp., 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); In re Bygaph, Inc., 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same); Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met).

44.    The Trustee believes that one or more of the tests of section 363(f) are satisfied with respect to the transfer of the Selling Debtor's assets pursuant to the APA.  In particular,

the Trustee believes that at least section 363(f)(2) will be met in connection with the transactions proposed under the APA because each of the parties holding liens on the Selling Debtor's Assets will consent or, absent any objection to this motion, will be deemed to have consented to the sale. Any lienholder also will be adequately protected by having their liens, if any, in each instance against the Selling Debtor or its estate, except as otherwise specifically provided in the APA or the order approving the sale attach to the Sale Proceeds ultimately attributable to the Purchased Assets in which such creditor alleges an interest, in the same order of priority, with the same validity, force and effect that such creditor had prior to the sale, subject to any claims and defenses the Selling Debtor and its estate may possess with respect thereto. Accordingly, section 363(f) authorizes the transfer and conveyance of the Selling Debtor's assets free and clear any such claims, interests, liabilities or liens.

45.    Although section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined anywhere in the Bankruptcy Code. Folger Adam Security v. DeMatteis/MacGregor JV, 209 F.3d 252, 257 (3d Cir. 2000). In the case of In re Trans World Airlines, Inc., 322 F.3d 283, 288-89 (3d Cir. 2003), the Third Circuit specifically addressed the scope of the term "any interest." The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in rem interests in property," the trend in modern cases is towards "a more expansive reading of 'interests in property' which 'encompasses other obligations that may flow from ownership of the property.'" Id. at 289 (citing 3 Collier on Bankruptcy 363.06[1]). As determined by the Fourth Circuit in In re Leckie Smokeless Coal Co., 99 F.3d 573, 581-582 (4th Cir. 1996), a case cited with approval and extensively by the Third Circuit in Folger, supra, the scope of section 363(f) is not limited to in rem interests. Thus, the Third Circuit in Folger stated that

-21-

Leckie held that the debtors "could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute." Folger, 209 F.3d at 258.

46.    Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes such assets free from successor liability resulting from pre-existing claims. See The Ninth Avenue Remedial Group v. Allis-Chalmers Corp., 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); MacArthur Company v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear under section 363(f) of the Bankruptcy Code); In re New England Fish Co., 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale included free and clear of Title VII employment discrimination and civil rights claims of debtor's employees); In re Hoffman, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any interest permissible even though the estate had unpaid taxes); American Living Systems v. Bonapfel (In re All Am. Of Ashburn, Inc.), 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product liability claims precluded on successor doctrine in a sale of assets free and clear); WBO Partnership v. Virginia Dept. of Medical Assistance Servs. (In re WBO Partnership), 189 B.R. 97, 104-05 (Bankr. E.D. Va. 1995) (Commonwealth of Virginia's right to recapture depreciation is an "interest" as used in section 363(f)).[6] The purpose of an order purporting to

---

[6]    Some courts, concluding that section 363(f) of the Bankruptcy Code does not empower them to convey assets free and clear of claims, have nevertheless found that section 105(a) of the Bankruptcy Code provides such authority. See Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (stating that the absence of specific authority to sell assets free and clear of claims poses no impediment to such a sale, as such authority is implicit in the court's equitable powers when necessary to carry out the provisions of title 11).

-22-

authorize the transfer of assets free and clear of all "interests" would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against the purchaser arising from the Selling Debtor's pre-sale conduct.  Under section 363(f) of the Bankruptcy Code, the purchaser is entitled to know that the Selling Debtor's assets are not infected with latent claims that will be asserted against the purchaser after the proposed transaction is completed. Accordingly, consistent with the above-cited case law, the order approving the sale should state that the Purchaser (or highest and best bidder) is not liable as a successor under any theory of successor liability, for claims that encumber or relate to the Selling Debtor's assets.

