

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**FPI MB Entertainment LLC**

**as Purchaser,**

**and**

**ALFRED GIULIANO,**

**as Chapter 7 Trustee on behalf of the bankruptcy estate of**

**HRP Myrtle Beach Operations, LLC**

**Dated as of February 9, 2009**

# TABLE OF CONTENTS

**Page**

ARTICLE I. PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES.......... 1

    1.1    Purchase and Sale of Assets.................................................................... 1

    1.2    Excluded Assets.................................................................................... 3

    1.3    Assumption of Liabilities...................................................................... 4

    1.4    Excluded Liabilities ............................................................................. 4

    1.5    "As Is" Transaction.............................................................................. 5

ARTICLE II. CONSIDERATION.......................................................................... 5

    2.1    Consideration ....................................................................................... 5

ARTICLE III. DEPOSIT, CLOSING AND TERMINATION ................................... 6

    3.1    Deposit ................................................................................................. 6

    3.2    Closing ................................................................................................. 6

    3.3    Closing Deliveries by the Trustee.......................................................... 6

    3.4    Closing Deliveries by the Purchaser ...................................................... 7

    3.5    Termination of Agreement..................................................................... 7

    3.6    Procedure Upon Termination.................................................................. 8

    3.7    Effect of Termination............................................................................ 8

ARTICLE IV. REPRESENTATIONS AND WARRANTIES OF THE TRUSTEE................... 9

    4.1    Authority Relative to This Agreement.................................................... 9

    4.2    Brokers and Finders ............................................................................. 9

    4.3    Absence of Certain Developments

    4.4    Regulatory Matters; Permits

    4.5    Title to Assets

    4.6    Real Property

    4.7    Environmental Matters

ARTICLE V. REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ............. 11

    5.1    Corporate Organization and Qualification............................................. 11

    5.2    Authority Relative to This Agreement.................................................... 12

    5.3    Consents and Approvals; No Violation; No Litigation ....................... 12

    5.4    Brokers and Finders ............................................................................. 13

    5.5    Investigation........................................................................................ 13

ARTICLE VI. BANKRUPTCY COURT MATTERS ................................................. 13

    6.1    Sale Order ............................................................................................ 13

ARTICLE VII. COVENANTS AND AGREEMENTS ............................................... 15

# TABLE OF CONTENTS
## (continued)

| | | | |
|---|---|---|---|
| 7.1 | Restricted Activity | 15 |
| 7.2 | Access to Information | 16 |
| 7.3 | Further Agreements | 17 |
| 7.4 | Preservation of Records | 17 |
| 7.5 | Publicity | 18 |
| 7.6 | Notification of Certain Matters | 18 |
| ARTICLE VIII. CONDITIONS TO CLOSING | | 20 |
| 8.1 | Conditions Precedent to the Obligations of the Purchaser and the Trustee | 20 |
| 8.2 | Conditions Precedent to the Obligations of the Trustee | 20 |
| 8.3 | Conditions Precedent to the Obligations of the Purchaser | 21 |
| 8.4 | Frustration of Closing Conditions | 22 |
| ARTICLE IX. ADDITIONAL DEFINITIONS | | 22 |
| 9.1 | Certain Definitions | 22 |
| ARTICLE X. TAXES | | 29 |
| 10.1 | Additional Tax Matters | 29 |
| ARTICLE XI RISK OF LOSS | | 24 |
| ARTICLE XII. MISCELLANEOUS | | 30 |
| 11.1 | Payment of Expenses | 30 |
| 11.2 | Survival of Representations and Warranties; Survival of Covenants | 31 |
| 11.3 | Entire Agreement; Amendments and Waivers | 31 |
| 11.4 | Counterparts | 31 |
| 11.5 | Governing Law | 31 |
| 11.6 | Jurisdiction, Waiver of Jury Trial | 31 |
| 11.7 | Notices | 32 |
| 11.8 | Binding Effect; Assignment | 33 |
| 11.9 | Severability | 34 |
| 11.10 | Non-Recourse | 34 |
| 11.11 | Certain Interpretations | 34 |

## EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Bill of Sale |
| Exhibit B | Form of Sale Order |
| Exhibit C | Form of Deposit Escrow Agreement |

## SCHEDULES

| | |
|---|---|
| Schedule 1.1(a) | Owned Real Property |
| Schedule 1.1(e) | Inventory and Equipment |
| Schedule 1.2(m) | Excluded Properties and Assets |
| Schedule 1.3(d) | Assumed Liabilities |
| Schedule 1.4(j) | Excluded Liabilities |
| Schedule 2.1(a) | Bank Account |
| Schedule 4.3 | Absence of Certain Developments |
| Schedule 4.4(a) | Material Permits |
| Schedule 4.6(a) | Owned Real Property |
| Schedule 4.6(b) | Leased Real Property |
| Schedule 4.6(c) | Leasehold Interests Conveyed |
| Schedule 7.1 | Conduct of Business |
| Schedule 9.1(ss) | Permitted Encumbrances |

## ASSET PURCHASE AGREEMENT

**ASSET PURCHASE AGREEMENT** (this "Agreement"), dated as of February __, 2009 (the "Execution Date"), is made and entered into by and between Alfred Giuliano, in his capacity as the Chapter 7 Trustee appointed in the Chapter 7 Case (as defined below) (the "Trustee") on behalf of the bankruptcy estate of HRP Myrtle Beach Operations, LLC, a Delaware limited liability company (the "Company"), and FPI MB Entertainment LLC, a Delaware limited liability company (the "Purchaser"). Certain capitalized terms used herein are defined in Article IX.

### RECITALS

WHEREAS, the Trustee is the Chapter 7 Trustee appointed on behalf of the bankruptcy estate of the Company (the "Bankruptcy Estate") in connection with certain pending bankruptcy cases under chapter 7 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), in each case, in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), Case No. 08-12193 (as jointly administered, collectively, the "Chapter 7 Case"); and

WHEREAS, in connection with the Chapter 7 Case and subject to the terms and conditions contained herein and following the entry of the Sale Order (as defined herein) and subject to the terms and conditions thereof, the Trustee, on behalf of the bankruptcy estate of the Company, shall sell, transfer and assign to the Purchaser, and the Purchaser shall purchase and acquire from the Trustee, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, the Purchased Assets (as defined herein), and assume from the Trustee the Assumed Liabilities (as defined herein), all as more specifically provided herein and in the Sale Order.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Purchaser and the Trustee hereby agree as follows:

### ARTICLE I.

### PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

1.1    Purchase and Sale of Assets. Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions set forth in this Agreement and the Sale Order, the Purchaser shall purchase, acquire and accept from the Trustee, and the Trustee shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to the Purchaser, on the Closing Date, all of the Bankruptcy Estate's right, title and interest in, to and under, free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), all of the following assets, properties and rights of the Bankruptcy Estate located at or related to the Park, excluding the Excluded Assets (collectively, the "Purchased Assets"):

(a)    all real property owned by the Bankruptcy Estate, as set forth by legal description on Schedule 1.1(a) ("Owned Real Property");

(b)    to the extent assignable or transferable in accordance with the terms and conditions of the applicable Permits or applicable Law, all Permits and all pending applications therefor;

(c)    all Documents used in respect of the Purchased Assets or Assumed Liabilities;

(d)    all goodwill and other intangible assets generated or associated with the Purchased Assets;

(e)    all Inventory and Equipment (including spare parts with respect thereto) (as set forth in Schedule 1.1(e)), provided that Inventory branded with the Hard Rock Park, Hard Rock or other similar logos licensed from a third party shall not be transferred to the extent transfer of such Inventory is prohibited by the terms of the applicable license agreement and provided further that any Equipment branded with the Hard Rock Park, Hard Rock or other similar logos licensed from a third party shall be sold to the Purchaser subject to compliance with the applicable license agreement, removal of licensed materials or subsequent agreement with the applicable licensor);

(f)    all rights, claims, credits, causes of action or rights of set-off against third parties relating to the Purchased Assets, including rights under vendor's, contractor's and manufacturer's warranties, indemnities and guaranties (but excluding (i) avoidance claims and causes of action under the Bankruptcy Code or similar state Law and (ii) claims and causes of action against directors, officers and employees of the Company other than any such claims or causes of action that arise out of any Contract that is a Purchased Asset);

(g)    any counterclaims, setoffs or defenses that the Company may have with respect to any Assumed Liabilities;

(h)    to the extent assignable or transferable in accordance with the terms and conditions of the applicable insurance policies or applicable Law, all of the Company's insurance policies and rights and benefits related to the Purchased Assets or Assumed Liabilities provided however that any coverage, rights or benefits under the liability policies with respect to claims arising out of or relating to any occurrence or event that happened prior to Closing shall continue to inure to the benefit of the Bankruptcy Estate notwithstanding the transfer under this provision.

(i)    all Contracts assigned to the Purchaser pursuant to Section 6.3 of this Agreement.

Notwithstanding the foregoing, the transfer of the Purchased Assets pursuant to this Agreement and the Sale Order shall not include the assumption of any Liability related to the Purchased Assets unless Purchaser expressly assumes that Liability pursuant to Section 1.3 of this Agreement.

1.2    Excluded Assets. Notwithstanding anything to the contrary in this Agreement, in no event shall the Trustee be deemed to sell, transfer, assign or convey, or have caused to be sold, transferred, assigned, transferred or conveyed, and the Bankruptcy Estate shall retain all right, title and interest to, in and under all assets, properties, interests and rights of the Bankruptcy Estate not included in the Purchased Assets, including, without limitation, the following assets, properties, interests and rights of the Bankruptcy Estate (collectively, the "Excluded Assets"):

(a)    except as may be selected by Purchaser pursuant to Section 6.3, all Contracts including the leases to the Leased Real Property;

(b)    all Accounts Receivable;

(c)    all Cash and Cash Equivalents, whether on hand, in transit or in banks or other financial institutions, security entitlements, securities accounts, commodity contracts and commodity accounts;

(d)    all Documents (whether copies or originals) (i) to the extent they relate solely to any of the Excluded Assets or Excluded Liabilities or the organization, existence, capitalization or debt financing of the Company or of any controlling Affiliate of the Company, (ii) that the Company is required by Law to retain and is prohibited by Law from providing a copy of to the Purchaser or (iii) prepared primarily in connection with the transactions contemplated by this Agreement, including bids received from other parties;

(e)    all membership interests or other equity interests in the subsidiaries of the Company;

(f)    the Company's D&O policy and the Bankruptcy Estate's rights, claims, demands, proceedings, credits, causes of action or rights of set off thereunder and any letters of credit related thereto;

(g)    except as set forth in subsection 1.1(f), any avoidance claims or causes of action under the Bankruptcy Code or applicable state Law, including, without limitation, all rights and avoidance claims of the Bankruptcy Estate arising under Chapter 5 of the Bankruptcy Code with respect to the Excluded Assets;

(h)    all claims that the Bankruptcy Estate may have against any Person with respect to any other Excluded Assets;

(i)    the Bankruptcy Estate's rights under this Agreement;

(j)    all rights and interests of the Bankruptcy Estate with respect to any of the Company's employment agreements, severance agreements and the Company Plans (including any rights and interests relating to insurance policies offering coverage or benefits pursuant to any Company Plans);

(k)    all Tax assets of the Bankruptcy Estate;

(l)    all loans and other Indebtedness payable to the Bankruptcy Estate; and

(m)    the properties and assets set forth on Schedule 1.2(m).