    **C.**    **No Need to Establish Bidding Procedures or Conduct an Auction Prior to the Sale Approval Hearing**

47.    The Trustee believes that the Selling Debtor's estate will obtain the maximum recovery for its creditors notwithstanding that the Trustee is not seeking approval of bidding procedures or an auction process prior to the Sale Approval Hearing.  The Debtors and the Trustee already have taken significant steps to identify potential purchasers.

48.    As set forth in Section 7.7 of the APA, effective February 11, 2009, the Trustee, the Senior Revolving Lenders and all officers, directors, employees, agents and representatives (including any investment banker, financial advisor, attorney, accountant or other representative) of the Trustee or the Senior Revolving Lenders cannot directly or indirectly (i) solicit, initiate, encourage, facilitate (including by way of furnishing information) or take any other action designed to facilitate any inquiries or proposals regarding any merger, share exchange, consolidation, sale of assets, sale of shares of capital stock (including by way of a tender offer) or similar transactions involving the Selling Debtor's  bankruptcy estate for any of the Purchased Assets (ii) participate in any discussions or negotiations regarding an alternative transaction for any of the Purchased Assets, or (iii) enter into any agreement

-23-

regarding any alternative transaction for any of the Purchased Assets.    Such non-solicitation

provision provides that the Trustee at the hearing on this Motion may respond to inquiries from

Qualified Bidders (as defined in the APA) by providing information that is not confidential

information.

49.    As set forth above, the Debtors, the Trustee and their respective professionals,

have already extensively marketed the Purchased Assets, and based upon the limited offers

received, the Trustee believes that the Purchaser's offer is likely to be the highest and best offer

for the Purchased Assets.    In the event that another interested party submits a bid for the

Purchased Assets at the Sale Approval Hearing, the Trustee will conduct an auction among all

interested purchasers present at the Sale Approval Hearing to determine the highest and best

offer for the Purchased Assets.

**D.    Backup Credit Bid**

50.    While the Trustee fully expects the Purchaser to honor its contractual

obligations under the APA, the Trustee believes that the presence of a backup bid will further

incentivize the parties to promptly consummate the proposed transaction. Pursuant to Section

363(k) of the Bankruptcy Code, the Senior Revolving Lenders have the statutory right (but not

the obligation) to credit bid the full amount of the Revolving Credit Obligations and the

Hedging Obligations in exchange for the Purchased Assets, free and clear of all liens, claims

and encumbrances and with all the attendant rights, benefits and protections proposed to be

afforded to the Purchaser.  Accordingly, the Trustee requests that it be authorized, if the APA

is validly terminated in accordance with its terms (or if a sale is delayed so that the Purchase

Price is reduced to below $22 million), to sell and convey the Purchased Assets to the Senior

Revolving Lenders (at their election) on a full credit bid basis.  The Trustee and the Senior

Revolving Lenders have agreed that in the event of a consummation of a credit bid, the administrative expense payments (including the payment of $1,273,250 for the benefit and use of the Bankruptcy Estate) outlined above in the event of a cash sale to the Purchaser (other than the payment to Raymond James, which will be addressed separately) will be made in the event a credit bid transaction is consummated. Accordingly, given the enhanced incentive to closing the proposed cash sale transaction to the Purchaser, and the additional benefit to the estate in the form of the outlined administrative expense payments, the Trustee believes that the approval of the backup credit bid (to the extent the Senior Revolving Lenders elect their option to proceed with the credit bid) in the circumstances outlined above is fair, reasonable and in the best interests of the estates of the Debtors.

### E.    Assumption and Assignment of Certain Executory Contracts and Unexpired Leases

51.    Section 365(a) of the Bankruptcy Code provides a trustee "subject to the court's approval may assume or reject any executory contracts or unexpired leases of the debtor." 11 U.S.C. § 365(a). Upon finding that the Trustee has exercised his sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code. See Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.), 78 F.3d 18, 25 (2d Cir. 1996); Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993).