1.3    Assumption of Liabilities. On the terms and subject to the conditions set forth in this Agreement and the Sale Order, the Purchaser shall assume, effective as of the Closing, and from and after the Closing the Purchaser shall pay, perform and discharge when due, only the following Liabilities and shall in no event assume any Liabilities of the Bankruptcy Estate not set forth in this Section 1.3 (collectively, the "Assumed Liabilities"):

(a)    any and all Liabilities arising out of the Purchaser's ownership of the Purchased Assets (including Liabilities in respect of any Contract assigned to Purchaser pursuant to Section 6.3) after the Closing Date;

(b)    any and all Liabilities for Taxes attributable to the Purchaser's ownership of the Purchased Assets or the Purchaser's operation of the Business, on or after the Closing Date;

(c)    all Liabilities from the operation of the maximum RPM ride after the Closing Date to the extent such operation violates or infringes the MINI Intellectual Property; and

(d)    all Liabilities set forth on Schedule 1.3(d).

1.4    Excluded Liabilities. Except as expressly provided in this Agreement and the Sale Order, the Purchaser shall not assume or be liable, nor be deemed to have assumed or be liable for, any Liability of the Bankruptcy Estate, the Company, or of any predecessor or Affiliate of the Company, that is not an Assumed Liability. The Excluded Liabilities shall remain the sole responsibility of and shall be retained, paid, performed and discharged solely by the Bankruptcy Estate. The term "Excluded Liabilities" means all Liabilities not expressly listed as Assumed Liabilities and includes, without limitation, the following Liabilities:

(a)    all Liabilities of the Company or the Bankruptcy Estate relating to or otherwise arising, whether before, on or after the Closing, out of, or in connection with the ownership, operation or conduct by the Company or the Bankruptcy Estate of the Purchased Assets and the Business prior to the Closing, other than to the extent assumed pursuant to Section 1.3(d);

(b)    all Liabilities of the Company or the Bankruptcy Estate relating to or otherwise arising, whether before, on or after the Closing, out of, or in connection with, any of the Excluded Assets;

(c)    all Liabilities of the Company or the Bankruptcy Estate in respect of Contracts except as provided in Section 6.3 with respect to Contracts as may be selected by Purchaser;

(d)    except as contemplated by Section 1.3(d), all Liabilities of the Company or the Bankruptcy Estate in respect of Indebtedness, whether or not relating to the Business;

(e)    any claims, demands, proceedings or causes of action against the Company subject to or covered by the Company's insurance policies;

(f)    all Liabilities under the Company Plans or in respect any of the Company's employment agreements and severance agreements;

(g)    any and all Liabilities for Taxes attributable to the ownership of the Purchased Assets or the operation of the Business prior to the Closing Date;

(h)    subject to Section 1.3(b), all Liabilities with respect to any pending Action or any Action commenced after the Closing and arising out of or relating to any occurrence or event happening prior to Closing;

(i)    any Liability of the Bankruptcy Estate arising out of or relating to the execution, delivery or performance of this Agreement or any of the other Trustee's Documents; and

(j)    all Liabilities set forth on Schedule 1.4(j).

1.5    "As Is" Transaction.    PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ARTICLE IV OF THIS AGREEMENT, THE TRUSTEE MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS.    WITHOUT IN ANY WAY LIMITING THE FOREGOING, THE TRUSTEE HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS.    PURCHASER FURTHER ACKNOWLEDGES THAT PURCHASER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE PURCHASED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE PURCHASED ASSETS AS PERMITTED IN THE SHORTENED TIME-FRAME OF THIS ASSET PURCHASE PROCESS AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE PURCHASED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE IV HEREOF, PURCHASER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, PURCHASER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

## ARTICLE II.

## CONSIDERATION

2.1    Consideration.

(a)    The aggregate consideration for the Purchased Assets payable by the Purchaser to the Trustee shall be Twenty-Five Million Dollars ($25,000,000.00) (the "Purchase Price"), which shall be payable by wire transfer of immediately available funds to the account identified by the Trustee on Schedule 2.1(a).  The Purchase Price shall be reduced by the sum

5

of One Million Dollars ($1,000,000) if the Closing does not occur on or before February 20, 2009 and shall be further reduced in the amount of Fifty Thousand Dollars for each calendar day after February 20, 2009 that the Closing occurs; provided however such purchase price reduction shall not occur if the failure to close arises solely out of act or failure to act by the Purchaser.  In the event the Closing does not occur on or before February 20, 2009, the Trustee and the Purchaser shall negotiate in good faith acceptable arrangements that will minimize any adjustment of the Purchase Price.

(b)    In addition to the foregoing consideration, as consideration for the grant, sale, assignment, transfer and delivery of the Purchased Assets, the Purchaser shall assume and discharge the Assumed Liabilities.

## ARTICLE III.

## DEPOSIT, CLOSING AND TERMINATION

3.1    Deposit.  The Purchaser submitted a deposit in the amount of Two Million, Three Hundred Thousand Dollars ($2,300,000.00) (the "Deposit").  The Deposit will be held by the Trustee in accordance with the terms and conditions of the Escrow Agreement attached hereto as Exhibit C.  The Deposit will be credited against the Purchase Price at the Closing and will otherwise be held and disbursed as provided in this Agreement.

3.2    Closing.  Subject to the satisfaction of the conditions set forth in Sections 8.1, 8.2 and 8.3 hereof or the waiver thereof by the party entitled to waive the applicable condition, the closing of the purchase and sale of the Purchased Assets, the delivery of the Purchase Price to the Trustee, the assumption of the Assumed Liabilities and the consummation of the other transactions contemplated by this Agreement (the "Closing") shall take place at the Wilmington, Delaware offices of Cozen O'Connor (or at such other place as the parties may designate in writing) on the date that is no later than the first Business Day following the entry of the Sale Order.  The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date."

3.3    Closing Deliveries by the Trustee.  At the Closing, the Trustee shall deliver to the Purchaser:

(a)    a duly executed bill of sale with respect to the Purchased Assets, substantially in the form attached hereto as Exhibit A;

(b)    a true and correct copy of the Sale Order;

(c)    duly executed transfer tax returns with respect to any transfer tax due on the sale of real property in South Carolina;

(d)    a duly executed deed in recordable form sufficient to convey good and marketable fee simple title to the Owned Real Property;

(e)    all other previously undelivered certificates, agreements and other documents of transfer or conveyance as may be reasonably requested by the Purchaser or are

otherwise required by this Agreement to be delivered by the Trustee at or prior to the Closing in connection with the transactions contemplated by this Agreement; and

(f)    the Trustee certificate required to be delivered pursuant to Section 8.3(b);

(g)    an affidavit duly executed by the Trustee stating that the Company is not a "foreign person" as defined Sec. 1445(b)(2) of the Internal Revenue Code of 1986, as amended

3.4    Closing Deliveries by the Purchaser.  At the Closing, the Purchaser shall deliver to (or at the direction of) the Trustee:

(a)    the officer's certificates required to be delivered pursuant to Sections 8.2(a);

(b)    duly executed transfer tax returns with respect to the any transfer tax due on the sale of real property in South Carolina; and

(c)    all other previously undelivered certificates, agreements and other documents of transfer or conveyance as may be reasonably requested by the Trustee or are otherwise required by this Agreement and the Purchaser's Documents to be delivered by the Purchaser at or prior to the Closing in connection with the transactions contemplated by this Agreement.

In addition, at the Closing, the Deposit will be released and delivered to the Trustee.

3.5    Termination of Agreement.  This Agreement may be terminated as follows:

(a)    by the mutual written consent of the Trustee and the Purchaser at any time prior to the Closing;

(b)    by the Trustee, if the Closing shall not have been consummated on the fifth Business Day following the entry of the Sale Order, or by the Purchaser, if the Closing shall not have been consummated on or prior to February 20, 2009 (the "Termination Date"); provided, however, that the right to terminate this Agreement under this Section 3.5(c) shall not be available to any party whose failure to fulfill any material obligation under this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or before such date;

(c)    by either the Purchaser or the Trustee, if there shall be any Law that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited, or there shall be in effect a final non-appealable order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; it being agreed that the parties hereto shall promptly appeal any adverse determination which is appealable (and pursue such appeal with reasonable diligence);

(d)    by the Purchaser, if the Chapter 7 Case is dismissed;

(e)    by the Purchaser on or prior to 5:00 p.m., Eastern Standard Time, on February 11, 2008 ("the "Diligence Date"), if its due diligence investigation with respect to the

7

Purchased Assets causes Purchaser to determine in Purchaser's sole discretion that it would be inadvisable to consummate the purchase;

(f)    by the Purchaser, if there shall be a breach by Seller of any representation, warranty, covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Section 8.3 and which breach is not reasonably capable of being cured such that the applicable condition is not capable of being satisfied prior to the Termination Date;

(g)    by the Trustee on or prior to 5:00 p.m., Eastern Standard Time, on February 11, 2008, if the Trustee has not reached a written agreement with the Senior Revolving Lenders regarding administrative expenses as contemplated by Section 6.2(iii)(C);

(h)    by the Trustee, if all of the conditions set forth in Sections 8.1 and 8.3 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing) or waived and the Purchaser fails to deliver the Purchase Price and/or pay the Deposit.

3.6    Procedure Upon Termination.  In the event of a termination of this Agreement by the Purchaser or the Trustee, or both, pursuant to Section 3.5: (a) written notice thereof shall be given promptly by the terminating party to the other party hereto, specifying the provision hereof pursuant to which such termination is made, (b) this Agreement shall thereupon terminate and become void and of no further force and effect and (c) the consummation of the transactions contemplated by this Agreement shall be abandoned without further action of the parties hereto. If this Agreement is terminated as provided herein, each party shall redeliver all documents, work papers and other material of any other party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the party furnishing the same.

3.7    Effect of Termination.  In the event that this Agreement is validly terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement effective as of the date of such termination and such termination shall be without Liability to the Purchaser or the Trustee; provided, however, that Section 3.5, Section 3.6, this Section 3.7 and Article XI shall survive any such termination and shall be enforceable hereunder; and provided, further, that in the event this Agreement is terminated, the Trustee shall be entitled to retain the Deposit in full and complete satisfaction of all of the Trustee's claims against Purchaser unless: (i) this Agreement was terminated pursuant to Sections 3.5(a), 3.5(c) or 3.5(g) or (ii) the Purchaser terminated this Agreement in accordance with any of Sections 3.5(b), 3.5(d), 3.5(e), 3.5(f) or Article XI, in which case the Deposit together with any interest accrued thereon shall be immediately returned to the Purchaser.  In no event shall any termination of this Agreement relieve any party hereto of any Liability for any willful breach of this Agreement by such party.

## ARTICLE IV.

## REPRESENTATIONS AND WARRANTIES OF THE TRUSTEE

The Trustee hereby represents and warrants in this Article IV to the Purchaser for itself and on behalf of the Company as of the Execution Date (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date) except as qualified or supplemented by sections in the Trustee Disclosure Schedule attached hereto, as the same may be amended or modified. Each such section of the Trustee Disclosure Schedule is numbered by reference to representations and warranties in a specific Section of this Article IV. The information disclosed in any numbered part of the Trustee Disclosure Schedule shall be deemed to be disclosed with respect to every other representation and warranty in this Article IV if such disclosure is reasonably apparent on its face. The Purchaser acknowledges that the Park has been closed since September 21, 2008 and that the representations and warranties below are qualified by that acknowledgement.