52.    Section 365(b) of the Bankruptcy Code requires that a trustee meet certain additional requirements to assume a lease:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contact or lease, the trustee—

WILMINGTON\84588\10  099997.000
2/10/09 1:28 AM

     (1)     cures, or provides adequate assurance that the trustee will promptly cure, such default;

     (2)     compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

     (3)     provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b). This section does not apply to a default that is a breach of a provision relating to:

     (4)     the insolvency or financial condition of the debtor at any time before the closing of the case;

     (5)     the commencement of a case under this title;

     (6)     the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement; or

     (7)     the satisfaction of any penalty rate or provision relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the executory contract or unexpired lease.

11 U.S.C. § 365(b)(2).

     53.     Pursuant to section 365(f)(2) of the Bankruptcy Code, a trustee may assign an executory contract or unexpired lease of nonresidential real property if:

     (1)     the trustee assumes such contract or lease in accordance with the provisions of this section; and

     (2)     adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

     54.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."

-26-

See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr.

D.N.J. 1989); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985)

(adequate assurance of future performance does not mean absolute assurance that debtor will

thrive and pay rent); In re Bon Ton Rest. & Pastry Shop, Inc., 53 B.R. 789, 803 (Bankr. N.D.

Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall

considerably short of an absolute guarantee of performance.").

      55.    Among other things, adequate assurance may be given by demonstrating the

assignee's financial health and experience in managing the type of enterprise or property

assigned. In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance

of future performance is present when prospective assignee of lease has financial resources and

expressed willingness to devote sufficient funding to business to give it strong likelihood of

succeeding; chief determinant of adequate assurance is whether rent will be paid).

      56.    The Trustee is seeking to establish a procedure by and through which the

Trustee may  assume and assign any executory contracts and unexpired leases designated by

the Purchaser (or higher and better bidder).  Specifically, the Trustee seeks approval of the

following schedule in connection with the assumption or assignment of any executory

contracts or unexpired leases :

      (a)    On or before February 27, 2009, the Purchaser shall advise the
Trustee which, if any, of the designated executory contracts and unexpired
leases the Purchaser desires to have assigned to it.

      (b)    No later than February 28, 2009, the Trustee shall promptly file a
motion seeking to assume and assign the designated executory contracts
and unexpired leases to Purchaser (the "Assumption and Assignment
Motion"), and the Trustee shall serve a copy of the Assumption and
Assignment Motion upon all nondebtor parties to all executory contracts
and unexpired leases designated by the Purchaser for assumption and
assignment to the Purchaser.   The Trustee shall include with the service
of the Assumption and Assignment Motion, a copy of financial documents

-27-

evidencing the Purchaser's financial credibility, willingness and ability of the Purchaser to perform under the designated executory contracts and unexpired leases.

(c)    All nondebtor parties to any executory contracts and unexpired leases designated to be assumed and assigned to the Purchaser by and through the Assumption and Assignment Motion shall have until March 5, 2009 to file an objection to the proposed assumption and assignment of any executory contracts and unexpired leases to which it is a party.

(d)    The Bankruptcy Court shall consider the Assumption and Assignment Motion at a hearing on or prior to March 6, 2009, and any objections thereto.    At the hearing to consider the Assumption and Assignment Motion, the Trustee will present evidence to prove the Purchaser's financial credibility, willingness and ability to perform under the designated executory contracts and unexpired leases, and the Court and other interested parties therefore will have the opportunity to evaluate the Purchaser's ability to provide adequate assurance of future performance under the contracts or leases, as required by section 365(b)(1)(C) of the Bankruptcy Code.

57.    The Trustee respectfully submits that that these proposed procedures are in the best interests of the Debtors, their estates, and their creditors while satisfying the due process requirements for all parties to all nondebtor parties to executory contracts and unexpired leases which may be designated for assumption and assignment by the Purchaser.

**F.    The Purchaser should be Afforded All Protections Under Section 363(m) as a Good Faith Purchaser**

58.    Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from the debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal.  Specifically, section 363(m) states that:

The reversal or modification on appeal of an authorization under [section 363(b)] ... does not affect the validity of a sale ... to an entity that purchased ... such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale were stayed pending appeal.