4.1     Authority Relative to This Agreement.   Except for such authorization as is required by the Bankruptcy Court, the Trustee has all requisite power, authority and legal capacity to (a) execute and deliver this Agreement, (b) execute and deliver the Trustee's Documents and (c) consummate the transactions contemplated hereby and under the Trustee's Documents. This Agreement has been, and at or prior to the Closing, the Trustee's Documents will be, duly and validly executed and delivered by the Trustee and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, and the entry of the Sale Order) this Agreement constitutes, and the Trustee's Documents when so executed and delivered will constitute, legal, valid and binding obligations of the Trustee, enforceable against the Trustee in accordance with their respective terms.

4.2     Brokers and Finders.   Except with respect to the engagement of Raymond James & Associates, Inc. and the Trustee's entitlement to statutory commissions awarded under the Bankruptcy Code, the Trustee has not employed any investment banker, broker, finder, consultant or intermediary in connection with the transactions contemplated by this Agreement which would entitle any of the Trustee's professionals any investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or the transactions contemplated hereby, and the Trustee covenants and agrees to pay any such fee or commission payable to Raymond James & Associates, Inc.

4.3     Absence of Certain Developments.   Except for actions taken in connection with the Chapter 7 Case, as contemplated or expressly required or permitted by this Agreement, or as set forth in Section 4.3 of the Trustee Disclosure Schedule, since the appointment of the Trustee, the Trustee has not acquired, sold, leased, transferred, assigned any Purchased Assets or entered into, accelerated, terminated, modified, amended or cancelled any agreement with respect to the Purchased Assets.

4.4     Regulatory Matters; Permits.

(a)     To the Knowledge of the Trustee, other than due to conflicts, breaches and defaults the enforcement of which will be stayed by virtue of the Chapter 7 Case, all of the

9

material Permits that are necessary for the operation of the Business as it was conducted by the Company and for the ownership of the Purchased Assets are held by the Bankruptcy Estate in full force and effect (collectively, the "<u>Material Permits</u>").    <u>Section 4.4(a)</u> of the Trustee Disclosure Schedule sets forth a true, complete and correct list of all Material Permits held by the Bankruptcy Estate as of the Execution Date.

(b)    Except for the commencement of the Chapter 7 Case and to the extent that enforcement with respect to such non-compliance is stayed as a result of the Chapter 7 Case, to the Knowledge of the Trustee, the Bankruptcy Estate is in compliance with its obligations under each of the Material Permits and the rules and regulations of the Governmental Body issuing such Material Permits, and no condition exists that without notice or lapse of time or both would constitute a default under, or a violation of, any Material Permit except for such failures to be in compliance or defaults that would not have, individually or in the aggregate, a material adverse effect on the Trustee's ability to own the Purchased Assets.

(c)    To the Knowledge of the Trustee, each Material Permit is valid and in full force and effect and there is no proceeding, notice of violation, order of forfeiture or complaint or investigation against the Trustee relating to any of the Material Permits pending or to the Knowledge of the Trustee, threatened, before any Governmental Body.

4.5    <u>Title to Assets</u>.    Other than due to conflicts, breaches and defaults the enforcement of which will be stayed by virtue of the filing of the Chapter 7 Case, at Closing, the Trustee will have (and shall convey to the Purchaser at the time of the transfer of the Purchased Assets to the Purchaser) good and marketable title or a valid leasehold interest in and to each of the Purchased Assets free and clear of all Encumbrances except Permitted Encumbrances.

4.6    <u>Real Property</u>.

(a)    <u>Section 4.6(a)</u> of the Trustee Disclosure Schedule sets forth a complete and correct list of all <u>Owned Real Property</u>.  Other than due to conflicts, breaches and defaults the enforcement of which will be stayed by virtue of the filing of the Chapter 7 Case, the Trustee has good and marketable title to the Owned Real Property, subject only to Permitted Encumbrances.

(b)    <u>Section 4.6(b)</u> of the Trustee Disclosure Schedule sets forth a complete and correct list of all Leased Real Property, if any, specifying the address or other information sufficient to identify all such Leased Real Property.

(c)    Except as set forth on <u>Section 4.6(c)</u> of the Trustee Disclosure Schedule, the Trustee has not leased or granted to any Person the right to access, enter upon, use, occupy, lease, manage, operate, maintain, broker or purchase any portion of Trustee's interest in the Owned Real Property, that is not otherwise a Permitted Encumbrance or that will not otherwise be terminated on or prior to the Closing Date.

(d)    To the Knowledge of the Trustee, the Trustee has not received any written notice of, oral notice of, condemnation or eminent domain proceedings pending or threatened that affect the Owned Real Property.  To the Knowledge of the Trustee, the Trustee has not received any written notice of any oral notice of, any zoning, ordinance, building, fire or health

code or other legal violation affecting any such Owned Real Property, except where any such violations would not have, individually or in the aggregate, a material adverse effect on the ability to operate the Business as it was operated by the Company.

(e)    To the Knowledge of the Trustee, there are no encroachments or other facts or conditions affecting any of the Owned Real Property that would be revealed by an accurate survey or inspection thereof, which encroachments, facts or conditions would have, individually or in the aggregate, a material adverse effect on the ability of the Trustee to operate the Business as it was operated by the Company. To the Knowledge of the Trustee, none of the buildings and structures on such Owned Real Property encroaches, in any material respect, upon real property of another Person or upon the area of any easement affecting the Owned Real Property.

4.7    Environmental Matters. To the Knowledge of the Trustee (a) the Trustee, the Company and/or the Bankruptcy Estate is in compliance with all Environmental Laws, (b) there is no material investigation, suit, claim, action or judicial or administrative proceeding relating to or arising under Environmental Laws that is pending or, to the Knowledge of the Trustee, threatened against the Trustee, the Company and/or the Bankruptcy Estate or any real property owned, operated or leased by the Trustee, the Company and/or the Bankruptcy Estate, or any of the Purchased Assets, (c) none of the Owned Real Property has been listed on the federal Comprehensive Environmental Response, Compensation Liability Information System (CERCLIS) database or any other similar federal, provincial or state list of known or suspected contaminated sites, (d) no Hazardous Materials have been treated, stored or released by the Trustee, the Company and/or the Bankruptcy Estate at any location or by any other Person at, on or under the Owned Real Property in any manner or concentration that requires investigation, removal or remediation under Environmental Laws or would otherwise cause the Trustee or any future owner or operator of any Owned Real Property to incur material liability under Environmental Laws, and (e) the Trustee has not received any notice of or entered into any order, settlement, judgment, injunction or decree involving uncompleted, outstanding or unresolved material obligations, liabilities or requirements relating to or arising under Environmental Laws.

## ARTICLE V.

### REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby makes the representations and warranties in this Article V to the Company as of the Execution Date (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date).

5.1    Corporate Organization and Qualification. The Purchaser is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware. The Purchaser is qualified and in good standing as a foreign entity in each jurisdiction where the properties owned, leased or operated, or the business conducted by it require such qualification except as would not have or reasonably be expected to have a material adverse effect on the Purchaser's ability to consummate the transactions contemplated by the Purchaser's Documents. The Purchaser has all requisite power and authority to own its properties and to carry on its business as it is now being conducted except as would not have or

reasonably be expected to have a material adverse effect on the Purchaser's ability to consummate the transactions contemplated by the Purchaser's Documents.

5.2    Authority Relative to This Agreement.    Except for such authorization as is required by the Bankruptcy Court, the Purchaser has the requisite limited liability company power and authority to (a) execute and deliver this Agreement, (b) execute and deliver the Purchaser's Documents, and (c) perform its obligations hereunder and under the Purchaser's Documents and consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by the Purchaser of this Agreement and each of the Purchaser's Documents have been duly authorized by all necessary limited liability company action on behalf of the Purchaser. This Agreement has been, and at or prior to the Closing each of the Purchaser's Documents will be, duly and validly executed and delivered by the Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, and the entry of the Sale Order) this Agreement constitutes, and each of the Purchaser's Documents when so executed and delivered will constitute, legal, valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

5.3    Consents and Approvals; No Violation; No Litigation.

(a)    Except as (i) with respect to the Chapter 7 Case, or (ii) as permitted by the Sale Order, none of the execution and delivery by the Purchaser of this Agreement or the Purchaser's Documents, the consummation of the transactions contemplated hereby or thereby, or the compliance by the Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of acceleration, payment, amendment, termination or cancellation under any provision of (A) the certificate of formation of the Purchaser, (B) any Contract (including but not limited to any Contracts related to financing) or Permit to which the Purchaser is a party or by which the Purchaser or its properties or assets are bound, (C) any order of any Governmental Body applicable to the Purchaser or by which any of the properties or assets of the Purchaser are bound, or (D) any applicable Law, other than, in the case of clauses (B), (C), and (D), except as would not have or reasonably be expected to have a material adverse effect on the Purchaser's ability to consummate the transactions contemplated by this Agreement.

(b)    Except (i) with respect to the Chapter 7 Case, (ii) the entry of the Sale Order, and (iii) where failure to obtain a consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to have a material adverse effect, the Purchaser is not required to file, seek or obtain any notice, authorization, approval, order, or consent of or with any Governmental Body in connection with the execution, delivery and performance by the Purchaser of this Agreement or the consummation of the transactions contemplated hereby.

(c)   No Action by or against the Purchaser is pending or, to the knowledge of the Purchaser, threatened, which could affect the legality, validity or enforceability of this Agreement, any of the Purchaser's Documents or the consummation of the transactions contemplated hereby and thereby.

5.4   <u>Brokers and Finders</u>.   Except with respect to the engagement of Roundbox Advisors, the Purchaser has not employed any investment banker, broker, finder, consultant or intermediary in connection with the transactions contemplated by this Agreement which would be entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or the transactions contemplated hereby, and Purchaser covenants and agrees to pay any such fee or commission payable to Roundbox Advisors.

5.5   <u>Investigation and Due Diligence</u>.   The Purchaser shall have until the Diligence Date to further conduct its own independent review and analysis of (i) the Business, the Purchased Assets and the Assumed Liabilities, of the value of such Purchased Assets and of the business, operations, technology, assets, Liabilities, financial condition and prospects of the Business, and the Trustee shall provide Purchaser with reasonable and coordinated access to the personnel, properties, premises (including the Owned Real Property) and records of the Business for this Purpose; and (ii) all orders of, and all motions, pleadings, and other submissions to, the Bankruptcy Court in connection with the Chapter 7 Case.   Should the Purchaser proceed to Closing, the Purchaser acknowledges that the price being paid under this Agreement for the Purchased Assets is the fair value for acquiring the Purchased Assets under the circumstances and that such value, rather than replacement cost, is the appropriate measure of damages if and to the extent the Purchaser may have any recourse for any failure of the Trustee to deliver the Purchased Assets on behalf of the Bankruptcy Estate in accordance with the terms of this Agreement.   In entering into this Agreement, the Purchaser has relied upon its own investigation and analysis as well as the representations and warranties made by the Trustee in <u>Article IV</u> and not on any factual representations or opinions of the Trustee.   The Purchaser acknowledges that (i) none of the Trustee, the Company, their Affiliates or any of their respective officers, directors, employees or representatives make or have made any representation or warranty, either express or implied, at law or in equity, as to the Purchased Assets or the accuracy or completeness of any of the information provided or made available to the Purchaser or any of its Affiliates, (ii) the Park has been closed since September 21, 2008 and (iii) none of the Trustee, the Company, their Affiliates or any of their respective officers, directors, employees or representatives will have or be subject to any liability or indemnification obligation to the Purchaser or to any other Person resulting from the distribution to the Purchaser, its Affiliates or representatives of, or the Purchaser's use of, any information relating to the Purchased Assets, including any information, documents or material made available to the Purchaser, whether orally or in writing.