-28-

11 U.S.C. § 363(m).  Section 363(m) "fosters the 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'"  In re Chateaugay Corp., 1993 U.S. Dist. Lexis 6130, *9 (S.D.N.Y. 1993) (quoting In re Abbotts Dairies of Penn., Inc., 788 F.2d 143, 147 (3d Cir. 1986)).  See also Allstate Ins. Co. v. Hughes, 174 BR. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); In re Stein & Day, Inc., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

59.    The selection of the Purchaser is the product of arm's-length, good faith negotiations in a lengthy purchasing process.  The Trustee intends to request at the Sale Approval Hearing a finding that the Purchaser (or party submitting a higher and better bid) is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

### G.    Relief from the Ten Day Waiting Period Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate.

60.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property. . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."  Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease. . .is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise."  The Trustee requests that the Order be effective immediately by providing that the ten (10) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

61.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  <u>See</u> Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the ten (10) day stay period, Collier suggests that the ten (10) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."  10 <u>Collier on Bankruptcy</u> 15th Ed. Rev., ¶ 6064.09 (L. King, 15th rev. ed. 1988).  Furthermore, <u>Collier on Bankruptcy</u> provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  <u>Id.</u>

62.    The Trustee hereby requests that the Court waive the ten-day stay period under Bankruptcy Rules 6004(h) and 6006(d) or, in the alternative, if an objection to the sale is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal.

### Notice

63.    Notice of this Motion has been provided to (a) the United States Trustee; (b) counsel to the administrative agents for the Debtors' prepetition secured lenders; (c) counsel to the Debtors' postpetition lenders; (d) counsel for the Junior DIP Lenders; (e) counsel for the Senior Indenture Trustee; (f) counsel for the Junior Indenture Trustee; (g) counsel for the Revolving Credit Agent and Senior Post-Petition Agent; (h) counsel to the Debtors; (i) creditors holding the twenty (20) largest unsecured claims against the each of the Debtors as included in the Debtors' Chapter 11 Schedules or their legal counsel, if known; (j) unsecured

creditors with a scheduled claim in excess of $25,000 as identified in the Selling Debtor's Schedules; (k) any known secured creditors as listed in Schedule D of the Debtors' Chapter 11 Schedules; (l) parties as listed in Schedule G of the Debtors' Chapter 11 Schedules; (m) all persons or entities known or reasonably believed to have asserted a Lien in any of the Purchased Assets; (n) the United States Department of Justice; (o) counsel to the Purchaser; (p) all persons or entities known or reasonably believed to have expressed an interest in acquiring the Purchased Assets; (q) the Attorney General for the State of South Carolina; (r) the United States Environmental Protection Agency; (s) South Carolina Environmental Regulator; (t) Internal Revenue Service; (u) South Carolina Department of Revenue; (v) South Carolina Dept. of Labor, Licensing and Regulation; (w) Horry County Treasurer's Office; (x) Horry County Property Assessor; (y) City of Myrtle Beach, Administration; and (z) any party who has requested notice and service of papers pursuant to Bankruptcy Rule 2002. In light of the nature of the relief herein, the Trustee respectfully submits that no further notice of this Motion is required.

WHEREFORE, the Trustee respectfully requests that the Court enter order, a copy of which is attached hereto: (i) approving the sale of the Purchased Assets to the Purchaser, subject to higher and better offers, (ii) authorizing the Trustee to enter into the APA and take all actions necessary to consummate the sale of the Purchased Assets, (iii) establishing a procedure for the assumption and assignment of certain executory contracts and unexpired leases designated by the Purchaser, and (iv) granting such other and further relief as the Court may deem proper.

WILMINGTON\84588\10  099997.000
2/10/09 1:28 AM

Dated:  February 10, 2009
      Wilmington, Delaware

COZEN O'CONNOR

/s/ John T. Carroll, III

John T. Carroll, III (DE No. 4060)
Jeffrey R. Waxman (DE No. 4159)
1201 North Market Street
Suite 1400
Wilmington, DE  19801
Telephone:  (302) 295-2028
Facsimile:  (302) 295-2013

Counsel to the Chapter 7 Trustee,
Alfred T. Giuliano

-32-