## ARTICLE VI.

## BANKRUPTCY COURT MATTERS

6.1   <u>Bankruptcy Actions</u>.

(a)   As soon as reasonably practicable after execution of this Agreement (but not later than two (2) Business Days after such execution), the Trustee shall file with the

Bankruptcy Court a motion seeking entry of the Sale Order (the "Sale Motion"). The Trustee shall provide a draft of the Sale Motion to the Purchaser and the Senior Revolving Lenders, prior to its filing in adequate time for the Purchaser and the Senior Revolving Lenders to provide comments thereon, which the Trustee shall consider in good faith. The Trustee shall use its reasonable best efforts to obtain the entry of the Sale Order as a Final Order on the Bankruptcy Court's docket. The Trustee shall file all pleadings with the Bankruptcy Court as are necessary or appropriate to secure entry of the Sale Order, shall serve all creditors and all other parties entitled to notice of such pleadings under applicable provisions of the Bankruptcy Code and Rules.

        (b)    In the event an appeal or other proceeding is filed seeking review of the Sale Order, or if a motion to reconsider, vacate, modify, amend or stay such Order is filed, the Trustee shall immediately notify the Purchaser and the Senior Revolving Lenders, of such appeal, other proceeding or motion and shall provide to the Purchaser and the Senior Revolving Lenders, within one (1) Business Day after the Trustee's receipt thereof a copy of the notice of appeal or motion.

      6.2   Sale Order.   The Sale Order shall be entered by the Bankruptcy Court substantially in the form attached hereto as Exhibit B and otherwise in a form and substance reasonably acceptable to the Trustee, the Purchaser and the Senior Revolving Lenders. Without limiting the foregoing, the Sale Order shall, among other things, (i) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by the Trustee of this Agreement, (B) the sale of the Purchased Assets to the Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (C) the performance by the Trustee and the Bankruptcy Estate of their respective obligations under this Agreement; (ii) find that Purchaser is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code, not a successor to the Trustee, the Bankruptcy Estate or the Company and grant the Purchaser the protections of Section 363(m) of the Bankruptcy Code; (iii) provide that the proceeds from the sale of the Purchased Assets, less any normal and customary costs of closing including real estate taxes (excluding amounts paid by the Purchaser in accordance with the terms of this Agreement), and net of an amount equal to (A) the sum of $1,273,250 for the benefit of and use by the Bankruptcy Estate, (B) the fees and expenses of Raymond James with respect to its role in the sale process, and (C) administrative expenses in an amount and subject to terms and documentation to be separately agreed between the Trustee and the Senior Revolving Lenders, shall be used first to pay (and shall be paid directly to) the Senior Revolving Lenders until their claims are paid in full, including, without limitation, claims for any and all principal, unpaid hedging obligations, interest, attorneys' fees and expenses and advances made during the Chapter 7 Case, in each case, to the fullest extent provided under the Pre-Petition Loan Documents; (iv) provide that any remaining proceeds from the sale of the Purchased Assets (after the claims of the Senior Revolving Lenders have been paid in full) shall be delivered to the Trustee for distribution among the creditors of the Bankruptcy Estate in accordance with the order of priority applicable to their claims; and (v) provide that in the event of a valid termination of this Agreement and upon the exercise of a full credit bid pursuant to Section 363(k) of the Bankruptcy Code , the Trustee shall convey the Purchased Assets to the Senior Revolving Lenders (or their designee). The Purchaser agrees that it will promptly take such actions as are reasonably requested by the Trustee to assist in obtaining Bankruptcy Court

approval of the Sale Order, including, without limitation, furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (a) demonstrating that the Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and (b) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code. In the event that the Bankruptcy Court's approval of the Sale Order shall be appealed, the Trustee shall use reasonable efforts to defend such appeal.

6.3 <u>Executory Contracts</u>: The Trustee has informed the Purchaser that the Trustee has filed motions to reject substantially all of the Company's Contracts, including all personal property leases, real property leases, intellectual property agreements (to the extent such are executory contracts), licenses and trademark agreements. The Purchaser shall have until February 13, 2009 to designate the Contracts that the Purchaser desires deleted from the list of Contracts to be rejected, in which case the Trustee shall withdraw the motion as to all Contracts so designated by Purchaser. On or before February 27, 2009 the Purchaser shall advise the Trustee which, if any, of the designated Contracts the Purchaser desires to have assigned to it. The Trustee shall promptly file a motion seeking to assume and assign the designated Contracts to Purchaser and the Trustee shall use its commercially reasonable best efforts to have such motion heard by the Bankruptcy Court prior to March 7, 2009 and to have the Court order that any assignment to the Purchaser of any insurance policies is effective as of the Closing Date. The Purchaser may delete any Contract from the list of Contracts to be assigned to the Purchaser at any time prior to the assignment of such Contract to the Purchaser. The Purchaser shall be responsible for any payment necessary to cure any default on any Contract assigned to the Purchaser, except that the Purchaser shall not be responsible for any payments to cure any default on any insurance policy assigned to the Purchaser, and the Trustee agrees that the cure payment is sufficient consideration for the assignment. The Trustee agrees that Purchaser may contact any party to any of the Company's Contracts to discuss with such party the assumption and assignment of such Contract to the Purchaser. If the Purchaser designates a Contract for deletion from the list of Contracts to be rejected and subsequently removes such Contract from the list of Contracts to be assigned to it, the Purchaser, if it is the successful purchaser of the Purchased Assets, shall pay to the Trustee the amount of any administrative expense incurred by the Bankruptcy Estate on account of such Contract during the period commencing with the Conversion Date through the date of rejection of such Contract and in no event shall the Senior Revolving Lenders or their agents be responsible for such amounts.

**ARTICLE VII.**

**COVENANTS AND AGREEMENTS**

7.1 <u>Restricted Activity</u>. During the period from the Execution Date and continuing until the earlier of (i) the termination of this Agreement in accordance with <u>Section 3.5</u> or (ii) the Closing, except (A) for any limitations on operations of the Business imposed by, or actions required by, the Bankruptcy Court or the Bankruptcy Code, (B) as required by applicable Law, (C) as otherwise expressly contemplated by this Agreement or as set forth on <u>Schedule 7.1</u> or (D) with the prior written consent of the Purchaser (such consent not to be unreasonably withheld, conditioned or delayed) the Trustee shall not:

15

(i)       mortgage, pledge or subject to any Encumbrance (other than a Permitted Encumbrance) any of the Purchased Assets;

(ii)      sell, assign, license, transfer, convey, lease, surrender, relinquish or otherwise dispose of any of the Purchased Assets;

(iii)     waive or release any material right of the Bankruptcy Estate that constitutes a Purchased Asset; or

(iv)     enter into any Contract to do any of the foregoing or agree to do anything prohibited by this Section 7.1.

7.2     Access to Information.

(a)     The Trustee agrees that, between the Execution Date and the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with Section 3.5, the Purchaser shall be entitled, through its officers, employees, counsel, accountants and other authorized representatives, agents and contractors ("Representatives"), to have such reasonable access to and make such reasonable investigation and examination of the books and records, properties, businesses, assets, accountants, auditors and operations of the Business as the Purchaser's Representatives may reasonably request.  Any such investigations and examinations shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances, including the Trustee's right to have his Representative accompany the Purchaser at the time of any inspection or examination and shall be subject to restrictions under applicable Law.  Pursuant to this Section 7.2, the Trustee shall furnish to the Purchaser and its Representatives such property related data and other information as such Persons reasonably request to the extent such data and information is reasonably available to the Trustee.  The Trustee shall use his respective commercially reasonable efforts to cause his Representatives to reasonably cooperate with the Purchaser and the Purchaser's Representatives in connection with such investigations and examinations, and the Purchaser shall, and use its commercially reasonably efforts to cause its Representatives to, reasonably cooperate with the Trustee and his Representatives and shall use its reasonable efforts to minimize any disruption to the Business.

(b)     From and after the Closing Date, the Purchaser shall give the Trustee and the Trustee's Representatives reasonable access during normal business hours upon reasonable advance notice and under reasonable circumstances to the offices, facilities, properties, assets, employees, Documents (including, without limitation, any Documents included in the Purchased Assets), personnel files and books and records of the Purchaser pertaining to (i) the conduct of the Business or ownership of the Purchased Assets prior to the Closing Date or (ii) the Excluded Assets and Excluded Liabilities.  Without limiting the generality of the foregoing, the Purchaser shall, and shall use commercially reasonable efforts to cause each of its Affiliates to, cooperate with the Trustee.

(c)     No information received pursuant to an investigation made under this Section 7.2 shall be deemed to (i) qualify, modify, amend or otherwise affect any representations, warranties, covenants or other agreements of the Trustee set forth in this

Agreement or any certificate or other instrument delivered to the Purchaser in connection with the transactions contemplated hereby, (ii) limit or restrict the remedies available to the parties under applicable Law arising out of a breach of this Agreement or otherwise available at Law or in equity, or (iii) limit or restrict the ability of either party to invoke or rely on the conditions to the obligations of the parties to consummate the transactions contemplated by this Agreement set forth in <u>Article VIII</u>.

7.3    <u>Further Agreements</u>. The Purchaser authorizes and empowers the Trustee from and after the Closing Date to receive and to open all mail received by him relating to the Purchased Assets or the Assumed Liabilities and to deal with the contents of such communications in accordance with the provisions of this <u>Section 7.3</u>. The Trustee shall (i) promptly deliver to the Purchaser any mail or other communication received by him after the Closing Date and relating to the Purchased Assets or the Assumed Liabilities, (ii) promptly wire transfer in immediately available funds to the Purchaser any cash, electronic credit or deposit received by the Trustee but solely to the extent that such cash, electronic credit or deposit are on account of any Purchased Assets or Assumed Liabilities and (iii) promptly forward to the Purchaser any checks or other instruments of payment that the Trustee may receive but solely to the extent that such checks or other instruments are on account of any Purchased Assets or Assumed Liabilities. The Purchaser shall (x) promptly deliver to the Trustee any mail or other communication received by it after the Closing Date and relating to the Excluded Assets or the Excluded Liabilities, (y) promptly wire transfer in immediately available funds to the Trustee, any cash, electronic credit or deposit received by the Purchaser but solely to the extent that such cash, electronic credit or deposit are on account of any Excluded Assets or Excluded Liabilities and (z) promptly forward to the Trustee any checks or other instruments of payment that it receives but solely to the extent that such checks or other instruments are on account of any Excluded Assets or Excluded Liabilities. From and after the Closing Date, the Trustee shall refer all inquiries with respect to the Purchased Assets and the Assumed Liabilities to the Purchaser, and the Purchaser shall refer all inquiries with respect to the Excluded Assets and the Excluded Liabilities to the Trustee.

7.4    <u>Preservation of Records</u>. The Trustee and the Purchaser agree that each of them shall preserve and keep the records held by them (including the Purchaser's Affiliates, in the case of the Purchaser) relating to the Purchased Assets, the Assumed Liabilities, the Excluded Assets and the Excluded Liabilities, as the case may be, for a period of five (5) years from the Closing Date, in the case of the Purchaser, and until the closing of the Chapter 7 Case in the case of the Trustee, and shall make such records available to the other party as may be reasonably required by such other party in connection with, among other things, any insurance claims by, Actions or Tax audits against or investigations by any Governmental Body of the Bankruptcy Estate or the Purchaser or in order to enable the Trustee or the Purchaser to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby. In the event the Trustee or the Purchaser wishes to destroy such records at the end of such applicable period, such party shall first give sixty (60) days' prior written notice to the other party and such other party shall have the right at its option and expense, upon prior written notice given to such party within such sixty (60) day period, to take possession of the records within one hundred and twenty (120) days after the date of such notice, or such shorter period as the closing of the Chapter 7 Case shall permit.

7.5     Publicity.  The Trustee, Raymond James or the Purchaser may issue a press release, post information to its web site or make a public announcement concerning the transactions contemplated hereby after the Sale Motion is filed with the Bankruptcy Court.  The publishing party shall provide a copy of the proposed published information to the other before publishing.  The non-publishing party shall have the right, which must be exercised within 24 hours of receipt or is deemed waived, to disapprove of the proposed published information if and only if the proposed published information contains a material misstatement of fact.  No such press release shall refer to Deutsche Bank Trust Company Americas or the Senior Revolving Lenders without their express consent.

7.6     Notification of Certain Matters.  The Trustee shall give prompt notice to the Purchaser, and the Purchaser shall give prompt notice to the Trustee, of (i) any notice or other communication from any Person alleging that the consent of such Person which is or may be required in connection with the transactions contemplated by this Agreement is not likely to be obtained prior to Closing, (ii) any written objection or proceeding that challenges the transactions contemplated hereby or the entry of the approval of the Bankruptcy Court and (iii) any fact, event or condition that would cause or constitute a material breach of or make materially inaccurate any representation or warranty of such party in this Agreement or may make the satisfaction of the conditions in Article VIII impossible or unlikely.

7.7     No Solicitation.  Effective as of the Diligence Date, or such earlier date as Purchaser shall notify Trustee in writing that the Purchaser waives the right to terminate this Agreement pursuant to paragraph 3.5(e) hereof, until the termination of this Agreement in accordance with Section 3.5 herein:

(a)     None of the Trustee, the Senior Revolving Lenders or any officer, director, employee, agent or representative (including any investment banker, financial advisor, attorney, accountant or other representative) of the Trustee or the Senior Revolving Lenders shall directly or indirectly (i) solicit, initiate, encourage, facilitate (including by way of furnishing information) or take any other action designed to facilitate any inquiries or proposals regarding any merger, share exchange, consolidation, sale of assets, sale of shares of capital stock (including by way of a tender offer) or similar transactions involving the Bankruptcy Estate or any of the Purchased Assets that, if consummated, would constitute an Alternative Transaction (any of the foregoing inquiries or proposals, including the indication of any intention to propose any of the foregoing, being referred to herein as an "Alternative Proposal"), (ii) participate in any discussions or negotiations regarding an Alternative Transaction or (iii) enter into any agreement regarding any Alternative Transaction.

As used in this Agreement, "Alternative Transaction" means any of (i) a transaction pursuant to which any person (or group of persons) (other than the Purchaser, the Senior Revolving Lenders, or any of their respective Affiliates), directly or indirectly, acquires or would acquire the Purchased Assets, whether from the Trustee or otherwise, (ii) a merger, share exchange, consolidation or other business combination involving the Bankruptcy Estate, (iii) any transaction pursuant to which any person (or group of persons) (other than the Senior Revolving Lenders or their Affiliates) acquires or would acquire control of the Purchased Assets, or (iv) any other consolidation, business combination, recapitalization or similar transaction

involving the Bankruptcy Estate or the Purchased Assets other than the transactions contemplated by this Agreement.

(b)     The Trustee shall notify the Purchaser and Senior Revolving Lenders promptly (but in no event later than 24 hours) after receipt of any Alternative Proposal, or any material modification of or material amendment to any Alternative Proposal, or any request for nonpublic information relating to the Purchased Assets or for access to the properties, books or records of Company or the Trustee, other than any such request that does not relate to and would not reasonably be expected to lead to, an Alternative Proposal.  Such notice to Purchaser and Senior Revolving Lenders shall be made orally and in writing, and shall indicate the identity of the person making the Alternative Proposal or intending to make or considering making an Alternative Proposal or requesting non-public information or access to the books and records of Company or the Trustee, and a copy (if in writing) and summary of the material terms of any such Alternative Proposal or modification or amendment to an Alternative Proposal.  The Trustee shall use its best efforts to keep Purchaser and Senior Revolving Lenders fully informed, on a current basis, of any material changes in the status and any material changes or modifications in the terms of any such Alternative Proposal, indication or request.  The Trustee shall also provide Purchaser and Senior Revolving Lenders 24 hours written notice before it enters into any discussions or negotiations concerning any Alternative Proposal in accordance with Section 7.7(a). The Bankruptcy Estate shall not enter into any confidentiality or other agreement that would impede its ability to comply with its obligations under this Section 7.7(b).

(c)     The Trustee and the Senior Revolving Lenders shall immediately cease and cause to be terminated any existing discussions or negotiations with any persons (other than Purchaser) conducted heretofore with respect to any of the foregoing, and the Trustee shall use reasonable best efforts to cause all persons other than the Purchaser who have been furnished confidential information regarding the Bankruptcy Estate or the Purchased Assets in connection with the solicitation of or discussions regarding an Alternative Proposal within the 12 months prior to the date hereof promptly to return or destroy such information.  The Trustee agrees not to release any third party from the confidentiality and standstill provisions of any agreement to which the Trustee or the Company is or may become a party, and shall immediately take all steps necessary to terminate any approval that may have been heretofore given under any such provisions authorizing any person to make an Alternative Proposal.

(d)     The Trustee shall ensure that its officers, directors and all employees, agents and representatives (including any investment bankers, financial advisors, attorneys, accountants or other representatives) and the Senior Revolving Lenders are aware of the restrictions described in this Section 7.7 as reasonably necessary to avoid violations thereof.  It is understood that any violation of the restrictions set forth in this Section 7.7 by any officer, director, employee, agent or representative (including any investment banker, financial advisor, attorney, accountant or other representative) of the Bankruptcy Estate shall be deemed to be a breach of this Section 7.7 by the Trustee.

(e)     Notwithstanding the provisions of this Section 7.7, at the hearing on the Sale Motion, the Trustee may respond to inquiries from Qualified Bidders by providing information that is not confidential information.

(f)    Nothing herein shall be deemed to prohibit the Trustee from delivering notice of the Sale Motion.

## ARTICLE VIII.

## CONDITIONS TO CLOSING

8.1    Conditions Precedent to the Obligations of the Purchaser and the Trustee.  The respective obligations of each party to this Agreement to consummate the transactions contemplated by this Agreement are subject to the satisfaction or written waiver, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by the Trustee and Purchaser in whole or in part to the extent permitted by applicable Law):

(a)    there shall not be in effect any statute, rule, regulation, executive order enacted, issued, entered or promulgated by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; and

(b)    the Bankruptcy Court shall have entered the Sale Order as provided in Article VI (which shall include a finding of good faith under section 363(m) of the Bankruptcy Code), and such order shall be a Final Order and otherwise in form and substance reasonably satisfactory to the Trustee, the Purchaser and the Senior Revolving Lenders.  On the Closing Date, the Sale Order shall be in effect, and shall not have been reversed, stayed, modified or amended without the prior written consent of Purchaser.

8.2    Conditions Precedent to the Obligations of the Trustee.  The obligations of the Trustee on behalf of the Bankruptcy Estate to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by the Trustee in whole or in part to the extent permitted by applicable Law):

(a)    the representations and warranties of the Purchaser set forth in Article V hereof shall be true and correct as of the Closing Date as though made on and as of the Closing Date (except for such representations and warranties made as of a certain date, which shall be true and correct as of such date as though made on and as of such date) except where the failure of such representations or warranties to be true and correct (without giving effect to any limitation or qualification as to "materiality" or "material adverse effect" set forth in such representations and warranties) has not had and would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the Purchaser's ability to consummate the transactions contemplated hereby, and the Trustee shall have received a certificate signed by an authorized officer of the Purchaser, dated the Closing Date, to the foregoing effect;

(b)    the Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by the Purchaser on or prior to the Closing Date,;

(c)    the Purchaser shall have delivered, or caused to be delivered, to the Trustee all of the items set forth in Section 3.4; and

(d)    the Purchaser shall have delivered to the Trustee certified copies of (i) its certificate of formation, (ii) limited liability company operating agreement and (iii) appropriate evidence of all necessary limited liability company action by the Purchaser in connection with the transactions contemplated by the Purchaser's Documents, including, without limitation: (A) resolutions duly adopted by the Purchaser's Managing Member approving the transactions contemplated by this Agreement and the Purchaser's Documents and authorizing the execution, delivery, and performance by the Purchaser of this Agreement and the Purchaser's Documents; and (B) a certificate as to the incumbency of officers of the Purchaser executing this Agreement, the Purchaser's Documents and any instrument or other document delivered in connection with the transactions contemplated by this Agreement.

8.3    Conditions Precedent to the Obligations of the Purchaser.  The obligations of the Purchaser to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by the Purchaser in whole or in part to the extent permitted by applicable Law):

(a)    The Trustee shall have delivered to the Purchaser (i) a certified copy of the Sale Order (which shall contain the terms described in Section 6.1 and be a Final Order as described in Section 8.1(b)) and (ii) copies of all affidavits of service of the Sale Motion or notice of such motion filed by or on behalf of the Trustee on behalf of the Bankruptcy Estate;

(b)    The representations and warranties of the Trustee set forth in Article IV hereof shall be true and correct as of the Closing Date as though made on and as of the Closing Date (except for such representations and warranties made as of a certain date, which shall be true and correct as of such date as though made on and as of such date) except where the failure of such representations or warranties to be true and correct (without giving effect to any limitation or qualification as to "materiality" or "material adverse effect" set forth in such representations and warranties) has not had and would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the value of the Purchased Assets and the Purchaser shall have received a certificate signed by the Trustee, dated the Closing Date, to the foregoing effect;

(c)    The Trustee shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by the Trustee on or prior to the Closing Date;

(d)    The Trustee shall have delivered, or caused to be delivered, to the Purchaser all of the items set forth in Section 3.3;

(e)    Title to the Purchased Assets shall be good and marketable and free of Encumbrances other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances and a national title insurer is willing to issue an Owner's Policy of title insurance to Purchaser insuring title to the Owned Real Property at standard rates; and

21

(f)    No Hazardous Materials have been discovered at any location on or under the Real Property in any manner or concentration that requires investigation, removal or remediation under Environmental Laws or would otherwise cause the Purchaser to incur material liability under Environmental Laws.

8.4    <u>Frustration of Closing Conditions</u>.  Neither the Trustee nor the Purchaser may rely on the failure of any condition set forth in <u>Sections 8.1</u>, <u>8.2</u> or <u>8.3</u>, as the case may be, if such failure was caused directly by such party's failure to comply with any provision of this Agreement.

## ARTICLE IX.

## ADDITIONAL DEFINITIONS

9.1    <u>Certain Definitions</u>.  As used herein:

(a)    "<u>Accounts Receivable</u>" means (i) any and all accounts receivable, trade accounts and other amounts receivables (including overdue accounts receivable) owed with respect to the Contracts and any other rights to payment with respect to the Contracts and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of goods shipped, products sold or services rendered with respect to such Contracts and including any and all receivables relating to collateral held by insurance companies or premium financiers related to insurance policies or premiums therefor, in each case owing to the Company or otherwise comprising the property of the Bankruptcy Estate in the Chapter 7 Case; (ii) all other accounts or notes receivable of the Company from Contracts and the full benefit of all security for such accounts or notes receivable arising in the conduct of the Business; and (iii) any and all claims, remedies or other rights relating to any of the foregoing, together with any interest or unpaid financing charges accrued thereon, in each case existing on the Execution Date or arising in the Ordinary Course of Business after the Execution Date and in each case that have not been satisfied or discharged prior to the close of business on the Business Day immediately preceding the Closing Date or have not been written off or sent to collection prior to the close of business on the Business Day immediately preceding the Closing Date (it being understood that the receipt of a check prior to the close of business on the Business Day immediately preceding the Closing Date shall constitute satisfaction or discharge of the applicable account or note receivable to the extent of the payment represented thereby).

(b)    "<u>Action</u>" means any litigation, action, claim, suit, proceeding, investigation, examination, hearing, arbitration, inquiry or subpoena.

(c)    "<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

22

      (d)      "Agreement" has the meaning specified therefor in the preamble hereto.

      (e)      "Assumed Liabilities" has the meaning specified therefor in Section 1.3.

      (f)      "Bankruptcy Code" has the meaning specified therefor in the recitals hereto.

      (g)      "Bankruptcy Court" has the meaning specified therefor in the recitals hereto.

      (h)      "Bankruptcy Estate" has the meaning specified therefor in the recitals hereto.

      (i)      "Business" means any and all business activities of any kind that are conducted by the Company, including the operation of the Park.

      (j)      "Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City, New York are authorized or required by Law to be closed.

      (k)      "Cash and Cash Equivalents" means all of the cash of the Company or otherwise comprising the property of the Bankruptcy Estate in the Chapter 7 Case (including petty cash and checks received prior to the close of business on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper and government securities, cash or cash equivalents held as collateral by insurance companies or premium financiers related to insurance policies or premiums therefor, and other cash equivalents.

      (l)      "Chapter 7 Case" has the meaning specified therefor in the recitals hereto.

      (m)      "Closing" has the meaning specified therefor in Section 3.2.

      (n)      "Closing Date" has the meaning specified therefor in Section 3.2.

      (o)      "Code" means the Internal Revenue Code of 1986, as amended.

      (p)      "Company" has the meaning specified therefor in the preamble hereto.

      (q)      "Company Plan" means (i) all "employee benefit plans" (as defined in Section 3(3) of ERISA), including all employee benefit plans which are "pension plans" (as defined in Section 3(2) of ERISA) and any other employee benefit arrangements or payroll practices (including, without limitation, severance pay, vacation pay, company awards, salary continuation for disability, sick leave, death benefit, hospitalization, welfare benefit, group or individual health, dental, medical, life, insurance, survivor benefit, deferred compensation, profit sharing, retirement, retiree medical, supplemental retirement, bonus or other incentive

compensation, stock purchase, stock option, stock appreciation rights, restricted stock and phantom stock arrangements or policies) and (ii) all material employment, termination, bonus, severance, change in control, collective bargaining or other similar contracts or agreements, whether formal or informal, written or oral, in each case to which the Company or any ERISA Affiliate is a party, with respect to which the Company or any ERISA Affiliate has any obligation or which are maintained by the Company or any ERISA Affiliate or to which the Company or an ERISA Affiliate contributes or is obligated to contribute with respect to current or former directors, officers, consultants and employees of the Company.

(r)    "Contract" means any written contract, purchase order, service order, sales order, indenture, note, bond, lease, license, commitment or instrument or other agreement, arrangement or commitment that is binding upon a Person or its property.

(s)    "Conversion Date" means the date the order of the Bankruptcy Court converting the Company's case under Chapter 11 of the Bankruptcy Code to a case under Chapter 7 was entered on the docket.

(t)    "Deposit" has the meaning specified therefor in Section 3.1.

(u)    "Documents" means all of the Company's written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies and documents, Tax Returns, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

(v)    "Encumbrance" means any lien, encumbrance, claim (as defined in Section 101(5) of the Bankruptcy Code), right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, restrictive covenants, encroachments, rights of first refusal, preemptive rights, judgments, conditional sale or other title retention agreements and other impositions, imperfections or defects of title or restrictions on transfer or use of any nature whatsoever.

(w)    "Environmental Laws" means all Laws relating to pollution or protection of health, safety, natural resources or the environment, or the generation, use, treatment, storage, handling, transportation or Release of, or exposure to, Hazardous Materials, including, without limitation, the Federal Water Pollution Control Act (33 U.S.C. §1251 et seq.), Resource Conservation and Recovery Act (42 U.S.C. §6901 et seq.), Safe Drinking Water Act (42 U.S.C. §3000(f) et seq.), Toxic Substances Control Act (15 U.S.C. §2601 et seq.), Clean Air Act (42 U.S.C. §7401 et seq.), Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. §9601 et seq.) and other similar federal, state, provincial and local statutes.

(x)    "Equipment" means all equipment, machinery, vehicles, storage tanks, furniture, fixtures and other tangible personal property of every kind and description and improvements and tooling used, or held for use, in connection with the operation of the Business and owned by the Bankruptcy Estate, located on the Park or held by another for the benefit of the Trustee, including but not limited to, the rides and associated hardware, communications equipment, the IT Assets, and any attached and associated hardware, routers, devices, panels, cables, manuals, cords, connectors, cards, and vendor documents, and including all warranties of the vendor applicable thereto, to the extent such warranties are transferable, but excluding software and any other intangibles associated therewith except to the extent embedded in such Equipment and required to operate it.

(y)    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

(z)    "ERISA Affiliate" means any entity which is a member of (A) a controlled group of corporations (as defined in Section 414(b) of the Code), (B) a group of trades or businesses under common control (as defined in Section 414(c) of the Code), (C) an affiliated service group (as defined under Section 414(m) of the Code) or (D) any group specified in regulations under Section 414(o) of the Code, any of which includes or included the Company.

(aa)    "Excluded Assets" has the meaning specified therefor in Section 1.2.

(bb)    "Excluded Liabilities" has the meaning specified therefor in Section 1.4.

(cc)    "Execution Date" has the meaning specified therefor in the preamble hereto.

(dd)    "Final Order" means an order, judgment or other decree of the Bankruptcy Court or any other court or judicial body of competent jurisdiction entered by the Clerk of the Bankruptcy Court or such other court on the docket in the Chapter 7 Case or the docket of such other court, which has not been modified, amended, reversed, vacated or stayed.

(ee)    "GAAP" means United States generally accepted accounting principles as in effect from time to time.

(ff)    "Governmental Body" means any government, quasi governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

(gg)    "Hazardous Materials" means petroleum and all derivatives thereof or synthetic substitutes therefor, asbestos and asbestos containing materials, and any and all materials now or hereafter defined, listed, designated or classified as, or otherwise determined to be, "hazardous wastes," "hazardous substances," "radioactive," "solid wastes," or "toxic" (or

words of similar meaning) under or pursuant to or otherwise listed or regulated pursuant to any Environmental Law.

(hh)     "Indebtedness" of any Person means, without duplication, (i) the interest in respect of, principal of and premium (if any) in respect of (x) indebtedness of such Person for money borrowed and (y) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property; (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; and (vi) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any Encumbrance (other than Permitted Encumbrances),  on any property or asset of such Person (whether or not such obligation is assumed by such Person).

(ii)     "Inventory" means all of the Bankruptcy Estate's inventories of raw materials, office supplies, works in progress, goods, spare parts and replacement and component parts and fuel that are used, or held for use, in connection with the operation of the Business and are located on the Park or held for the benefit of the Trustee by a third party, except for and excluding any perishable goods or inventory.

(jj)     "IT Assets" means all of the Bankruptcy Estate's computers, computer software and databases (including source code, object code and all related documentation), firmware, middleware, servers, workstations, routers, hubs, switches, data communications lines, and all other information technology equipment and elements, and all associated documentation that are used, or held for use, in connection with the operation of the Business.

(kk)     "Knowledge" means the actual knowledge of the Trustee.

(ll)     "Laws" means all federal, state, local or foreign laws, statutes, common law, rules, codes, regulations, restrictions, ordinances, orders, decrees, approvals, directives, judgments, rulings, injunctions, writs and awards of, or issued, promulgated, enforced or entered by, any and all Governmental Bodies, or court of competent jurisdiction, or other requirement or rule of law.

(mm)     "Liability" means, as to any Person, any debt, adverse claim, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed, including all costs and expenses relating thereto.

(nn)     "Leased Real Property" means all of the real property leased, subleased, licensed, used or occupied by the Seller, together with all buildings, structures,

fixtures and improvements erected thereon, and any and all rights privileges, easements, licenses, hereditaments and other appurtenances relating thereto, and used, or held for use, in connection with the operation of the Business

(oo)    "Ordinary Course of Business" means the ordinary and usual course of normal day to day operations of the Business; provided, however, that the Purchaser acknowledges that (i) the Company has commenced the Chapter 7 Case; and (ii) the Park has been closed since September 21, 2008.

(pp)    "Owned Real Property" has the meaning specified therefor in Section 1.1(b).

(qq)    "Park" means the Hard Rock Park theme park located in Myrtle Beach, South Carolina.

(rr)    "Parties" has the meaning specified therefor in Section 10.1(b).

(ss)    "Permits" means all notifications, licenses, permits (including environmental, construction and operation permits), franchises, certificates, approvals, consents, waivers, clearances, exemptions, classifications, registrations, variances, orders, tariffs, rate schedules and other similar documents and authorizations issued by any Governmental Body to the Company and used, or held for use, applicable to ownership of the Purchased Assets or assumption of the Assumed Liabilities.

(tt)    "Permitted Encumbrances" means (i) Encumbrances for utilities and current Taxes not yet due and payable or being contested in good faith; (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Purchased Assets which do not, individually or in the aggregate, materially adversely affect the operation of the Business, (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law which do not, individually or in the aggregate, materially adversely affect the operation of the Business, (iv) such other Encumbrances or title exceptions as are set forth on Schedule 9.1(ss) or which would be shown by an accurate updated survey of the Owned Real Property and (v) such other Encumbrances or title exceptions which do not render title unmarketable..

(uu)    "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group.

(vv)    "Pre-Petition Loan Documents" means the Pre-Petition Loan and all other Loan Documents (as defined therein) and all other documents, agreements and instruments executed or delivered in connection therewith.

(ww)    "Purchase Price" has the meaning specified therefor in Section 2.1(a).

(xx)    "Purchased Assets" has the meaning specified therefor in Section 1.1.

(yy)    "Purchaser" has the meaning specified therefor in the preamble hereto.

(zz)    "Purchaser's Documents" means collectively each agreement, document, instrument or certificate (i) contemplated by this Agreement and (ii) to be executed by the Purchaser in connection with the consummation of the transactions contemplated by this Agreement.

(aaa)    "Qualified Bidder" means a person or entity that has made a cash deposit in an amount of at least the amount of the Deposit and has provided to the Trustee evidence that such person has the ability to close an Alternative Transaction in the time frame contemplated by this Agreement.

(bbb)    "Representatives" has the meaning specified therefor in Section 7.2(a).

(ccc)    "Sale Motion" means the motion or motions of the Trustee on behalf of the Bankruptcy Estate, in form and substance reasonably acceptable to the Trustee and the Purchaser, seeking approval and entry of the Sale Order.

(ddd)    "Sale Order" means an order substantially in the form attached hereto as Exhibit B and otherwise in form and substance reasonably satisfactory to the Trustee and the Purchaser.

(eee)    "Schedules" means the Schedules attached to this Agreement, which schedules are incorporated into and form an integral part of this Agreement.

(fff)    "Senior Revolving Lenders" means the lenders party to the Revolving Credit Agreement, dated as of March 30, 2006, by and among the Company, as Borrower, Deutsche Bank Trust Company Americas, as Agent and a Lender, Deutsche Bank Securities Inc., as Joint Lead Arranger, Jefferies Finance LLC, as Joint Lead Arranger and a Lender and each of the other lenders party thereto (the "Pre-Petition Loan").

(ggg)    "Tax" and "Taxes" mean any and all taxes, charges, fees, tariffs, duties, impositions, levies or other assessments, imposed by any Governmental Body, and include any interest or penalties attributable to, or imposed upon, or with respect to, Taxes.

(hhh)    "Tax Return" means any return, report, information return, declaration, claim for refund or other document (including any schedule or related or supporting information) supplied or required to be supplied to any Governmental Body with respect to Taxes, including amendments thereto.

(iii)    "Transfer Taxes" has the meaning specified therefor in Section 10.1(a).

(jjj)    "Trustee" has the meaning specified therefor in the preamble hereto.

(kkk)    "Trustee's Documents" means collectively each agreement, document, instrument or certificate (i) contemplated by this Agreement and (ii) to be executed by the Trustee in connection with the consummation of the transactions contemplated by this Agreement.

## ARTICLE X.

## TAXES

10.1    Additional Tax Matters.

(a)    Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges (the "Transfer Taxes") which may be payable by reason of the sale of the Purchased Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated herein shall be borne and timely paid by the Purchaser as an Assumed Liability, and the Purchaser shall indemnify, defend (with counsel reasonably satisfactory to the Trustee), protect, and save and hold the Trustee and the Bankruptcy Estate harmless from and against any and all claims, charges, interest or penalties assessed, imposed or asserted in relation to any such Taxes. The Purchaser shall be responsible for preparing and filing all Tax Returns with respect to Transfer Taxes.

(b)    The Purchaser, the Trustee and the Company (the "Parties") shall use their respective reasonable best efforts to agree in good faith upon an allocation among the Purchased Assets of the sum of the Purchase Price and the Assumed Liabilities consistent with Section 1060 of the Code and the Treasury Regulations thereunder within thirty (30) days after the Closing Date. In the event that the Parties cannot agree on a mutually satisfactory allocation within such thirty (30) day period, the Parties shall appoint an independent accounting firm that shall, at the Bankruptcy Estate's and the Purchaser's joint expense, determine the appropriate allocation. In the event that the Parties cannot promptly agree on the selection of an accounting firm to act as the independent accounting firm, either Party may request the American Arbitration Association to appoint a nationally recognized independent accounting firm, and such appointment shall be final, binding and conclusive on the Company and the Purchaser. Resolution of any disagreements shall be made by the independent accounting firm in a writing addressed to all Parties within thirty (30) days following referral to it by the Parties of such disagreements in accordance with this Agreement. The finding of such independent accounting firm shall be final, binding and conclusive on the Parties. After determination of the allocation by agreement of the Parties or by binding determination of the independent accounting firm, the Purchaser shall prepare and deliver IRS Form 8594 to the Trustee and the Company within thirty (30) days after the allocation (as determined in this Section 10.1(b) to be filed with the Internal Revenue Service. The Company (or the appropriate Person on behalf of the Company) and the Purchaser shall report the transactions contemplated by this Agreement for U.S. Federal income Tax and all other Tax purposes in a manner consistent with the allocation determined pursuant to this Agreement. In any examination, audit or other proceeding related to the determination of any Tax, neither the Purchaser nor the Company shall contend or represent that such allocation determined under this Section 10.1(b) is not a correct allocation. The Purchaser, the Trustee and the Company shall notify and provide the other with reasonable assistance in the event of an examination, audit or other proceeding regarding the agreed-upon allocation of the Purchase Price and the Assumed Liabilities. Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 10.1(b) shall survive the Closing without limitation.

## ARTICLE XI.

### RISK OF LOSS

11.1     Trustee covenants that it will maintain the existing property or casualty insurance on the Owned Real Property, Inventory and Equipment until the Closing.  In the event of any damage or destruction to any portion of the Owned Real Property, Inventory and Equipment prior to the date of Closing, the estimated cost of repair or replacement of which, as determined by a third party selected by Trustee and approved by Purchaser, is in excess of Five Hundred Thousand Dollars ($500,000.00), Purchaser shall have the option to terminate this Agreement upon written notice to the Trustee prior to Closing, whereupon the deposit shall be immediately refunded to Purchaser, and neither the Trustee nor Purchaser shall have any further right or obligation to the other under this Agreement unless expressly provided otherwise herein.   If Purchaser does not exercise its option under the immediately preceding sentence of this Section 11.1 to terminate this Agreement, then the Agreement shall remain in full force and effect; and all of the Trustee's and/or the Bankruptcy Estate's right to all insurance proceeds resulting from such damage or destruction shall be assigned in writing by the Trustee to Purchaser, the Trustee shall provide a credit to Purchaser at Closing in the amount of any applicable deductible, and the Trustee shall have no further obligation to Purchaser with regard to such damage or destruction. In the event of any damage or destruction to the Owned Real Property, Inventory and Equipment prior to the date of Closing, the estimated cost of repair or replacement of which, as determined by a third party contractor selected by the Trustee and approved by Purchaser, is Five Hundred Thousand Dollars ($500,000.00) or less, Purchaser shall have no right to terminate this Agreement as a result thereof; and all of the Trustee's and/or the Bankruptcy Estate's right to all insurance proceeds resulting from such damage or destruction shall be assigned in writing by the Trustee to Purchaser, the Trustee shall provide a credit to Purchaser at Closing in the amount of any applicable deductible, and the Trustee shall have no further obligation to Purchaser with regard to such damage or destruction.

11.2     In the event of a taking by condemnation or similar proceedings or actions of all of the Owned Real Property or any material portion of the Owned Real Property being ten percent (10%) or more of the land or any portion of the improvements, prior to the date of Closing, Purchaser shall have the option to terminate this Agreement upon written notice to the Trustee prior to Closing whereupon the deposit shall be immediately refunded to Purchaser.  If Purchaser does not exercise its option under the immediately preceding sentence of this Section 11.2 to terminate this Agreement, then the Agreement shall remain in full force and effect and the Trustee shall assign or pay to Purchaser at Closing, the Trustee's and/or the Bankruptcy Estate's entire interest in and to any and all condemnation awards or proceeds from any such proceedings or actions in lieu thereof.

## ARTICLE XII.

### MISCELLANEOUS

12.1     Payment of Expenses.  Except as otherwise provided in this Agreement and whether or not the transactions contemplated hereby are consummated, the Trustee and the Purchaser shall bear their own expenses incurred or to be incurred in connection with the

negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby. Notwithstanding the foregoing, the Trustee shall be responsible for any investment banking, brokerage, finder's or similar fee or commission payable to Raymond James & Associates, Inc. in connection with this Agreement on the transactions contemplated hereby.

12.2    Survival of Representations and Warranties; Survival of Covenants.  The parties hereto agree that the representations and warranties contained in this Agreement shall expire upon the Closing Date.  The parties hereto agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive in accordance with the terms of the particular covenant or until fully performed.

12.3    Entire Agreement; Amendments and Waivers.  This Agreement (including the schedules and exhibits hereto) represents the entire understanding and agreement between the parties hereto with respect to the subject matter hereof.  This Agreement may be amended, supplemented or changed, and any provision hereof may be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  No action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of any party shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by applicable Law.

12.4    Counterparts.  For the convenience of the parties hereto, this Agreement may be executed (by facsimile or PDF signature) in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

12.5    Governing Law.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

12.6    Jurisdiction, Waiver of Jury Trial.

(a)    THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY; PROVIDED, HOWEVER, THAT IF THE

BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE COURTS OF THE STATE OF NEW YORK AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN THE SOUTHERN DISTRICT OF THE STATE OF NEW YORK WILL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.

(b)  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

12.7    Notices.    Unless otherwise set forth herein, any notice, request, instruction or other document to be given hereunder by any party to the other parties shall be in writing and shall be deemed duly given (i) upon delivery, when delivered personally, (ii) one (1) Business Day after being sent by overnight courier or when sent by facsimile transmission (with a confirming copy sent by overnight courier), and (iii) three (3) Business Days after being sent by registered or certified mail, postage prepaid, as follows:

If to the Trustee:

> Alfred Giuliano,
> Chapter 7 Trustee on behalf of the Bankruptcy Estate
> Giuliano Miller & Company, LLC
> Berlin Business Park
> 140 Bradford Drive
> West Berlin, NJ 08091
> Facsimile: 856.767.3500
> Electronic mail: atgiuliano@giulianomiller.com

With a copy (which shall not constitute effective notice) to:

> Cozen O'Connor
> 1201 North Market Street
> Suite 1400
> Wilmington, DE 19801
> Attn:  John T. Carroll, III
> Facsimile:  302.295.2013
> Electronic mail:  jcarroll@cozen.com

With a copy (which shall not constitute effective notice) to:

> Deutsche Bank Trust Company Americas,
> as Agent to the Senior Revolving Lenders
> 60 Wall Street
> New York, NY 10005

Attn:  Michael Meagher
Facsimile:  212.797.5695
Electronic mail:  Michael.meagher@db.com

With a copy (which shall not constitute effective notice) to:

White & Case LLP
1155 Avenue of the Americas
New York, NY  10036
Attn:  Scott Greissman, Esq.
Facsimile:  212.354.8113
Electronic mail:  sgreissman@whitecase.com

If to the Purchaser:

FPI MB Entertainment LLC
C/o Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111
Attn:  Bennett G. Young
Facsimile:  415.951.1180
Electronic mail:  byoung@dl.com

With a copy (which shall not constitute effective notice) to:

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111
Attn:  Bennett G. Young
Facsimile:  415.951.1180
Electronic mail:  byoung@dl.com

And to:

Diamond McCarthy LLP
120 Elm Street, 34th Floor
Dallas Tx 75270
Attn:  Walter (Skip) Scott
Facsimile:  214.389.5399
Electronic mail:  SScott@diamondmccarthy.com

or to such other Persons or addresses as may be designated in writing by the party to receive such notice.

12.8    Binding Effect; Assignment.  This Agreement shall be binding upon the Purchaser and, subject to entry of the Sale Order, the Trustee, and inure to the benefit of the parties and their respective successors and permitted assigns.  Nothing in this Agreement shall create or be

deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement except as provided below. No assignment of this Agreement or of any rights or obligations hereunder may be made by the Trustee or the Purchaser (by operation of law or otherwise) without the prior written consent of the other party and any attempted assignment without the required consents shall be void; provided, that the Purchaser may assign its rights and obligations hereunder in whole or in part to one or more Affiliates of the Purchaser (subject to the next succeeding sentence). No assignment of any obligations hereunder shall relieve the parties hereto of any such obligations. Upon any such permitted assignment, the references in this Agreement to the Purchaser shall also apply to any such assignee unless the context otherwise requires.

12.9    Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in a manner adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible..

12.10    Non-Recourse. Except as expressly contemplated by this Agreement, no past, present or future director, officer, employee, incorporator, member, partner, lender or equity holder of the Trustee or the Company shall have any liability for any obligations or liabilities of the Trustee under this Agreement or Trustee's Documents of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby.

12.11    LIMITATION ON DAMAGES. IN NO EVENT SHALL EITHER PARTY OR THEIR RESPECTIVE AFFILIATES HAVE ANY LIABILITY TO THE OTHER PARTY OR ANY OTHER PERSON FOR ANY SPECIAL, CONSEQUENTIAL, INDIRECT, EXEMPLARY OR PUNITIVE DAMAGES (INCLUDING ANY DAMAGES ON ACCOUNT OF LOST PROFITS OR OPPORTUNITIES OR BUSINESS INTERRUPTION AND THE LIKE), WHETHER BY STATUTE, IN TORT OR UNDER CONTRACT, AND ANY SUCH CLAIM, RIGHT OR CAUSE OF ACTION FOR ANY SUCH DAMAGES IS HEREBY FULLY WAIVED, RELEASED AND FOREVER DISCHARGED.

12.12    Certain Interpretations.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)    All references in this Agreement to Articles, Sections, Schedules and Exhibits shall be deemed to refer to Articles, Sections, Schedules and Exhibits to this Agreement.

(ii)    All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.

Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

        (iii)    The Article, Section and paragraph captions herein are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions hereof.

        (iv)    The words "include," includes" and "including," when used herein shall be deemed in each case to be followed by the words "without limitation" (regardless or whether such words or similar words actually appear).

        (v)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day.

        (vi)    Any reference in this Agreement to $ shall mean U.S. dollars.

        (vii)    Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

        (viii) The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

        (b)    The parties hereto agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefor, waive the application of any Law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

        (c)    The Purchaser acknowledges hereby that the Trustee may not comply with the provisions of any bulk transfer laws of any jurisdiction in connection with the transactions contemplated by this Agreement.

*[Remainder of page intentionally left blank]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement, or a counterpart hereof, to be executed by their respective duly authorized officers as of the date first above written.

**TRUSTEE:**
**ALFRED GIULIANO,**
**as Chapter 7 Trustee on behalf of the**
**Bankruptcy Estate**

_____

**PURCHASER:**

**FPI MB ENTERTAINMENT LLC**


By: _____
      Name:
      Title:


By: _____
      Name:
      Title:

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement, or a counterpart hereof, to be executed by their respective duly authorized officers as of the date first above written.

**TRUSTEE:**
**ALFRED GIULIANO,**
**as Chapter 7 Trustee on behalf of the**
**Bankruptcy Estate**

_____

**PURCHASER:**

**FPI MB ENTERTAINMENT LLC**

By: _____
    Name: *Alexey Sidnew*
    Title: DIRECTOR

By: _____
    Name:
    Title:

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement, or a counterpart hereof, to be executed by their respective duly authorized officers as of the date first above written.

> **TRUSTEE:**
> **ALFRED GIULIANO,**
> **as Chapter 7 Trustee on behalf of the**
> **Bankruptcy Estate**
>
> _____
>
> **PURCHASER:**
>
> **FPI MB ENTERTAINMENT LLC**
>
> By: _____
>      Name:
>      Title:
>
> By: _____
>      Name: DAVID WASSON
>      Title: DIRECTOR

## EXHIBIT A

## FORM OF BILL OF SALE

A-1

NEWYORK 7017364 (2K)

**Exhibit A**

## BILL OF SALE AND INSTRUMENT OF ASSIGNMENT OF ASSETS AND ASSUMPTION OF LIABILITIES

BILL OF SALE AND INSTRUMENT OF ASSIGNMENT OF ASSETS AND ASSUMPTION OF LIABILITIES, dated as of February __, 2009 (this "Bill of Sale and Instrument of Assignment and Assumption"), from Alfred Guiliano, in his capacity as the Chapter 7 Trustee (the "Trustee") for the bankruptcy estate of HRP Myrtle Beach Operations, LLC, a limited liability company organized under the laws of the State of Delaware (the "Bankruptcy Estate"), to FPI MB Entertainment LLC, a limited liability company organized under the laws of the State of Delaware (the "Purchaser");

WHEREAS, the Trustee is the Chapter 7 Trustee for the Bankruptcy Estate;

WHEREAS, the Trustee and the Purchaser have entered into an Asset Purchase Agreement, dated as of February 9, 2009 (the "Asset Purchase Agreement"; unless otherwise defined herein, capitalized terms shall be used herein as defined in the Asset Purchase Agreement), pursuant to which the Trustee has agreed to sell, assign and transfer to the Purchaser, and the Purchaser has agreed to purchase and acquire from the Trustee on behalf of the Bankruptcy Estate, the Purchased Assets and the Purchaser has agreed to assume the Assumed Liabilities;

WHEREAS, the execution and delivery of this Bill of Sale and Instrument of Assignment and Assumption by the Trustee and the Purchaser is required by Sections 3.3(a) and 3.4(c) of the Asset Purchase Agreement;

NOW, THEREFORE, in consideration of the promises and mutual agreements set forth in the Asset Purchase Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Trustee and the Purchaser does hereby agree as follows:

1.    Sale and Assignment of Assets and Properties.  On the terms and subject to the conditions set forth in the Asset Purchase Agreement, the Trustee hereby sells, assigns, transfers, conveys and delivers unto the Purchaser and its successors and assigns, forever, the entire right, title and interest of the Bankruptcy Estate free and clear of all Encumbrances (except Permitted Encumbrances) in and to the Purchased Assets.

2.    Assumption of Assumed Liabilities.  On the terms and subject to the conditions set forth in the Asset Purchase Agreement, the Purchaser hereby assumes, and agrees to timely pay, perform and discharge in accordance with their terms, the Assumed Liabilities.

3.    Further Action.  The Trustee shall, at the request of the Purchaser, use commercially reasonable efforts to timely execute and deliver any additional documents and perform such additional acts that may be necessary, proper and advisable under applicable Law to grant, sell, convey, assign, transfer, set over to or vest in the Purchaser any of the Purchased Assets.

4.      No Third Party Beneficiaries.  This Bill of Sale and Instrument of Assignment and Assumption shall be binding upon and inure solely to the benefit of the parties to the Asset Purchase Agreement and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person, any legal or equitable right, benefit or remedy of any nature whatsoever, under or by reason of this Bill of Sale and Instrument of Assignment and Assumption.

5.      Interpretation.  The respective rights of the Trustee and the Bankruptcy Estate, on the one hand, and the Purchaser, on the other, with respect to the Purchased Assets sold, transferred, assigned and conveyed hereby and the assumption of the Assumed Liabilities hereunder shall be governed exclusively by the Asset Purchase Agreement, and nothing in this Bill of Sale and Instrument of Assignment and Assumption shall alter any liability or obligations arising under the Asset Purchase Agreement, which shall (without limiting the generality of the foregoing) govern, and shall contain the sole and exclusive representations, warranties and obligations of the parties with respect to the rights and obligations sold, transferred, assigned, conveyed and assumed hereunder.  If there is any conflict or inconsistency between the provisions of the Asset Purchase Agreement and this Bill of Sale and Instrument of Assignment and Assumption, the provisions of the Asset Purchase Agreement shall govern.

6.      Governing Law.  This Bill of Sale and Instrument of Assignment and Assumption shall be governed by the Laws of the State of New York, and to the extent applicable, the Bankruptcy Code.

7.      Counterparts.  This Bill of Sale and Instrument of Assignment and Assumption may be executed and delivered (including by facsimile transmission) in counterparts, and by the different parties hereto in separate counterparts, each of when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.

[Remainder of Page Intentionally Left Blank]

2

IN WITNESS WHEREOF, this Bill of Sale and Instrument of Assignment and Assumption has been duly executed as of the date first above written.

THE TRUSTEE

ALFRED GUILIANO

_____

Alfred Guiliano, Trustee

FPI MB ENTERTAINMENT LLC

By: _____
    Name:
    Title:

3

## EXHIBIT B

## FORM OF SALE ORDER

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : Chapter 7 |
| | : |
| HRP Myrtle Beach Holdings, LLC *et al.*,[1] | : Case No. 08-12193 (KJC) |
| | : |
| Debtors | : Jointly Administered |
| | : |
| | : **Related Doc. No.** _____ |
| | : |

## ORDER (I) AUTHORIZING SALE OF HARD ROCK PARK FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS AND (II) ESTABLISHING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN DESIGNATED CONTRACTS AND UNEXPIRED LEASES

This matter is before the Court on the motion[1] (the "Sale Motion") [Docket No. ___],

dated February 9, 2009, of Alfred Giuliano, as Chapter 7 Trustee (the "Trustee") on behalf of the

bankruptcy estate of HRP Myrtle Beach Operations, LLC (the "Selling Debtor," and together

with the other, related debtors, the "Debtors"), and for entry of an order, pursuant to sections

105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007 and

9014 approving the asset purchase agreement, a copy of which was attached as Exhibit A to the

Sale Motion, (the "Asset Purchase Agreement") by and among the Trustee and FPI MB

Entertainment LLC (the "Purchaser"), and such other agreements to be entered into and among

the parties as contemplated therein, and authorizing the sale of the Purchased Assets to the

---

[1] The Debtors are the following seven entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): HRP Myrtle Beach Holdings, LLC (1546), HRP Myrtle Beach Holdings Capital Corp. (5553), HRP Myrtle Beach Operations, LLC (1625), HRP Myrtle Beach Capital Corp (4272), HRP Myrtle Beach Management, LLC (0297), HRP Global Management LLC (2138) and We Got Your Back Security Co., LLC (3877). The address of each of the Debtors is 211 George Bishop Parkway, Myrtle Beach, South Carolina 29579.

Purchaser (the "Sale") free and clear of all liens, claims, encumbrances, and other interests (all

such liens, claims, encumbrances and other interests shall be referred to collectively as the

"Liens") other than any Permitted Liens and Assumed Liabilities; and the Court having heard

statements of counsel and the evidence presented in support of the relief requested by the Trustee

in the Sale Motion at a hearing before the Court on February 17, 2009 (the "Sale Hearing"); and

it appearing that the Court has jurisdiction over this matter; and it further appearing that the legal

and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the

relief granted herein; and after due deliberation thereon,

THE COURT HEREBY FINDS AND DETERMINES THAT:[2]

**Jurisdiction, Final Order and Statutory Predicates**

A.      This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28

U.S.C. §§ 157(b)(1) and 1334(a).  This is a core proceeding pursuant to 28 U.S.C. §

157(b)(2)(A), (N) and (O).  Venue is proper in this District and in this Court pursuant to 28

U.S.C. §§ 1408 and 1409.

B.      This Order constitutes a final and appealable order within the meaning of 28

U.S.C. § 158(a).

---

[1] Unless otherwise stated, all capitalized terms not defined herein shall have the same meaning as set forth in the Asset Purchase Agreement (as defined herein) and the Sale Motion, as applicable.

[2] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  All findings of fact and conclusions of law announced by the Court at the Sale Hearing in relation to the Sale Motion are hereby incorporated herein to the extent not inconsistent herewith.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.