# EXHIBIT "A"

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | Chapter 7 |
|  | : |  |
| HRP Myrtle Beach Holdings, LLC *et al.*, | : | Case No. 08-12193 (KJC) |
|  | : |  |
| Debtors | : | Jointly Administered |
|  | : |  |
|  | : | **Hearing Date: Requested: 2/17/2009 at 10:00 a.m.** |
|  | : | **[Pending Motion to Limit and Shorten Notice]** |
|  | : |  |
|  | : | **Objection Date: Requested: 2/17/2009 at 10:00 a.m.** |
|  | : | **[Pending Motion to Limit and Shorten Notice]** |

## NOTICE OF MOTION

To:  (a) the United States Trustee; (b) counsel to the administrative agents for the Debtors' prepetition secured lenders; (c) counsel to the Debtors' postpetition lenders; (d) counsel for the Junior DIP Lenders; (e) counsel for the Senior Indenture Trustee; (f) counsel for the Junior Indenture Trustee; (g) counsel for the Revolving Credit Agent and Senior Post-Petition Agent; (h) counsel to the Debtors; (i) creditors holding the twenty (20) largest unsecured claims against the each of the Debtors as included in the Debtors' Chapter 11 Schedules or their legal counsel, if known; (j) unsecured creditors with a scheduled claim in excess of $25,000 as identified in the Selling Debtor's Schedules; (k) any known secured creditors as listed in Schedule D of the Debtors' Chapter 11 Schedules; (l) parties as listed in Schedule G of the Debtors' Chapter 11 Schedules; (m) all persons or entities known or reasonably believed to have asserted a Lien in any of the Purchased Assets; (n) the United States Department of Justice; (o) counsel to the Purchaser; (p) all persons or entities known or reasonably believed to have expressed an interest in acquiring the Purchased Assets; (q) the Attorney General for the State of South Carolina; (r) the United States Environmental Protection Agency; (s) South Carolina Environmental Regulator; (t) Internal Revenue Service; (u) South Carolina Department of Revenue; (v) South Carolina Dept. of Labor, Licensing and Regulation; (w) Horry County Treasurer's Office; (x) Horry County Property Assessor; (y) City of Myrtle Beach, Administration; and (z) any party who has requested notice and service of papers pursuant to Bankruptcy Rule 2002.

**PLEASE TAKE NOTICE** that Alfred T. Giuliano, Chapter 7 trustee (the "Trustee") has filed the *Motion for Entry of an Order (I) Authorizing Sale Of Hard Rock Park Free and Clear of All Liens, Claims, Encumbrances and Other Interests and (II) Establishing Procedures for the Assumption and Assignment of Certain Designated Contracts and Unexpired Leases* (the "Motion"). Objections to the Motion, if any, may be filed on or before **February 17, 2009 at 10:00 a.m. (ET)** (the "Objection Deadline") with the United States Bankruptcy Court for the District of Delaware, 3rd Floor, 824 N. Market Street, Wilmington, DE.

DOCKET NO. *401*

DATE *2/10/09*

19801.  At the same time, you must also serve a copy of the response upon the Trustee's counsel:

<div align="center">

**John T. Carroll, III, Esquire**
**Cozen O'Connor**
**1201 North Market Street, Suite 1400**
**Wilmington, DE  19801**
**Telephone:  (302) 295-2000**
**Facsimile:  (302) 295-2013**

</div>

PLEASE TAKE NOTICE THAT IF YOU FAIL TO RESPOND TO THE MOTION, THE COURT MAY GRANT THE REQUESTED RELIEF WITHOUT FURTHER NOTICE OR A HEARING.

PLEASE TAKE FURTHER NOTICE THAT A HEARING TO CONSIDER THE MOTION HAS BEEN SCHEDULED BEFORE THE HONORABLE KEVIN CAREY AT THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 N. MARKET STREET, 5th FLOOR, COURTROOM 5, WILMINGTON, DE 19801, **FEBRUARY 17, 2009 AT 10:00 A.M.**

Dated: February 10, 2009

COZEN O'CONNOR

John T. Carroll, III, (DE No. 4060)

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| | : | |
| HRP Myrtle Beach Holdings, LLC *et al.*,[1] | : | Case No. 08-12193 (KJC) |
| | : | |
| Debtors | : | Jointly Administered |
| | : | |
| | : | **Hearing Date: Requested: 2/17/2009 at 10:00 a.m.** |
| | : | **[Pending Motion to Limit and Shorten Notice]** |
| | : | |
| | : | **Objection Date: Requested: 2/17/2009 at 10:00 a.m.** |
| | : | **[Pending Motion to Limit and Shorten Notice]** |

### MOTION OF ALFRED T. GIULIANO, CHAPTER 7 TRUSTEE, FOR ENTRY OF AN ORDER (I) AUTHORIZING SALE OF HARD ROCK PARK FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS AND (II) ESTABLISHING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN DESIGNATED CONTRACTS AND UNEXPIRED LEASES

Alfred T. Giuliano, Chapter 7 Trustee (the "Trustee")[2] for the estate of HRP Myrtle Beach Operations LLC (the "Selling Debtor," and together with the other related debtor affiliates, the "Debtors"), hereby moves this Court for the entry of an order pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code") authorizing the sale of the Purchased Assets (as defined herein) to FPI MB Entertainment LLC (the "Purchaser") pursuant to an Asset Purchase Agreement, dated February 9, 2009, a copy of which is attached hereto as Exhibit "A" (the "APA"), free and clear of all liens, claims,

---

[1]     The Debtors are the following seven entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): HRP Myrtle Beach Holdings, LLC (1546), HRP Myrtle Beach Holdings Capital Corp. (5553), HRP Myrtle Beach Operations, LLC (1625), HRP Myrtle Beach Capital Corp (4272), HRP Myrtle Beach Management, LLC (0297), HRP Global Management LLC (2138) and We Got Your Back Security Co., LLC (3877). The address of each of the Debtors is 211 George Bishop Parkway, Myrtle Beach, South Carolina 29579.

[2]     Capitalized terms used herein as defined terms and not otherwise defined shall have those meaning ascribed to them in the APA.



DOCKET NO. 401

DATE 2/10/09

encumbrances and other interests and to establish procedures for the assumption and assignment of certain designated contracts and unexpired leases (the "Sale Motion"), and in support of the Sale Motion, the Trustee respectfully states as follows:

### Jurisdiction and Venue

1.    The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

### General Background

2.    The Debtors own a destination theme park located in Myrtle Beach, South Carolina (the "Park" or "Hard Rock Park").   As more fully set forth in the Affidavit of Steven Goodwin in Support of First-Day Pleadings (the "Goodwin Affidavit"), as the world's first rock-'n-roll theme park, the Park offered visitors an entertainment experience that features six unique, custom-designed zones celebrating the culture, lifestyle and legends of rock music entertainment.  The Debtors are not affiliated with Hard Rock Café International, Inc., but branded and operated the Park pursuant to a license agreement with Hard Rock Café International (USA), Inc.

3.    The Park opened in April 2008, after nearly two years of construction. Although guest satisfaction levels were reportedly strong and guests spent considerable amounts on food, beverage and retail items, overall attendance at the Park was lower than projected which is thought to be partly as a result of macroeconomic conditions that significantly depressed overall demand in the travel and leisure industry, as well as the Debtors' inability to devote sufficient resources to local, regional and out-of-market marketing in their initial year of operations.   Accordingly the Debtors were faced with significant

-2-

liquidity constraints at the conclusion of their first season of operations and, in that context, a substantially overleveraged balance sheet.

4.    On September 24, 2008 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. After the Petition Date, the Debtors continued to operate their businesses as debtors and debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.

5.    On November 10, 2008, the Debtors filed a Motion to Approve an Order (I)(A) Approving Procedures in Connection With the Sale of the Debtors' Assets; (B) Scheduling the Related Auction to Consider Approval of Sale; (C) Approving Procedures Related to the Assumption of Certain Executory Contracts and Unexpired Leases; (D) Approving the Form and Manner of Notice Thereof; and (E) Granting Related Relief; and (II)(A) Authorizing the Sale of Such Assets Pursuant to the Modified Purchase Agreement Free and Clear of Liens, Claims Encumbrances, and Other Interests; (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (C) Granting Related Relief (the "Chapter 11 Sale Motion") pursuant to which the Debtors sought approval of certain procedures in connection with a proposed sale of the Debtors' assets (the "Assets") [Docket No. 146]. On November 20, 2008, the Court entered an order approving the proposed sale procedures (the "Chapter 11 Sale Motion Order") [Docket No. 194]. The Chapter 11 Sale Motion Order set a deadline of December 12, 2008 for submitting bids and scheduled an auction on December 15, 2008, if necessary. Unfortunately, the Debtors were unable to generate any qualifying offers, and were therefore unable to sell their Assets. On or about December 30, 2008, the Debtors informed the Court of their intention to seek conversion of their Chapter 11 cases to cases under Chapter 7 of the Bankruptcy Code.

-3-

6.      On January 6, 2009 (the "Conversion Date"), the Court entered an Order Converting the Debtors' Chapter 11 Bankruptcy Cases to Cases under Chapter 7 of the Bankruptcy Code [Docket No. 335], and the United States Trustee appointed Alfred T. Giuliano as the interim Trustee [Docket No. 336].

### The Debtors' Debt Structure

7.      According to the Goodwin Affidavit, the Debtors' primary liabilities consist of (a) a revolving credit facility, (b) junior secured debtor-in-possession financing facility, (c) senior secured notes, (d) junior secured notes, (e) pay-in-kind notes, and (f) unsecured trade debt. These liabilities are described in more detail below.

A.      The Revolving Credit Agreement

8.      On March 30, 2006, the Selling Debtor entered into a $15 million revolving credit agreement (the "Revolving Credit Agreement," and together with the documents, agreements and instruments executed or delivered from time to time in connection therewith, the "Revolving Credit Documents")[3] with Deutsche Bank Trust Company Americas ("DBTCA"), as agent (in such capacity, the "Revolving Credit Agent"), and various lenders thereto (the "Senior Revolving Lenders"), to fund its general corporate and working capital needs.

9.      As of the Petition Date, the Debtors were indebted to the Senior Revolving Lenders in the principal amount of not less than fifteen million dollars ($15,000,000), plus accrued and unpaid interest thereon and fees, costs and expenses (including fees and expenses of the counsel, consultants and advisors for the Revolving Credit Agent and Senior Revolving

---

[3]     The Revolving Credit Agreement has been guaranteed by HRP Myrtle Beach Holdings, LLC and HRP Myrtle Beach Capital Corp.

-4-

Lenders), and all other amounts payable (collectively, the "Revolving Credit Obligations"), under and pursuant to the Revolving Credit Agreement. The Senior Revolving Lenders have also alleged that the Debtors are indebted on account of, and as used herein the Revolving Credit Obligations also include, certain specified hedging obligations (the "Hedging Obligations") associated with the termination of an interest rate hedging agreement to which the Selling Debtor was a party, totaling approximately $3,490,000 as of the Petition Date, plus all accrued and unpaid interest, fees and other amounts related thereto. As used herein, "Revolving Lenders" shall include both the lenders from time to time under the Revolving Credit Agreement and the counterparties to the Hedging Obligations.

10.    The Senior Revolving Lenders have also alleged that, pursuant to the Revolving Credit Documents, the Revolving Credit Agent, for the benefit of the Revolving Lenders, holds, with certain exceptions to the extent set forth in the Revolving Credit Documents, perfected, valid, enforceable, and non-avoidable first-priority liens on and security interests in (the "Revolving Credit Pre-Petition Liens") all of the Debtors' now existing or hereinafter arising properties and assets of any kind or nature, including, without limitation, cash, accounts receivable, chattel paper, contracts, equipment, general intangibles, instruments, intellectual property, inventory, investment property, letter of credit rights, commercial tort claims, real property, pledged capital stock and other pledged interests of subsidiaries and other tangible and intangible personal property, together with all proceeds, products, offspring, rents, and profits thereof, whether arising prior to, on, or after the Petition Date (the "Revolving Credit Pre-Petition Collateral").

B.    The Junior Secured DIP

11.     On September 29, 2008, the Court entered an Interim Order (A) Authorizing The Debtors To Obtain Super-Priority Senior Secured Postpetition Financing, (B) Authorizing The Debtors To Use Cash Collateral of Existing Secured Lenders, On A Limited Basis, (C) Providing Related Adequate Protection, and (D) Prescribing The Form and Manner of Notice And Setting The Time For The Final Hearing [Docket No. 37], and on October 22, 2008, the Court entered a Final Order (A) Authorizing the Debtors to obtain Super-Priority Senior Secured Post-Petition Financing, (B) Authorizing the Debtors to Use Cash Collateral of Existing Secured Creditors, on a Limited Basis, and (C) Providing Related Adequate Protection (the "Final Junior DIP Order") [Docket No. 113].

12.     Pursuant to the Final Junior DIP Order, certain holders (the "Junior Secured DIP Lenders") of the Debtors' Senior Bonds (as defined below) provided debtor-in-possession financing ("Junior Secured DIP Financing") to the Debtors, which was junior in priority, and subject, to the Revolving Credit Obligations and all related adequate protection liens and claims in favor of the Revolving Credit Lenders.

C.      Senior Secured Notes

13.     According to the Goodwin Affidavit, on March 30, 2006, the Selling Debtor and HRP Myrtle Beach Capital Corp. (collectively, the "Issuers") issued Floating Rate Senior Secured Notes due 2012 (the "Senior Bonds") in the aggregate principal amount of $155,000,000. DBTCA is the trustee of the Senior Bonds. Interest on the Senior Bonds accrues at a variable annual rate of the six-month LIBOR rate, plus 4.75% and is reset semi-annually. The interest rate on the Senior Bonds as of June 30, 2008 was 7.38%. Interest payments are due semi-annually on April 1 and October 1 of each year. The Senior Bonds were guaranteed by HRP Myrtle Beach Holdings, LLC, We Got Your Back Security Co., LLC,

-6-

and the existing and future wholly-owned domestic subsidiaries of the Issuers (collectively, the "Bond Guarantors"). The Senior Bonds are secured by a first priority lien on all amounts on deposit in the Senior Bonds interest reserve account (the "Senior Interest Reserve Account")[4] and a second priority lien on substantially all of the Issuers' existing and future assets, including the land and improvements of the Park and equity interests in the Issuers' subsidiaries. As of the Petition Date, the Issuers were current on their interest payments and the total amount due under the Senior Bonds was $155,000,000.

### D.    Swap Agreement

14.    According to the Goodwin Affidavit, in March 2006, HRP Myrtle Beach Operatings, LLC entered into an Interest Rate Swap Agreement (the "Swap") in order to manage risk associated with the variable interest rate associated with the Senior Bonds. The Swap fixed the interest rate on the Senior Bonds at a maximum of 10.5% for a three-year period. As of June 30, 2008, the Swap was recorded as a liability of $3,613,701.

### E.    Junior Secured Bonds

15.    On March 30, 2006, the Issuers issued 12.5% Junior Secured Notes due 2013 (the "Junior Bonds") in the aggregate amount of $100,000,000. Interest on the Junior Bonds accrues at a fixed annual rate of 12.5% and payments are due semi-annually on April 1 and October 1 of each year. The Junior Bonds have been guaranteed by the Bond Guarantors. The Junior Bonds are secured by a first priority lien on all amounts on deposit in the interest reserve account established for the Junior Bonds (the "Junior Interest Reserve Account") and a third priority lien on substantially all of the Issuers' existing and future assets, including the land and

---

[4]    The APA does not transfer any interest, or otherwise affect the Senior Interest Reserve Account or the Junior Interest Reserve Account (as defined herein).

improvements of the Park, and equity interests in the Issuers' subsidiaries. As of the Petition Date, the Issuers were current on their interest payments and the total amount due under the Junior Bonds was $100,000,000.

  F.  PIK Notes

  16.  According to the Goodwin Affidavit, on March 30, 2006, HRP Myrtle Beach Holdings, LLC, HRP Myrtle Beach Holdings Capital Corp., and HRP PIK Corp. issued 50,000 units, each consisting of (i) $1,000 aggregate principal amount of 14.5% Senior Pay-in-Kind Notes due 2014 co-issued by Holdings and Holdings Capital (the "PIK Bond Issuers"); and (ii) one share of Class B Common Stock of HRP PIK Corp. with a par value of $0.01 per share. As of the Petition Date, Holdings and Holdings Capital were current on their interest payments and the total amount due, including of all PIK Bonds issued by the PIK Bond Issuers, was $62,247,068.

  G.  Trade Debt

  17.  According to the Goodwin Affidavit, as of the Petition Date, the Debtors estimated that they owed approximately $7.1 million for goods and services provided to them on an unsecured basis.

**Notice of Abandonment**

  18.  On February 3, 2009, the Trustee filed a notice of abandonment of property of the estate [Docket No. 394] (the "Notice of Abandonment") by and through which the Trustee gave notice pursuant to Sections 105(a) and 554 of the Bankruptcy Code of abandonment of the Park, including but not limited to all related real property, all related equipment, all related inventory, and all related tangible personal property located at the Park and at the warehouse located at 568 George Bishop Parkway, Myrtle Beach, South Carolina from the Debtors'

bankruptcy estates as being burdensome to the estates and of inconsequential value and of no benefit to the estates given the lack of any value or equity in the Debtors' estates in excess of the liens and security interests held by creditors against the Park and related Assets. The Notice of Abandonment further provided that, if no objection or request for hearing is filed with the United States Bankruptcy Court for the District of Delaware and served on the Trustee's counsel within fifteen (15) days after the filing of the Notice of Abandonment, the Park and related Assets would be deemed abandoned by the Trustee from Debtors' bankruptcy estates.

19.    In the event that the proposed sale of the Purchased Assets as contemplated by this Sale Motion is approved, the Trustee intends to withdraw the Notice of Abandonment prior to February 18, 2009.

### Purchased Assets to Be Sold

20.    By and through the APA, the Trustee has agreed, subject to approval by the Bankruptcy Court, to sell all of the Selling Debtor's right, title and interest in, to and under, the following assets, properties and rights of the Selling Debtor located at or related to the Park (the "Purchased Assets"), to the Purchaser free and clear of all claims, liens, and encumbrances (other than encumbrances included in the Assumed Liabilities and Permitted Encumbrances):

> a)    all real property owned by the Bankruptcy Estate, as set forth by legal description on Schedule 1.1(a) ("Owned Real Property") of the APA;
>
> b)    to the extent assignable or transferable in accordance with the terms and conditions of the applicable Permits or applicable Law, all Permits and all pending applications therefor;
>
> c)    all Documents used in respect of the Purchased Assets or Assumed Liabilities;
>
> d)    all goodwill and other intangible assets generated or associated with the Purchased Assets;

-9-

e)    all Inventory and Equipment (including spare parts with respect thereto) (as set forth in Schedule 1.1(e)) of the APA, provided that Inventory branded with the Hard Rock Park, Hard Rock or other similar logos licensed from a third party shall not be transferred to the extent transfer of such Inventory is prohibited by the terms of the applicable license agreement and provided further that any Equipment branded with the Hard Rock Park, Hard Rock or other similar logos licensed from a third party shall be sold to the Purchaser subject to compliance with the applicable license agreement, removal of licensed materials or subsequent agreement with the applicable licensor);

f)    all rights, claims, credits, causes of action or rights of set-off against third parties relating to the Purchased Assets, including rights under vendor's, contractor's and manufacturer's warranties, indemnities and guaranties (but excluding (i) avoidance claims and causes of action under the Bankruptcy Code or similar state Law and (ii) claims and causes of action against directors, officers and employees of the Company other than any such claims or causes of action that arise out of any Contract that is a Purchased Asset);

g)    any counterclaims, setoffs or defenses that the Company may have with respect to any Assumed Liabilities;

h)    to the extent assignable or transferable in accordance with the terms and conditions of the applicable insurance policies or applicable Law, all of the Company's insurance policies and rights and benefits related to the Purchased Assets or Assumed Liabilities provided however that any coverage, rights or benefits under the liability policies with respect to claims arising out of or relating to any occurrence or event that happened prior to Closing shall continue to inure to the benefit of the Bankruptcy Estate notwithstanding the transfer under this provision; and

i)    all Contracts assigned to the Purchaser pursuant to Section 6.3 of the APA.

**Marketing of the Purchased Assets**

21.    Prior to the Conversion Date, the Debtors and their professionals including Raymond James & Associates ("Raymond James"), marketed the Purchased Assets, however they were unable to find any parties willing to bid more than $20 million for the Purchased

-10-

Assets. Further, since the Conversion Date, Raymond James has continued to market the Purchased Assets to prospective purchasers.

22.     Specifically, beginning in November 2008, Raymond James engaged in an extensive marketing process with regard to the sale of the Debtors' assets pursuant to section 363 of the Bankruptcy Code as follows: approximately two hundred and six (206) interested parties were contacted and confidentiality agreements were forwarded to one hundred and four (104) interested parties of which forty-six (46) interested parties returned executed confidentiality agreements. According to Raymond James, all of the interested parties were provided the opportunity to execute confidentiality agreements, and those interested parties that executed a confidentiality agreement were provided substantial information concerning, and access to, the Debtors, including, but not limited to, presentations and discussions with the Debtors' management; access to an extensive online data room containing detailed financial information, operating statistics, material agreements and other operational and financial information of the Debtors. Additionally, nine (9) of the interested parties conducted one or more on-site tours of the Park. Unfortunately, during the Chapter 11, the Debtors received no offers for the Purchased Assets which constituted qualified offers under the procedures established in the Chapter 11 Sale Motion Order.

23.     Since the Conversion Date, Raymond James has worked to continue to market the Purchased Assets to interested parties as follows: forty-five (45) interested parties were contacted, including twenty-five (25) additional interested parties that were not previously contacted in the Chapter 11 sale process. Of the forty-five (45) interested parties that were contacted, thirty-nine (39) executed confidentiality agreements and were provided substantial information concerning the Debtors' assets. Additionally, thirteen (13) of the interested parties

-11-

conducted on-site tours of the Park since the conversion of the Chapter 11 cases to Chapter 7. To date, Raymond James has received formal offers from 11 of the interested parties for the Assets. The Purchaser's offer of $25,000,000 is the highest and best offer received by the Trustee for the Purchased Assets.

### Time is of the Essence

24.    The Purchaser has informed the Trustee that time is of the essence for the consummation of the sale and has required that the sale of the Purchased Assets close no later than February 20, 2009. The Senior Revolving Lenders have also required that the sale close as soon as possible.

25.    The Memorial Day holiday weekend, the first long weekend of the summer vacation season, is May 23 to 25, 2009. Many people take advantage of the three-day Memorial Day weekend to take a short vacation to a nearby destination. As a result, Memorial Day usually is a busy weekend for theme parks. Moreover, the publicity and "buzz" generated is important to marketing a theme park during the rest of the summer. The Purchaser has advised the Trustee that if the Park is not open Memorial Day weekend, the Purchaser will suffer a significant revenue loss which impacts the Purchaser's valuation model and willingness to offer the Purchase Price.

26.    The Purchaser expects that readying the Park for reopening will take at least ninety (90) days. There are numerous tasks that must be accomplished before the Park will be ready to reopen. Among other things, South Carolina safety regulations mandate annual maintenance of the Park's rides. These regulations include a requirement that the rides be disassembled, inspected and then reassembled. Selected rides must be re-vamped and new capital expenditures made. The rides and other equipment will need to be tested. Furthermore,

-12-

the Park's landscape and hardscape must be refurbished as necessary and a physical inventory of the goods and equipment made.

27.    In addition, a marketing and public relations plan must be designed and implemented. Merchandising must also be arranged. New attractions and shows must be designed and produced. Employees must be hired and trained. The food and beverage service must be planned and prepared. Systems must be planned and integrated.

28.    Finally, the Purchaser anticipates conducting a "soft opening" of the Park prior to the Memorial Day weekend. A soft opening is a private opening where friends and family and selected representative groups are invited to come experience the Park. This soft opening will permit management to test the park experience and to refine the operating strategy.

29.    In order to open the Park prior to the summer season, the Purchaser has required that the sale close no later than February 20, 2009. Section 2.1 of the APA provides that, in the event that the sale does not close by February 20, 2009, the Purchase Price shall be reduced by the sum of One Million Dollars ($1,000,000), and shall be further reduced in the amount of Fifty Thousand Dollars for each day after February 20, 2009 that the Closing does not occur.

30.    In an effort to have the sale consummated prior to February 20, 2009, contemporaneously with the filing of this motion, the Trustee has filed a motion to shorten notice to have this Sale Motion considered at a hearing on February 17, 2009 at 10:00 a.m. (the "Sale Approval Hearing"). Subject to approval of this Sale Motion, at the Sale Approval Hearing, the closing of the purchase and sale of the Purchased Assets shall take place at the offices of Cozen O'Connor, 1900 Market Street, Philadelphia, PA Philadelphia, PA 19103-3508 (or at such other place as the parties may designate in writing) no later than February 20,

-13-

2009, unless another time or date, or both, are agreed to in writing by the Trustee, the Purchaser, and the Senior Revolving Lenders.

## Sale Approval Hearing

31.     At the Sale Approval Hearing, the Trustee will seek Court approval of the sale to the Purchaser or another party submitting the highest and best bid, free and clear of all liens, claims and encumbrances pursuant to 11 U.S.C. § 363, and except as otherwise specifically provided in the APA or the order approving the sale, all liens, claims and encumbrances to attach to the Sale Proceeds with the same validity and in the same order of priority as they attached to the Purchased Assets prior to the sale, including the assumption by the Debtors and assignment to the Prevailing Bidder(s) of the assumed Contracts and Leases pursuant to section 365 of the Bankruptcy Code.   The Trustee will submit and present additional evidence, as necessary, at the Sale Approval Hearing demonstrating that the sale to the Purchaser as provided in the APA is fair, reasonable and in the best interest of the Selling Debtor's estate and all interested parties.

## Assumption and Assignment of Certain Executory Contracts and Unexpired Leases

32.     On January 16, 2009 and January 30, 2009, the Trustee filed motions to reject substantially all of the Selling Debtor's executory contracts and unexpired leases, including all personal property leases, real property leases, intellectual property agreements (to the extent such are executory contracts), licenses and trademark agreements (the "Motions to Reject") [Docket Nos. 364 and 389].   In the event that the Trustee does not withdraw the Motions to Reject as to any particular executory contracts and unexpired leases, such executory contracts and unexpired leases shall be rejected effective January 6, 2009.

-14-

33.    Pursuant to Section 6.3 of the APA, the Purchaser shall have until February 13, 2009, to designate the executory contracts or unexpired leases that the Purchaser desires deleted from the list of executory contracts to be rejected, in which case the Trustee shall withdraw the motion with respect to executory contracts and unexpired leases so designated by Purchaser.  On or before February 27, 2009, the Purchaser shall advise the Trustee which, if any, of the designated executory contracts and unexpired leases the Purchaser desires to have assigned to it.  The Trustee shall promptly file a motion seeking to assume and assign the designated executory contracts and unexpired leases to Purchaser and the Trustee shall use its commercially reasonable best efforts to have such motion heard by the Bankruptcy Court prior to March 7, 2009, and to file a motion requesting that any assignment to the Purchaser of any insurance policies is effective as of the Closing Date.  Further, the Purchaser may delete any executory contract or unexpired lease from the list of contracts and leases to be assigned to the Purchaser at any time prior to the assignment of such contract or lease to the Purchaser.

34.    The Purchaser shall be responsible for any payment necessary to cure any default on any contract or lease assigned to the Purchaser, and the Trustee agrees that the payment of such cure amounts is sufficient consideration for the assignment.  The Trustee agrees that Purchaser may contact any party to any of the Selling Debtor's executory contracts or unexpired leases to discuss with such party the assumption and assignment of such contract or lease to the Purchaser.  If the Purchaser designates a contract or lease for deletion from the list of executory contracts and unexpired leases to be rejected and subsequently elects not to have a designated contract(s) or lease(s) assigned to it, the Purchaser, if it is the successful purchaser of the Purchased Assets, shall pay to the Trustee the amount of any administrative expense incurred by the Bankruptcy Estate on account of such contract or lease during the

-15-

period commencing with the Conversion Date through the date of rejection of such contract or lease and in no event shall the Senior Revolving Lenders or their agents be responsible for such amounts.

<center><b><u>Distribution of Proceeds of Sale</u></b></center>

35.    Upon consummation of the sale, the Trustee shall make distribution of the proceeds from the sale of the Purchased Assets, less normal and customary costs of closing, (including real estates taxes) and a net of an amount equal to (A) the amount of $1,273,250 for the benefit and use of the Bankruptcy Estate of the Selling Debtor, (B) the fees and expenses of Raymond James with respect to its role in the sale process, and (C) administrative expenses in an amount and subject to terms and documentation to be separately agreed between the Trustee and the Senior Revolving Lenders, to pay (and shall pay directly to) the Senior Revolving Lenders until their claims are paid in full, including, without limitation, claims for any and all principal, unpaid hedging obligations, interest, attorneys' fees and expenses and advances made during the Chapter 7 Case, in each case, to the fullest extent provided under the Pre-Petition Loan Documents (as defined in the APA).  In the event that any proceeds from the sale of the Purchased Assets remain after the claims of the Senior Revolving Lenders have been paid in full, such proceeds shall be delivered to the Trustee for distribution among the creditors of the Selling Debtor's bankruptcy estate in accordance with the order of priority applicable to their claims.

36.    The aforesaid distribution of proceeds from the sale of Purchased Assets (A) in the amount of $1,273,250 for the benefit and use of the Bankruptcy Estate of the Selling Debtor, (B) the fees and expenses of Raymond James with respect to its role in the sale process, and (C) administrative expenses in an amount and subject to terms and documentation

<center>-16-</center>

to be separately agreed between the Trustee and the Senior Revolving Lenders, are being made by the Senior Revolving Lenders as advances for the payment of expenses in accordance with the Pre-Petition Loan Documents (as defined in the APA). The expenses funded to date by the Senior Revolving Lenders since the Conversion Date which would constitute administrative expenses are in the amount of $564,000, including but not limited to items such as insurance, electric, real estate taxes, water and sewer charges, and payroll for security, maintenance and management personnel. There are additional expenses of an administrative nature which are anticipated to be incurred in the approximate amount of $300,000 prior to the Closing.

## RELIEF REQUESTED

37.    The Trustee requests entry of an order, a copy of which is attached hereto as Exhibit "B" (i) approving the sale of the Purchased Assets to the Purchaser pursuant to sections 105, 363, and 365 of the Bankruptcy Code, in accordance with the terms and conditions[5] of the APA,  (ii) authorizing the Trustee to enter into the APA and take all actions necessary to consummate the sale of the Purchased Assets, and (iii) establishing a procedure for the assumption and assignment of certain executory contracts and unexpired leases designated by the Purchaser.

## BASIS FOR RELIEF REQUESTED

### A.    The Sale of the Purchased Assets is Authorized by Section 363 and is a Sound Exercise of the Trustee's Business Judgment

38.    Section 363 of the Bankruptcy Code provides that a trustee, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Although section 363 of the Bankruptcy Code does not specify a

---

[5]    Attached as Exhibit "C" hereto are the highlighted provisions of the APA as required by Local Rule 6004-1.

standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, a sale of a debtor's assets should be authorized if a sound business reason exists for doing so. See, e.g., Meyers v. Martin (In re Martin), 91 F.3d 289, 295 (3d Cir. 1996), citing Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 515 (7th Cir. 1990; In re Abbotts Dairies of Pennsylvania, Inc., 788 P.2d 143 (2d Cir. 1986); In re Titusville Country Club, 128 BR. 396 (W.D. Pa. 1991); In re Delaware & Hudson Railway Co., 124 BR. 169, 176 D. Del. 1991); see also Official Committee of Unsecured Creditors v. The LTV Corp. (In re Chateaugay Corp.), 973 P.2d 141, 143 (2d Cir, 1992); Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir, 1983); Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). The Delaware & Hudson Railway court rejected the pre-Code "emergency" or "compelling circumstances" standard, finding the "sound business purpose" standard applicable and, discussing the requirements of that test under McClung and Lionel, observed that:

> [a] non-exhaustive list of factors to be considered in determining if there is a sound business purpose for the sale include: the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the likelihood that a plan of reorganization will be proposed and confirmed in the near future; the effect of the proposed disposition of the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the property; and whether the asset is decreasing or increasing in value. 124 B.R. at 176.

39.    The business judgment rule shields a trustee from judicial second-guessing. Johns-Manville Corp., 60 B.R. at 615-16 ("a presumption of reasonableness attaches to a debtor's management decisions"). Once a debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors

-18-

of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).  Thus, if a trustee's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1).  Indeed, when applying the "business judgment" standard, courts show great deference to a trustee's business decisions.  See Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.), 1989 WL 106838, at *3 (N.D. Ill. 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

40.    As set forth above, the Trustee has determined that the best method of preserving the value of the Selling Debtor's assets is through a sale.  The fairness and reasonableness of the consideration to be paid by the Purchaser has been demonstrated after a lengthy "market exposure" of the Purchased Assets, and an open and fair process by and through which the Debtors and the Trustee have sought to establish the highest and best value of the Purchased Assets.  After significant efforts, the Trustee has determined in his business judgment, and subject to higher and better offers, that the offer of the Purchaser as set forth in the APA realizes the highest value for the Purchased Assets.

**B.    The Sale of the Purchased Assets Free and Clear of Liens and Other Interests is Authorized by Section 363(f)**

41.    The Trustee further submits that it is appropriate to sell the Purchased Assets free and clear of liens pursuant to section 363(f) of the Bankruptcy Code.  Section 363(f) of the

-19-

Bankruptcy Code authorizes a trustee to sell assets free and clear of liens, claims, interests and encumbrances if:

    a)      applicable nonbankruptcy law permits sale of such property free and clear of such interests;

    b)      such entity consents;

    c)      such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

    d)      such interest is in bona fide dispute; or

    e)      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. 11 U.S.C. §363(f).

42.     This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

43.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free and clear" of liens and interests. In re Dundee Equity Corp., 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); In re Bygaph, Inc., 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same); Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met).

44.     The Trustee believes that one or more of the tests of section 363(f) are satisfied with respect to the transfer of the Selling Debtor's assets pursuant to the APA. In particular,

-20-

the Trustee believes that at least section 363(f)(2) will be met in connection with the transactions proposed under the APA because each of the parties holding liens on the Selling Debtor's Assets will consent or, absent any objection to this motion, will be deemed to have consented to the sale. Any lienholder also will be adequately protected by having their liens, if any, in each instance against the Selling Debtor or its estate, except as otherwise specifically provided in the APA or the order approving the sale attach to the Sale Proceeds ultimately attributable to the Purchased Assets in which such creditor alleges an interest, in the same order of priority, with the same validity, force and effect that such creditor had prior to the sale, subject to any claims and defenses the Selling Debtor and its estate may possess with respect thereto. Accordingly, section 363(f) authorizes the transfer and conveyance of the Selling Debtor's assets free and clear any such claims, interests, liabilities or liens.

45.    Although section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined anywhere in the Bankruptcy Code. Folger Adam Security v. DeMatteis/MacGregor JV, 209 F.3d 252, 257 (3d Cir. 2000). In the case of In re Trans World Airlines, Inc., 322 F.3d 283, 288-89 (3d Cir. 2003), the Third Circuit specifically addressed the scope of the term "any interest." The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in rem interests in property," the trend in modern cases is towards "a more expansive reading of 'interests in property' which 'encompasses other obligations that may flow from ownership of the property.'" Id. at 289 (citing 3 Collier on Bankruptcy 363.06[1]). As determined by the Fourth Circuit in In re Leckie Smokeless Coal Co., 99 F.3d 573, 581-582 (4th Cir. 1996), a case cited with approval and extensively by the Third Circuit in Folger, supra, the scope of section 363(f) is not limited to in rem interests. Thus, the Third Circuit in Folger stated that

Leckie held that the debtors "could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute." Folger, 209 F.3d at 258.

46.    Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes such assets free from successor liability resulting from pre-existing claims. See The Ninth Avenue Remedial Group v. Allis-Chalmers Corp., 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); MacArthur Company v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear under section 363(f) of the Bankruptcy Code); In re New England Fish Co., 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale included free and clear of Title VII employment discrimination and civil rights claims of debtor's employees); In re Hoffman, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any interest permissible even though the estate had unpaid taxes); American Living Systems v. Bonapfel (In re All Am. Of Ashburn, Inc.), 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product liability claims precluded on successor doctrine in a sale of assets free and clear); WBO Partnership v. Virginia Dept. of Medical Assistance Servs. (In re WBO Partnership), 189 B.R. 97, 104-05 (Bankr. E.D. Va. 1995) (Commonwealth of Virginia's right to recapture depreciation is an "interest" as used in section 363(f)).[6] The purpose of an order purporting to

---

[6]    Some courts, concluding that section 363(f) of the Bankruptcy Code does not empower them to convey assets free and clear of claims, have nevertheless found that section 105(a) of the Bankruptcy Code provides such authority. See Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (stating that the absence of specific authority to sell assets free and clear of claims poses no impediment to such a sale, as such authority is implicit in the court's equitable powers when necessary to carry out the provisions of title 11).

-22-

authorize the transfer of assets free and clear of all "interests" would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against the purchaser arising from the Selling Debtor's pre-sale conduct. Under section 363(f) of the Bankruptcy Code, the purchaser is entitled to know that the Selling Debtor's assets are not infected with latent claims that will be asserted against the purchaser after the proposed transaction is completed. Accordingly, consistent with the above-cited case law, the order approving the sale should state that the Purchaser (or highest and best bidder) is not liable as a successor under any theory of successor liability, for claims that encumber or relate to the Selling Debtor's assets.

### C.    No Need to Establish Bidding Procedures or Conduct an Auction Prior to the Sale Approval Hearing

47.    The Trustee believes that the Selling Debtor's estate will obtain the maximum recovery for its creditors notwithstanding that the Trustee is not seeking approval of bidding procedures or an auction process prior to the Sale Approval Hearing. The Debtors and the Trustee already have taken significant steps to identify potential purchasers.

48.    As set forth in Section 7.7 of the APA, effective February 11, 2009, the Trustee, the Senior Revolving Lenders and all officers, directors, employees, agents and representatives (including any investment banker, financial advisor, attorney, accountant or other representative) of the Trustee or the Senior Revolving Lenders cannot directly or indirectly (i) solicit, initiate, encourage, facilitate (including by way of furnishing information) or take any other action designed to facilitate any inquiries or proposals regarding any merger, share exchange, consolidation, sale of assets, sale of shares of capital stock (including by way of a tender offer) or similar transactions involving the Selling Debtor's bankruptcy estate for any of the Purchased Assets (ii) participate in any discussions or negotiations regarding an alternative transaction for any of the Purchased Assets, or (iii) enter into any agreement

-23-

regarding any alternative transaction for any of the Purchased Assets. Such non-solicitation provision provides that the Trustee at the hearing on this Motion may respond to inquiries from Qualified Bidders (as defined in the APA) by providing information that is not confidential information.

49.     As set forth above, the Debtors, the Trustee and their respective professionals, have already extensively marketed the Purchased Assets, and based upon the limited offers received, the Trustee believes that the Purchaser's offer is likely to be the highest and best offer for the Purchased Assets. In the event that another interested party submits a bid for the Purchased Assets at the Sale Approval Hearing, the Trustee will conduct an auction among all interested purchasers present at the Sale Approval Hearing to determine the highest and best offer for the Purchased Assets.

**D.     Backup Credit Bid**

50.     While the Trustee fully expects the Purchaser to honor its contractual obligations under the APA, the Trustee believes that the presence of a backup bid will further incentivize the parties to promptly consummate the proposed transaction. Pursuant to Section 363(k) of the Bankruptcy Code, the Senior Revolving Lenders have the statutory right (but not the obligation) to credit bid the full amount of the Revolving Credit Obligations and the Hedging Obligations in exchange for the Purchased Assets, free and clear of all liens, claims and encumbrances and with all the attendant rights, benefits and protections proposed to be afforded to the Purchaser. Accordingly, the Trustee requests that it be authorized, if the APA is validly terminated in accordance with its terms (or if a sale is delayed so that the Purchase Price is reduced to below $22 million), to sell and convey the Purchased Assets to the Senior Revolving Lenders (at their election) on a full credit bid basis. The Trustee and the Senior

-24-

Revolving Lenders have agreed that in the event of a consummation of a credit bid, the administrative expense payments (including the payment of $1,273,250 for the benefit and use of the Bankruptcy Estate) outlined above in the event of a cash sale to the Purchaser (other than the payment to Raymond James, which will be addressed separately) will be made in the event a credit bid transaction is consummated. Accordingly, given the enhanced incentive to closing the proposed cash sale transaction to the Purchaser, and the additional benefit to the estate in the form of the outlined administrative expense payments, the Trustee believes that the approval of the backup credit bid (to the extent the Senior Revolving Lenders elect their option to proceed with the credit bid) in the circumstances outlined above is fair, reasonable and in the best interests of the estates of the Debtors.

### E.    Assumption and Assignment of Certain Executory Contracts and Unexpired Leases

51.    Section 365(a) of the Bankruptcy Code provides a trustee "subject to the court's approval may assume or reject any executory contracts or unexpired leases of the debtor." 11 U.S.C. § 365(a). Upon finding that the Trustee has exercised his sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code. See Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.), 78 F.3d 18, 25 (2d Cir. 1996); Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993).

52.    Section 365(b) of the Bankruptcy Code requires that a trustee meet certain additional requirements to assume a lease:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contact or lease, the trustee—

-25-

(1)     cures, or provides adequate assurance that the trustee will promptly cure, such default;

(2)     compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(3)     provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b). This section does not apply to a default that is a breach of a provision relating to:

(4)     the insolvency or financial condition of the debtor at any time before the closing of the case;

(5)     the commencement of a case under this title;

(6)     the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement; or

(7)     the satisfaction of any penalty rate or provision relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the executory contract or unexpired lease.

11 U.S.C. § 365(b)(2).

53.     Pursuant to section 365(f)(2) of the Bankruptcy Code, a trustee may assign an executory contract or unexpired lease of nonresidential real property if:

(1)     the trustee assumes such contract or lease in accordance with the provisions of this section; and

(2)     adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

54.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."

-26-

See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); In re Bon Ton Rest. & Pastry Shop, Inc., 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

55.     Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid).

56.     The Trustee is seeking to establish a procedure by and through which the Trustee may  assume and assign any executory contracts and unexpired leases designated by the Purchaser (or higher and better bidder).  Specifically, the Trustee seeks approval of the following schedule in connection with the assumption or assignment of any executory contracts or unexpired leases :

> (a)     On or before February 27, 2009, the Purchaser shall advise the Trustee which, if any, of the designated executory contracts and unexpired leases the Purchaser desires to have assigned to it.

> (b)     No later than February 28, 2009, the Trustee shall promptly file a motion seeking to assume and assign the designated executory contracts and unexpired leases to Purchaser (the "Assumption and Assignment Motion"), and the Trustee shall serve a copy of the Assumption and Assignment Motion upon all nondebtor parties to all executory contracts and unexpired leases designated by the Purchaser for assumption and assignment to the Purchaser.   The Trustee shall include with the service of the Assumption and Assignment Motion, a copy of financial documents

evidencing the Purchaser's financial credibility, willingness and ability of the Purchaser to perform under the designated executory contracts and unexpired leases.

(c)    All nondebtor parties to any executory contracts and unexpired leases designated to be assumed and assigned to the Purchaser by and through the Assumption and Assignment Motion shall have until March 5, 2009 to file an objection to the proposed assumption and assignment of any executory contracts and unexpired leases to which it is a party.

(d)    The Bankruptcy Court shall consider the Assumption and Assignment Motion at a hearing on or prior to March 6, 2009, and any objections thereto.    At the hearing to consider the Assumption and Assignment Motion, the Trustee will present evidence to prove the Purchaser's financial credibility, willingness and ability to perform under the designated executory contracts and unexpired leases, and the Court and other interested parties therefore will have the opportunity to evaluate the Purchaser's ability to provide adequate assurance of future performance under the contracts or leases, as required by section 365(b)(1)(C) of the Bankruptcy Code.

57.    The Trustee respectfully submits that that these proposed procedures are in the best interests of the Debtors, their estates, and their creditors while satisfying the due process requirements for all parties to all nondebtor parties to executory contracts and unexpired leases which may be designated for assumption and assignment by the Purchaser.

F.    **The Purchaser should be Afforded All Protections Under Section 363(m) as a Good Faith Purchaser**

58.    Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from the debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal.    Specifically, section 363(m) states that:

The reversal or modification on appeal of an authorization under [section 363(b)] ... does not affect the validity of a sale ... to an entity that purchased ... such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(m) "fosters the 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'" In re Chateaugay Corp., 1993 U.S. Dist. Lexis 6130, *9 (S.D.N.Y. 1993) (quoting In re Abbotts Dairies of Penn., Inc., 788 F.2d 143, 147 (3d Cir. 1986)). See also Allstate Ins. Co. v. Hughes, 174 BR. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); In re Stein & Day, Inc., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

59.    The selection of the Purchaser is the product of arm's-length, good faith negotiations in a lengthy purchasing process. The Trustee intends to request at the Sale Approval Hearing a finding that the Purchaser (or party submitting a higher and better bid) is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

### G.    Relief from the Ten Day Waiting Period Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate.

60.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property. . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease. . .is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise." The Trustee requests that the Order be effective immediately by providing that the ten (10) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

61.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the ten (10) day stay period, Collier suggests that the ten (10) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."  10 Collier on Bankruptcy 15th Ed. Rev., ¶ 6064.09 (L. King, 15th rev. ed. 1988).  Furthermore, Collier on Bankruptcy provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  Id.

62.    The Trustee hereby requests that the Court waive the ten-day stay period under Bankruptcy Rules 6004(h) and 6006(d) or, in the alternative, if an objection to the sale is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal.

## Notice

63.    Notice of this Motion has been provided to (a) the United States Trustee; (b) counsel to the administrative agents for the Debtors' prepetition secured lenders; (c) counsel to the Debtors' postpetition lenders; (d) counsel for the Junior DIP Lenders; (e) counsel for the Senior Indenture Trustee; (f) counsel for the Junior Indenture Trustee; (g) counsel for the Revolving Credit Agent and Senior Post-Petition Agent; (h) counsel to the Debtors; (i) creditors holding the twenty (20) largest unsecured claims against the each of the Debtors as included in the Debtors' Chapter 11 Schedules or their legal counsel, if known; (j) unsecured

creditors with a scheduled claim in excess of $25,000 as identified in the Selling Debtor's Schedules; (k) any known secured creditors as listed in Schedule D of the Debtors' Chapter 11 Schedules; (l) parties as listed in Schedule G of the Debtors' Chapter 11 Schedules; (m) all persons or entities known or reasonably believed to have asserted a Lien in any of the Purchased Assets; (n) the United States Department of Justice; (o) counsel to the Purchaser; (p) all persons or entities known or reasonably believed to have expressed an interest in acquiring the Purchased Assets; (q) the Attorney General for the State of South Carolina; (r) the United States Environmental Protection Agency; (s) South Carolina Environmental Regulator; (t) Internal Revenue Service; (u) South Carolina Department of Revenue; (v) South Carolina Dept. of Labor, Licensing and Regulation; (w) Horry County Treasurer's Office; (x) Horry County Property Assessor; (y) City of Myrtle Beach, Administration; and (z) any party who has requested notice and service of papers pursuant to Bankruptcy Rule 2002. In light of the nature of the relief herein, the Trustee respectfully submits that no further notice of this Motion is required.

WHEREFORE, the Trustee respectfully requests that the Court enter order, a copy of which is attached hereto: (i) approving the sale of the Purchased Assets to the Purchaser, subject to higher and better offers, (ii) authorizing the Trustee to enter into the APA and take all actions necessary to consummate the sale of the Purchased Assets, (iii) establishing a procedure for the assumption and assignment of certain executory contracts and unexpired leases designated by the Purchaser, and (iv) granting such other and further relief as the Court may deem proper.

Dated:  February 10, 2009
        Wilmington, Delaware

COZEN O'CONNOR

/s/ John T. Carroll, III

John T. Carroll, III (DE No. 4060)
Jeffrey R. Waxman (DE No. 4159)
1201 North Market Street
Suite 1400
Wilmington, DE  19801
Telephone:  (302) 295-2028
Facsimile:  (302) 295-2013

Counsel to the Chapter 7 Trustee,
Alfred T. Giuliano

-32-



# ASSET PURCHASE AGREEMENT

## BY AND BETWEEN

## FPI MB Entertainment LLC

## as Purchaser,

## and

## ALFRED GIULIANO,

## as Chapter 7 Trustee on behalf of the bankruptcy estate of

## HRP Myrtle Beach Operations, LLC

## Dated as of February 9, 2009

## TABLE OF CONTENTS

ARTICLE I. PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES.......... 1

    1.1    Purchase and Sale of Assets......................................................................... 1

    1.2    Excluded Assets ........................................................................................... 3

    1.3    Assumption of Liabilities............................................................................. 4

    1.4    Excluded Liabilities ..................................................................................... 4

    1.5    "As Is" Transaction...................................................................................... 5

ARTICLE II. CONSIDERATION.................................................................................... 5

    2.1    Consideration ............................................................................................... 5

ARTICLE III. DEPOSIT, CLOSING AND TERMINATION ...................................... 6

    3.1    Deposit ......................................................................................................... 6

    3.2    Closing ......................................................................................................... 6

    3.3    Closing Deliveries by the Trustee................................................................ 6

    3.4    Closing Deliveries by the Purchaser ........................................................... 7

    3.5    Termination of Agreement............................................................................ 7

    3.6    Procedure Upon Termination........................................................................ 8

    3.7    Effect of Termination.................................................................................... 8

ARTICLE IV. REPRESENTATIONS AND WARRANTIES OF THE TRUSTEE................... 9

    4.1    Authority Relative to This Agreement.................................................... 9

    4.2    Brokers and Finders ............................................................................... 9

    4.3    Absence of Certain Developments
    4.4    Regulatory Matters; Permits
    4.5    Title to Assets
    4.6    Real Property
    4.7    Environmental Matters

ARTICLE V. REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ............. 11

    5.1    Corporate Organization and Qualification............................................. 11

    5.2    Authority Relative to This Agreement................................................... 12

    5.3    Consents and Approvals; No Violation; No Litigation ......................... 12

    5.4    Brokers and Finders ............................................................................... 13

    5.5    Investigation.......................................................................................... 13

ARTICLE VI. BANKRUPTCY COURT MATTERS ................................................. 13

    6.1    Sale Order .............................................................................................. 13

ARTICLE VII. COVENANTS AND AGREEMENTS ............................................... 15

# TABLE OF CONTENTS
## (continued)

| | | | |
|---|---|---|---|
| 7.1 | Restricted Activity | | 15 |
| 7.2 | Access to Information | | 16 |
| 7.3 | Further Agreements | | 17 |
| 7.4 | Preservation of Records | | 17 |
| 7.5 | Publicity | | 18 |
| 7.6 | Notification of Certain Matters | | 18 |
| ARTICLE VIII. CONDITIONS TO CLOSING | | | 20 |
| 8.1 | Conditions Precedent to the Obligations of the Purchaser and the Trustee | | 20 |
| 8.2 | Conditions Precedent to the Obligations of the Trustee | | 20 |
| 8.3 | Conditions Precedent to the Obligations of the Purchaser | | 21 |
| 8.4 | Frustration of Closing Conditions | | 22 |
| ARTICLE IX. ADDITIONAL DEFINITIONS | | | 22 |
| 9.1 | Certain Definitions | | 22 |
| ARTICLE X. TAXES | | | 29 |
| 10.1 | Additional Tax Matters | | 29 |
| ARTICLE XI RISK OF LOSS | | | 24 |
| ARTICLE XII. MISCELLANEOUS | | | 30 |
| 11.1 | Payment of Expenses | | 30 |
| 11.2 | Survival of Representations and Warranties; Survival of Covenants | | 31 |
| 11.3 | Entire Agreement; Amendments and Waivers | | 31 |
| 11.4 | Counterparts | | 31 |
| 11.5 | Governing Law | | 31 |
| 11.6 | Jurisdiction, Waiver of Jury Trial | | 31 |
| 11.7 | Notices | | 32 |
| 11.8 | Binding Effect; Assignment | | 33 |
| 11.9 | Severability | | 34 |
| 11.10 | Non-Recourse | | 34 |
| 11.11 | Certain Interpretations | | 34 |

## EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Bill of Sale |
| Exhibit B | Form of Sale Order |
| Exhibit C | Form of Deposit Escrow Agreement |

## SCHEDULES

| | |
|---|---|
| Schedule 1.1(a) | Owned Real Property |
| Schedule 1.1(e) | Inventory and Equipment |
| Schedule 1.2(m) | Excluded Properties and Assets |
| Schedule 1.3(d) | Assumed Liabilities |
| Schedule 1.4(j) | Excluded Liabilities |
| Schedule 2.1(a) | Bank Account |
| Schedule 4.3 | Absence of Certain Developments |
| Schedule 4.4(a) | Material Permits |
| Schedule 4.6(a) | Owned Real Property |
| Schedule 4.6(b) | Leased Real Property |
| Schedule 4.6(c) | Leasehold Interests Conveyed |
| Schedule 7.1 | Conduct of Business |
| Schedule 9.1(ss) | Permitted Encumbrances |

## ASSET PURCHASE AGREEMENT

**ASSET PURCHASE AGREEMENT** (this "Agreement"), dated as of February __, 2009 (the "Execution Date"), is made and entered into by and between Alfred Giuliano, in his capacity as the Chapter 7 Trustee appointed in the Chapter 7 Case (as defined below) (the "Trustee") on behalf of the bankruptcy estate of HRP Myrtle Beach Operations, LLC, a Delaware limited liability company (the "Company"), and FPI MB Entertainment LLC, a Delaware limited liability company (the "Purchaser"). Certain capitalized terms used herein are defined in Article IX.

## RECITALS

WHEREAS, the Trustee is the Chapter 7 Trustee appointed on behalf of the bankruptcy estate of the Company (the "Bankruptcy Estate") in connection with certain pending bankruptcy cases under chapter 7 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), in each case, in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), Case No. 08-12193 (as jointly administered, collectively, the "Chapter 7 Case"); and

WHEREAS, in connection with the Chapter 7 Case and subject to the terms and conditions contained herein and following the entry of the Sale Order (as defined herein) and subject to the terms and conditions thereof, the Trustee, on behalf of the bankruptcy estate of the Company, shall sell, transfer and assign to the Purchaser, and the Purchaser shall purchase and acquire from the Trustee, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, the Purchased Assets (as defined herein), and assume from the Trustee the Assumed Liabilities (as defined herein), all as more specifically provided herein and in the Sale Order.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Purchaser and the Trustee hereby agree as follows:

## ARTICLE I.

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

1.1    Purchase and Sale of Assets.   Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions set forth in this Agreement and the Sale Order, the Purchaser shall purchase, acquire and accept from the Trustee, and the Trustee shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to the Purchaser, on the Closing Date, all of the Bankruptcy Estate's right, title and interest in, to and under, free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), all of the following assets, properties and rights of the Bankruptcy Estate located at or related to the Park, excluding the Excluded Assets (collectively, the "Purchased Assets"):

(a)    all real property owned by the Bankruptcy Estate, as set forth by legal description on Schedule 1.1(a) ("Owned Real Property");

(b)    to the extent assignable or transferable in accordance with the terms and conditions of the applicable Permits or applicable Law, all Permits and all pending applications therefor;

(c)    all Documents used in respect of the Purchased Assets or Assumed Liabilities;

(d)    all goodwill and other intangible assets generated or associated with the Purchased Assets;

(e)    all Inventory and Equipment (including spare parts with respect thereto) (as set forth in Schedule 1.1(e)), provided that Inventory branded with the Hard Rock Park, Hard Rock or other similar logos licensed from a third party shall not be transferred to the extent transfer of such Inventory is prohibited by the terms of the applicable license agreement and provided further that any Equipment branded with the Hard Rock Park, Hard Rock or other similar logos licensed from a third party shall be sold to the Purchaser subject to compliance with the applicable license agreement, removal of licensed materials or subsequent agreement with the applicable licensor);

(f)    all rights, claims, credits, causes of action or rights of set-off against third parties relating to the Purchased Assets, including rights under vendor's, contractor's and manufacturer's warranties, indemnities and guaranties (but excluding (i) avoidance claims and causes of action under the Bankruptcy Code or similar state Law and (ii) claims and causes of action against directors, officers and employees of the Company other than any such claims or causes of action that arise out of any Contract that is a Purchased Asset);

(g)    any counterclaims, setoffs or defenses that the Company may have with respect to any Assumed Liabilities;

(h)    to the extent assignable or transferable in accordance with the terms and conditions of the applicable insurance policies or applicable Law, all of the Company's insurance policies and rights and benefits related to the Purchased Assets or Assumed Liabilities provided however that any coverage, rights or benefits under the liability policies with respect to claims arising out of or relating to any occurrence or event that happened prior to Closing shall continue to inure to the benefit of the Bankruptcy Estate notwithstanding the transfer under this provision.

(i)    all Contracts assigned to the Purchaser pursuant to Section 6.3 of this Agreement.

Notwithstanding the foregoing, the transfer of the Purchased Assets pursuant to this Agreement and the Sale Order shall not include the assumption of any Liability related to the Purchased Assets unless Purchaser expressly assumes that Liability pursuant to Section 1.3 of this Agreement.

1.2    <u>Excluded Assets</u>.  Notwithstanding anything to the contrary in this Agreement, in no event shall the Trustee be deemed to sell, transfer, assign or convey, or have caused to be sold, transferred, assigned, transferred or conveyed, and the Bankruptcy Estate shall retain all right, title and interest to, in and under all assets, properties, interests and rights of the Bankruptcy Estate not included in the Purchased Assets, including, without limitation, the following assets, properties, interests and rights of the Bankruptcy Estate (collectively, the "<u>Excluded Assets</u>"):

(a)    except as may be selected by Purchaser pursuant to <u>Section 6.3</u>, all Contracts including the leases to the Leased Real Property;

(b)    all Accounts Receivable;

(c)    all Cash and Cash Equivalents, whether on hand, in transit or in banks or other financial institutions, security entitlements, securities accounts, commodity contracts and commodity accounts;

(d)    all Documents (whether copies or originals) (i) to the extent they relate solely to any of the Excluded Assets or Excluded Liabilities or the organization, existence, capitalization or debt financing of the Company or of any controlling Affiliate of the Company, (ii) that the Company is required by Law to retain and is prohibited by Law from providing a copy of to the Purchaser or (iii) prepared primarily in connection with the transactions contemplated by this Agreement, including bids received from other parties;

(e)    all membership interests or other equity interests in the subsidiaries of the Company;

(f)    the Company's D&O policy and the Bankruptcy Estate's rights, claims, demands, proceedings, credits, causes of action or rights of set off thereunder and any letters of credit related thereto;

(g)    except as set forth in subsection 1.1(f), any avoidance claims or causes of action under the Bankruptcy Code or applicable state Law, including, without limitation, all rights and avoidance claims of the Bankruptcy Estate arising under Chapter 5 of the Bankruptcy Code with respect to the Excluded Assets;

(h)    all claims that the Bankruptcy Estate may have against any Person with respect to any other Excluded Assets;

(i)    the Bankruptcy Estate's rights under this Agreement;

(j)    all rights and interests of the Bankruptcy Estate with respect to any of the Company's employment agreements, severance agreements and the Company Plans (including any rights and interests relating to insurance policies offering coverage or benefits pursuant to any Company Plans);

(k)    all Tax assets of the Bankruptcy Estate;

(l)    all loans and other Indebtedness payable to the Bankruptcy Estate; and

(m)    the properties and assets set forth on <u>Schedule 1.2(m)</u>.

1.3    <u>Assumption of Liabilities</u>.  On the terms and subject to the conditions set forth in this Agreement and the Sale Order, the Purchaser shall assume, effective as of the Closing, and from and after the Closing the Purchaser shall pay, perform and discharge when due, only the following Liabilities and shall in no event assume any Liabilities of the Bankruptcy Estate not set forth in this <u>Section 1.3</u> (collectively, the "<u>Assumed Liabilities</u>"):

(a)    any and all Liabilities arising out of the Purchaser's ownership of the Purchased Assets (including Liabilities in respect of any Contract assigned to Purchaser pursuant to <u>Section 6.3</u>) after the Closing Date;

(b)    any and all Liabilities for Taxes attributable to the Purchaser's ownership of the Purchased Assets or the Purchaser's operation of the Business, on or after the Closing Date;

(c)    all Liabilities from the operation of the maximum RPM ride after the Closing Date to the extent such operation violates or infringes the MINI Intellectual Property; and

(d)    all Liabilities set forth on <u>Schedule 1.3(d)</u>.

1.4    <u>Excluded Liabilities</u>.  Except as expressly provided in this Agreement and the Sale Order, the Purchaser shall not assume or be liable, nor be deemed to have assumed or be liable for, any Liability of the Bankruptcy Estate, the Company, or of any predecessor or Affiliate of the Company, that is not an Assumed Liability.  The Excluded Liabilities shall remain the sole responsibility of and shall be retained, paid, performed and discharged solely by the Bankruptcy Estate.  The term "<u>Excluded Liabilities</u>" means all Liabilities not expressly listed as Assumed Liabilities and includes, without limitation, the following Liabilities:

(a)    all Liabilities of the Company or the Bankruptcy Estate relating to or otherwise arising, whether before, on or after the Closing, out of, or in connection with the ownership, operation or conduct by the Company or the Bankruptcy Estate of the Purchased Assets and the Business prior to the Closing, other than to the extent assumed pursuant to Section 1.3(d);

(b)    all Liabilities of the Company or the Bankruptcy Estate relating to or otherwise arising, whether before, on or after the Closing, out of, or in connection with, any of the Excluded Assets;

(c)    all Liabilities of the Company or the Bankruptcy Estate in respect of Contracts except as provided in <u>Section 6.3</u> with respect to Contracts as may be selected by Purchaser;

(d)    except as contemplated by <u>Section 1.3(d)</u>, all Liabilities of the Company or the Bankruptcy Estate in respect of Indebtedness, whether or not relating to the Business;

(e)     any claims, demands, proceedings or causes of action against the Company subject to or covered by the Company's insurance policies;

(f)     all Liabilities under the Company Plans or in respect any of the Company's employment agreements and severance agreements;

(g)     any and all Liabilities for Taxes attributable to the ownership of the Purchased Assets or the operation of the Business prior to the Closing Date;

(h)     subject to Section 1.3(b), all Liabilities with respect to any pending Action or any Action commenced after the Closing and arising out of or relating to any occurrence or event happening prior to Closing;

(i)     any Liability of the Bankruptcy Estate arising out of or relating to the execution, delivery or performance of this Agreement or any of the other Trustee's Documents; and

(j)     all Liabilities set forth on Schedule 1.4(j).

1.5     "As Is" Transaction.  PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ARTICLE IV OF THIS AGREEMENT, THE TRUSTEE MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS.  WITHOUT IN ANY WAY LIMITING THE FOREGOING, THE TRUSTEE HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS.  PURCHASER FURTHER ACKNOWLEDGES THAT PURCHASER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE PURCHASED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE PURCHASED ASSETS AS PERMITTED IN THE SHORTENED TIME-FRAME OF THIS ASSET PURCHASE PROCESS AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE PURCHASED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE IV HEREOF, PURCHASER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS.  ACCORDINGLY, PURCHASER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

## ARTICLE II.

## CONSIDERATION

2.1     Consideration.

(a)     The aggregate consideration for the Purchased Assets payable by the Purchaser to the Trustee shall be Twenty-Five Million Dollars ($25,000,000.00) (the "Purchase Price"), which shall be payable by wire transfer of immediately available funds to the account identified by the Trustee on Schedule 2.1(a). The Purchase Price shall be reduced by the sum

of One Million Dollars ($1,000,000) if the Closing does not occur on or before February 20, 2009 and shall be further reduced in the amount of Fifty Thousand Dollars for each calendar day after February 20, 2009 that the Closing occurs; provided however such purchase price reduction shall not occur if the failure to close arises solely out of act or failure to act by the Purchaser. In the event the Closing does not occur on or before February 20, 2009, the Trustee and the Purchaser shall negotiate in good faith acceptable arrangements that will minimize any adjustment of the Purchase Price.

(b)    In addition to the foregoing consideration, as consideration for the grant, sale, assignment, transfer and delivery of the Purchased Assets, the Purchaser shall assume and discharge the Assumed Liabilities.

## ARTICLE III.

## DEPOSIT, CLOSING AND TERMINATION

3.1    Deposit. The Purchaser submitted a deposit in the amount of Two Million, Three Hundred Thousand Dollars ($2,300,000.00) (the "Deposit"). The Deposit will be held by the Trustee in accordance with the terms and conditions of the Escrow Agreement attached hereto as Exhibit C. The Deposit will be credited against the Purchase Price at the Closing and will otherwise be held and disbursed as provided in this Agreement.

3.2    Closing. Subject to the satisfaction of the conditions set forth in Sections 8.1, 8.2 and 8.3 hereof or the waiver thereof by the party entitled to waive the applicable condition, the closing of the purchase and sale of the Purchased Assets, the delivery of the Purchase Price to the Trustee, the assumption of the Assumed Liabilities and the consummation of the other transactions contemplated by this Agreement (the "Closing") shall take place at the Wilmington, Delaware offices of Cozen O'Connor (or at such other place as the parties may designate in writing) on the date that is no later than the first Business Day following the entry of the Sale Order. The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date."

3.3    Closing Deliveries by the Trustee. At the Closing, the Trustee shall deliver to the Purchaser:

(a)    a duly executed bill of sale with respect to the Purchased Assets, substantially in the form attached hereto as Exhibit A;

(b)    a true and correct copy of the Sale Order;

(c)    duly executed transfer tax returns with respect to any transfer tax due on the sale of real property in South Carolina;

(d)    a duly executed deed in recordable form sufficient to convey good and marketable fee simple title to the Owned Real Property;

(e)    all other previously undelivered certificates, agreements and other documents of transfer or conveyance as may be reasonably requested by the Purchaser or are

6

otherwise required by this Agreement to be delivered by the Trustee at or prior to the Closing in connection with the transactions contemplated by this Agreement; and

(f)     the Trustee certificate required to be delivered pursuant to Section 8.3(b);

(g)     an affidavit duly executed by the Trustee stating that the Company is not a "foreign person" as defined Sec. 1445(b)(2) of the Internal Revenue Code of 1986, as amended

3.4     Closing Deliveries by the Purchaser.  At the Closing, the Purchaser shall deliver to (or at the direction of) the Trustee:

(a)     the officer's certificates required to be delivered pursuant to Sections 8.2(a);

(b)     duly executed transfer tax returns with respect to the any transfer tax due on the sale of real property in South Carolina; and

(c)     all other previously undelivered certificates, agreements and other documents of transfer or conveyance as may be reasonably requested by the Trustee or are otherwise required by this Agreement and the Purchaser's Documents to be delivered by the Purchaser at or prior to the Closing in connection with the transactions contemplated by this Agreement.

In addition, at the Closing, the Deposit will be released and delivered to the Trustee.

3.5     Termination of Agreement.  This Agreement may be terminated as follows:

(a)     by the mutual written consent of the Trustee and the Purchaser at any time prior to the Closing;

(b)     by the Trustee, if the Closing shall not have been consummated on the fifth Business Day following the entry of the Sale Order, or by the Purchaser, if the Closing shall not have been consummated on or prior to February 20, 2009 (the "Termination Date"); provided, however, that the right to terminate this Agreement under this Section 3.5(c) shall not be available to any party whose failure to fulfill any material obligation under this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or before such date;

(c)     by either the Purchaser or the Trustee, if there shall be any Law that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited, or there shall be in effect a final non-appealable order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; it being agreed that the parties hereto shall promptly appeal any adverse determination which is appealable (and pursue such appeal with reasonable diligence);

(d)     by the Purchaser, if the Chapter 7 Case is dismissed;

(e)     by the Purchaser on or prior to 5:00 p.m., Eastern Standard Time, on February 11, 2008 ("the "Diligence Date"), if its due diligence investigation with respect to the

7

Purchased Assets causes Purchaser to determine in Purchaser's sole discretion that it would be inadvisable to consummate the purchase;

(f)    by the Purchaser, if there shall be a breach by Seller of any representation, warranty, covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Section 8.3 and which breach is not reasonably capable of being cured such that the applicable condition is not capable of being satisfied prior to the Termination Date;

(g)    by the Trustee on or prior to 5:00 p.m., Eastern Standard Time, on February 11, 2008, if the Trustee has not reached a written agreement with the Senior Revolving Lenders regarding administrative expenses as contemplated by Section 6.2(iii)(C);

(h)    by the Trustee, if all of the conditions set forth in Sections 8.1 and 8.3 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing) or waived and the Purchaser fails to deliver the Purchase Price and/or pay the Deposit.

3.6    Procedure Upon Termination.  In the event of a termination of this Agreement by the Purchaser or the Trustee, or both, pursuant to Section 3.5: (a) written notice thereof shall be given promptly by the terminating party to the other party hereto, specifying the provision hereof pursuant to which such termination is made, (b) this Agreement shall thereupon terminate and become void and of no further force and effect and (c) the consummation of the transactions contemplated by this Agreement shall be abandoned without further action of the parties hereto. If this Agreement is terminated as provided herein, each party shall redeliver all documents, work papers and other material of any other party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the party furnishing the same.

3.7    Effect of Termination.  In the event that this Agreement is validly terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement effective as of the date of such termination and such termination shall be without Liability to the Purchaser or the Trustee; provided, however, that Section 3.5, Section 3.6, this Section 3.7 and Article XI shall survive any such termination and shall be enforceable hereunder; and provided, further, that in the event this Agreement is terminated, the Trustee shall be entitled to retain the Deposit in full and complete satisfaction of all of the Trustee's claims against Purchaser unless: (i) this Agreement was terminated pursuant to Sections 3.5(a), 3.5(c) or 3.5(g) or (ii) the Purchaser terminated this Agreement in accordance with any of Sections 3.5(b), 3.5(d), 3.5(e), 3.5(f) or Article XI, in which case the Deposit together with any interest accrued thereon shall be immediately returned to the Purchaser. In no event shall any termination of this Agreement relieve any party hereto of any Liability for any willful breach of this Agreement by such party.

## ARTICLE IV.

### REPRESENTATIONS AND WARRANTIES OF THE TRUSTEE

The Trustee hereby represents and warrants in this <u>Article IV</u> to the Purchaser for itself and on behalf of the Company as of the Execution Date (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date) except as qualified or supplemented by sections in the Trustee Disclosure Schedule attached hereto, as the same may be amended or modified. Each such section of the Trustee Disclosure Schedule is numbered by reference to representations and warranties in a specific Section of this <u>Article IV</u>. The information disclosed in any numbered part of the Trustee Disclosure Schedule shall be deemed to be disclosed with respect to every other representation and warranty in this <u>Article IV</u> if such disclosure is reasonably apparent on its face. The Purchaser acknowledges that the Park has been closed since September 21, 2008 and that the representations and warranties below are qualified by that acknowledgement.

4.1   <u>Authority Relative to This Agreement</u>.   Except for such authorization as is required by the Bankruptcy Court, the Trustee has all requisite power, authority and legal capacity to (a) execute and deliver this Agreement, (b) execute and deliver the Trustee's Documents and (c) consummate the transactions contemplated hereby and under the Trustee's Documents. This Agreement has been, and at or prior to the Closing, the Trustee's Documents will be, duly and validly executed and delivered by the Trustee and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, and the entry of the Sale Order) this Agreement constitutes, and the Trustee's Documents when so executed and delivered will constitute, legal, valid and binding obligations of the Trustee, enforceable against the Trustee in accordance with their respective terms.

4.2   <u>Brokers and Finders</u>.   Except with respect to the engagement of Raymond James & Associates, Inc. and the Trustee's entitlement to statutory commissions awarded under the Bankruptcy Code, the Trustee has not employed any investment banker, broker, finder, consultant or intermediary in connection with the transactions contemplated by this Agreement which would entitle any of the Trustee's professionals any investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or the transactions contemplated hereby, and the Trustee covenants and agrees to pay any such fee or commission payable to Raymond James & Associates, Inc.

4.3   <u>Absence of Certain Developments</u>.   Except for actions taken in connection with the Chapter 7 Case, as contemplated or expressly required or permitted by this Agreement, or as set forth in <u>Section 4.3</u> of the Trustee Disclosure Schedule, since the appointment of the Trustee, the Trustee has not acquired, sold, leased, transferred, assigned any Purchased Assets or entered into, accelerated, terminated, modified, amended or cancelled any agreement with respect to the Purchased Assets.

4.4   <u>Regulatory Matters; Permits</u>.

(a)   To the Knowledge of the Trustee, other than due to conflicts, breaches and defaults the enforcement of which will be stayed by virtue of the Chapter 7 Case, all of the

material Permits that are necessary for the operation of the Business as it was conducted by the Company and for the ownership of the Purchased Assets are held by the Bankruptcy Estate in full force and effect (collectively, the "Material Permits"). Section 4.4(a) of the Trustee Disclosure Schedule sets forth a true, complete and correct list of all Material Permits held by the Bankruptcy Estate as of the Execution Date.

(b)    Except for the commencement of the Chapter 7 Case and to the extent that enforcement with respect to such non-compliance is stayed as a result of the Chapter 7 Case, to the Knowledge of the Trustee, the Bankruptcy Estate is in compliance with its obligations under each of the Material Permits and the rules and regulations of the Governmental Body issuing such Material Permits, and no condition exists that without notice or lapse of time or both would constitute a default under, or a violation of, any Material Permit except for such failures to be in compliance or defaults that would not have, individually or in the aggregate, a material adverse effect on the Trustee's ability to own the Purchased Assets.

(c)    To the Knowledge of the Trustee, each Material Permit is valid and in full force and effect and there is no proceeding, notice of violation, order of forfeiture or complaint or investigation against the Trustee relating to any of the Material Permits pending or to the Knowledge of the Trustee, threatened, before any Governmental Body.

4.5    Title to Assets.    Other than due to conflicts, breaches and defaults the enforcement of which will be stayed by virtue of the filing of the Chapter 7 Case, at Closing, the Trustee will have (and shall convey to the Purchaser at the time of the transfer of the Purchased Assets to the Purchaser) good and marketable title or a valid leasehold interest in and to each of the Purchased Assets free and clear of all Encumbrances except Permitted Encumbrances.

4.6    Real Property.

(a)    Section 4.6(a) of the Trustee Disclosure Schedule sets forth a complete and correct list of all Owned Real Property. Other than due to conflicts, breaches and defaults the enforcement of which will be stayed by virtue of the filing of the Chapter 7 Case, the Trustee has good and marketable title to the Owned Real Property, subject only to Permitted Encumbrances.

(b)    Section 4.6(b) of the Trustee Disclosure Schedule sets forth a complete and correct list of all Leased Real Property, if any, specifying the address or other information sufficient to identify all such Leased Real Property.

(c)    Except as set forth on Section 4.6(c) of the Trustee Disclosure Schedule, the Trustee has not leased or granted to any Person the right to access, enter upon, use, occupy, lease, manage, operate, maintain, broker or purchase any portion of Trustee's interest in the Owned Real Property, that is not otherwise a Permitted Encumbrance or that will not otherwise be terminated on or prior to the Closing Date.

(d)    To the Knowledge of the Trustee, the Trustee has not received any written notice of, oral notice of, condemnation or eminent domain proceedings pending or threatened that affect the Owned Real Property. To the Knowledge of the Trustee, the Trustee has not received any written notice of any oral notice of, any zoning, ordinance, building, fire or health

code or other legal violation affecting any such Owned Real Property, except where any such violations would not have, individually or in the aggregate, a material adverse effect on the ability to operate the Business as it was operated by the Company.

(e)    To the Knowledge of the Trustee, there are no encroachments or other facts or conditions affecting any of the Owned Real Property that would be revealed by an accurate survey or inspection thereof, which encroachments, facts or conditions would have, individually or in the aggregate, a material adverse effect on the ability of the Trustee to operate the Business as it was operated by the Company. To the Knowledge of the Trustee, none of the buildings and structures on such Owned Real Property encroaches, in any material respect, upon real property of another Person or upon the area of any easement affecting the Owned Real Property.

4.7    _Environmental Matters_. To the Knowledge of the Trustee (a) the Trustee, the Company and/or the Bankruptcy Estate is in compliance with all Environmental Laws, (b) there is no material investigation, suit, claim, action or judicial or administrative proceeding relating to or arising under Environmental Laws that is pending or, to the Knowledge of the Trustee, threatened against the Trustee, the Company and/or the Bankruptcy Estate or any real property owned, operated or leased by the Trustee, the Company and/or the Bankruptcy Estate, or any of the Purchased Assets, (c) none of the Owned Real Property has been listed on the federal Comprehensive Environmental Response, Compensation Liability Information System (CERCLIS) database or any other similar federal, provincial or state list of known or suspected contaminated sites, (d) no Hazardous Materials have been treated, stored or released by the Trustee, the Company and/or the Bankruptcy Estate at any location or by any other Person at, on or under the Owned Real Property in any manner or concentration that requires investigation, removal or remediation under Environmental Laws or would otherwise cause the Trustee or any future owner or operator of any Owned Real Property to incur material liability under Environmental Laws, and (e) the Trustee has not received any notice of or entered into any order, settlement, judgment, injunction or decree involving uncompleted, outstanding or unresolved material obligations, liabilities or requirements relating to or arising under Environmental Laws.

## ARTICLE V.

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby makes the representations and warranties in this Article V to the Company as of the Execution Date (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date).

5.1    _Corporate Organization and Qualification_. The Purchaser is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware. The Purchaser is qualified and in good standing as a foreign entity in each jurisdiction where the properties owned, leased or operated, or the business conducted by it require such qualification except as would not have or reasonably be expected to have a material adverse effect on the Purchaser's ability to consummate the transactions contemplated by the Purchaser's Documents. The Purchaser has all requisite power and authority to own its properties and to carry on its business as it is now being conducted except as would not have or

reasonably be expected to have a material adverse effect on the Purchaser's ability to consummate the transactions contemplated by the Purchaser's Documents.

5.2    _Authority Relative to This Agreement._    Except for such authorization as is required by the Bankruptcy Court, the Purchaser has the requisite limited liability company power and authority to (a) execute and deliver this Agreement, (b) execute and deliver the Purchaser's Documents, and (c) perform its obligations hereunder and under the Purchaser's Documents and consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by the Purchaser of this Agreement and each of the Purchaser's Documents have been duly authorized by all necessary limited liability company action on behalf of the Purchaser. This Agreement has been, and at or prior to the Closing each of the Purchaser's Documents will be, duly and validly executed and delivered by the Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, and the entry of the Sale Order) this Agreement constitutes, and each of the Purchaser's Documents when so executed and delivered will constitute, legal, valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

5.3    _Consents and Approvals; No Violation; No Litigation._

(a)    Except as (i) with respect to the Chapter 7 Case, or (ii) as permitted by the Sale Order, none of the execution and delivery by the Purchaser of this Agreement or the Purchaser's Documents, the consummation of the transactions contemplated hereby or thereby, or the compliance by the Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of acceleration, payment, amendment, termination or cancellation under any provision of (A) the certificate of formation of the Purchaser, (B) any Contract (including but not limited to any Contracts related to financing) or Permit to which the Purchaser is a party or by which the Purchaser or its properties or assets are bound, (C) any order of any Governmental Body applicable to the Purchaser or by which any of the properties or assets of the Purchaser are bound, or (D) any applicable Law, other than, in the case of clauses (B), (C), and (D), except as would not have or reasonably be expected to have a material adverse effect on the Purchaser's ability to consummate the transactions contemplated by this Agreement.

(b)    Except (i) with respect to the Chapter 7 Case, (ii) the entry of the Sale Order, and (iii) where failure to obtain a consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to have a material adverse effect, the Purchaser is not required to file, seek or obtain any notice, authorization, approval, order, or consent of or with any Governmental Body in connection with the execution, delivery and performance by the Purchaser of this Agreement or the consummation of the transactions contemplated hereby.

12

(c)    No Action by or against the Purchaser is pending or, to the knowledge of the Purchaser, threatened, which could affect the legality, validity or enforceability of this Agreement, any of the Purchaser's Documents or the consummation of the transactions contemplated hereby and thereby.

5.4    <u>Brokers and Finders</u>.    Except with respect to the engagement of Roundbox Advisors, the Purchaser has not employed any investment banker, broker, finder, consultant or intermediary in connection with the transactions contemplated by this Agreement which would be entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or the transactions contemplated hereby, and Purchaser covenants and agrees to pay any such fee or commission payable to Roundbox Advisors.

5.5    <u>Investigation and Due Diligence</u>.    The Purchaser shall have until the Diligence Date to further conduct its own independent review and analysis of (i) the Business, the Purchased Assets and the Assumed Liabilities, of the value of such Purchased Assets and of the business, operations, technology, assets, Liabilities, financial condition and prospects of the Business, and the Trustee shall provide Purchaser with reasonable and coordinated access to the personnel, properties, premises (including the Owned Real Property) and records of the Business for this Purpose; and (ii) all orders of, and all motions, pleadings, and other submissions to, the Bankruptcy Court in connection with the Chapter 7 Case.    Should the Purchaser proceed to Closing, the Purchaser acknowledges that the price being paid under this Agreement for the Purchased Assets is the fair value for acquiring the Purchased Assets under the circumstances and that such value, rather than replacement cost, is the appropriate measure of damages if and to the extent the Purchaser may have any recourse for any failure of the Trustee to deliver the Purchased Assets on behalf of the Bankruptcy Estate in accordance with the terms of this Agreement. In entering into this Agreement, the Purchaser has relied upon its own investigation and analysis as well as the representations and warranties made by the Trustee in <u>Article IV</u> and not on any factual representations or opinions of the Trustee. The Purchaser acknowledges that (i) none of the Trustee, the Company, their Affiliates or any of their respective officers, directors, employees or representatives make or have made any representation or warranty, either express or implied, at law or in equity, as to the Purchased Assets or the accuracy or completeness of any of the information provided or made available to the Purchaser or any of its Affiliates, (ii) the Park has been closed since September 21, 2008 and (iii) none of the Trustee, the Company, their Affiliates or any of their respective officers, directors, employees or representatives will have or be subject to any liability or indemnification obligation to the Purchaser or to any other Person resulting from the distribution to the Purchaser, its Affiliates or representatives of, or the Purchaser's use of, any information relating to the Purchased Assets, including any information, documents or material made available to the Purchaser, whether orally or in writing.

## ARTICLE VI.

## BANKRUPTCY COURT MATTERS

6.1    <u>Bankruptcy Actions</u>.

(a)    As soon as reasonably practicable after execution of this Agreement (but not later than two (2) Business Days after such execution), the Trustee shall file with the

Bankruptcy Court a motion seeking entry of the Sale Order (the "Sale Motion"). The Trustee shall provide a draft of the Sale Motion to the Purchaser and the Senior Revolving Lenders, prior to its filing in adequate time for the Purchaser and the Senior Revolving Lenders to provide comments thereon, which the Trustee shall consider in good faith. The Trustee shall use its reasonable best efforts to obtain the entry of the Sale Order as a Final Order on the Bankruptcy Court's docket. The Trustee shall file all pleadings with the Bankruptcy Court as are necessary or appropriate to secure entry of the Sale Order, shall serve all creditors and all other parties entitled to notice of such pleadings under applicable provisions of the Bankruptcy Code and Rules.

(b)     In the event an appeal or other proceeding is filed seeking review of the Sale Order, or if a motion to reconsider, vacate, modify, amend or stay such Order is filed, the Trustee shall immediately notify the Purchaser and the Senior Revolving Lenders, of such appeal, other proceeding or motion and shall provide to the Purchaser and the Senior Revolving Lenders, within one (1) Business Day after the Trustee's receipt thereof a copy of the notice of appeal or motion.

6.2     Sale Order.   The Sale Order shall be entered by the Bankruptcy Court substantially in the form attached hereto as Exhibit B and otherwise in a form and substance reasonably acceptable to the Trustee, the Purchaser and the Senior Revolving Lenders. Without limiting the foregoing, the Sale Order shall, among other things, (i) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by the Trustee of this Agreement, (B) the sale of the Purchased Assets to the Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (C) the performance by the Trustee and the Bankruptcy Estate of their respective obligations under this Agreement; (ii) find that Purchaser is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code, not a successor to the Trustee, the Bankruptcy Estate or the Company and grant the Purchaser the protections of Section 363(m) of the Bankruptcy Code; (iii) provide that the proceeds from the sale of the Purchased Assets, less any normal and customary costs of closing including real estate taxes (excluding amounts paid by the Purchaser in accordance with the terms of this Agreement), and net of an amount equal to (A) the sum of $1,273,250 for the benefit of and use by the Bankruptcy Estate, (B) the fees and expenses of Raymond James with respect to its role in the sale process, and (C) administrative expenses in an amount and subject to terms and documentation to be separately agreed between the Trustee and the Senior Revolving Lenders, shall be used first to pay (and shall be paid directly to) the Senior Revolving Lenders until their claims are paid in full, including, without limitation, claims for any and all principal, unpaid hedging obligations, interest, attorneys' fees and expenses and advances made during the Chapter 7 Case, in each case, to the fullest extent provided under the Pre-Petition Loan Documents; (iv) provide that any remaining proceeds from the sale of the Purchased Assets (after the claims of the Senior Revolving Lenders have been paid in full) shall be delivered to the Trustee for distribution among the creditors of the Bankruptcy Estate in accordance with the order of priority applicable to their claims; and (v) provide that in the event of a valid termination of this Agreement and upon the exercise of a full credit bid pursuant to Section 363(k) of the Bankruptcy Code , the Trustee shall convey the Purchased Assets to the Senior Revolving Lenders (or their designee). The Purchaser agrees that it will promptly take such actions as are reasonably requested by the Trustee to assist in obtaining Bankruptcy Court

14

approval of the Sale Order, including, without limitation, furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (a) demonstrating that the Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and (b) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code. In the event that the Bankruptcy Court's approval of the Sale Order shall be appealed, the Trustee shall use reasonable efforts to defend such appeal.

6.3    Executory Contracts: The Trustee has informed the Purchaser that the Trustee has filed motions to reject substantially all of the Company's Contracts, including all personal property leases, real property leases, intellectual property agreements (to the extent such are executory contracts), licenses and trademark agreements. The Purchaser shall have until February 13, 2009 to designate the Contracts that the Purchaser desires deleted from the list of Contracts to be rejected, in which case the Trustee shall withdraw the motion as to all Contracts so designated by Purchaser. On or before February 27, 2009 the Purchaser shall advise the Trustee which, if any, of the designated Contracts the Purchaser desires to have assigned to it. The Trustee shall promptly file a motion seeking to assume and assign the designated Contracts to Purchaser and the Trustee shall use its commercially reasonable best efforts to have such motion heard by the Bankruptcy Court prior to March 7, 2009 and to have the Court order that any assignment to the Purchaser of any insurance policies is effective as of the Closing Date. The Purchaser may delete any Contract from the list of Contracts to be assigned to the Purchaser at any time prior to the assignment of such Contract to the Purchaser. The Purchaser shall be responsible for any payment necessary to cure any default on any Contract assigned to the Purchaser, except that the Purchaser shall not be responsible for any payments to cure any default on any insurance policy assigned to the Purchaser, and the Trustee agrees that the cure payment is sufficient consideration for the assignment. The Trustee agrees that Purchaser may contact any party to any of the Company's Contracts to discuss with such party the assumption and assignment of such Contract to the Purchaser. If the Purchaser designates a Contract for deletion from the list of Contracts to be rejected and subsequently removes such Contract from the list of Contracts to be assigned to it, the Purchaser, if it is the successful purchaser of the Purchased Assets, shall pay to the Trustee the amount of any administrative expense incurred by the Bankruptcy Estate on account of such Contract during the period commencing with the Conversion Date through the date of rejection of such Contract and in no event shall the Senior Revolving Lenders or their agents be responsible for such amounts.

**ARTICLE VII.**

**COVENANTS AND AGREEMENTS**

7.1    Restricted Activity. During the period from the Execution Date and continuing until the earlier of (i) the termination of this Agreement in accordance with Section 3.5 or (ii) the Closing, except (A) for any limitations on operations of the Business imposed by, or actions required by, the Bankruptcy Court or the Bankruptcy Code, (B) as required by applicable Law, (C) as otherwise expressly contemplated by this Agreement or as set forth on Schedule 7.1 or (D) with the prior written consent of the Purchaser (such consent not to be unreasonably withheld, conditioned or delayed) the Trustee shall not:

        (i)     mortgage, pledge or subject to any Encumbrance (other than a Permitted Encumbrance) any of the Purchased Assets;

        (ii)    sell, assign, license, transfer, convey, lease, surrender, relinquish or otherwise dispose of any of the Purchased Assets;

        (iii)   waive or release any material right of the Bankruptcy Estate that constitutes a Purchased Asset; or

        (iv)   enter into any Contract to do any of the foregoing or agree to do anything prohibited by this Section 7.1.

7.2    Access to Information.

        (a)    The Trustee agrees that, between the Execution Date and the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with Section 3.5, the Purchaser shall be entitled, through its officers, employees, counsel, accountants and other authorized representatives, agents and contractors ("Representatives"), to have such reasonable access to and make such reasonable investigation and examination of the books and records, properties, businesses, assets, accountants, auditors and operations of the Business as the Purchaser's Representatives may reasonably request. Any such investigations and examinations shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances, including the Trustee's right to have his Representative accompany the Purchaser at the time of any inspection or examination and shall be subject to restrictions under applicable Law. Pursuant to this Section 7.2, the Trustee shall furnish to the Purchaser and its Representatives such property related data and other information as such Persons reasonably request to the extent such data and information is reasonably available to the Trustee. The Trustee shall use his respective commercially reasonable efforts to cause his Representatives to reasonably cooperate with the Purchaser and the Purchaser's Representatives in connection with such investigations and examinations, and the Purchaser shall, and use its commercially reasonably efforts to cause its Representatives to, reasonably cooperate with the Trustee and his Representatives and shall use its reasonable efforts to minimize any disruption to the Business.

        (b)    From and after the Closing Date, the Purchaser shall give the Trustee and the Trustee's Representatives reasonable access during normal business hours upon reasonable advance notice and under reasonable circumstances to the offices, facilities, properties, assets, employees, Documents (including, without limitation, any Documents included in the Purchased Assets), personnel files and books and records of the Purchaser pertaining to (i) the conduct of the Business or ownership of the Purchased Assets prior to the Closing Date or (ii) the Excluded Assets and Excluded Liabilities. Without limiting the generality of the foregoing, the Purchaser shall, and shall use commercially reasonable efforts to cause each of its Affiliates to, cooperate with the Trustee.

        (c)    No information received pursuant to an investigation made under this Section 7.2 shall be deemed to (i) qualify, modify, amend or otherwise affect any representations, warranties, covenants or other agreements of the Trustee set forth in this

Agreement or any certificate or other instrument delivered to the Purchaser in connection with the transactions contemplated hereby, (ii) limit or restrict the remedies available to the parties under applicable Law arising out of a breach of this Agreement or otherwise available at Law or in equity, or (iii) limit or restrict the ability of either party to invoke or rely on the conditions to the obligations of the parties to consummate the transactions contemplated by this Agreement set forth in <u>Article VIII</u>.

7.3    <u>Further Agreements</u>.  The Purchaser authorizes and empowers the Trustee from and after the Closing Date to receive and to open all mail received by him relating to the Purchased Assets or the Assumed Liabilities and to deal with the contents of such communications in accordance with the provisions of this <u>Section 7.3</u>.  The Trustee shall (i) promptly deliver to the Purchaser any mail or other communication received by him after the Closing Date and relating to the Purchased Assets or the Assumed Liabilities, (ii) promptly wire transfer in immediately available funds to the Purchaser any cash, electronic credit or deposit received by the Trustee but solely to the extent that such cash, electronic credit or deposit are on account of any Purchased Assets or Assumed Liabilities and (iii) promptly forward to the Purchaser any checks or other instruments of payment that the Trustee may receive but solely to the extent that such checks or other instruments are on account of any Purchased Assets or Assumed Liabilities.  The Purchaser shall (x) promptly deliver to the Trustee any mail or other communication received by it after the Closing Date and relating to the Excluded Assets or the Excluded Liabilities, (y) promptly wire transfer in immediately available funds to the Trustee, any cash, electronic credit or deposit received by the Purchaser but solely to the extent that such cash, electronic credit or deposit are on account of any Excluded Assets or Excluded Liabilities and (z) promptly forward to the Trustee any checks or other instruments of payment that it receives but solely to the extent that such checks or other instruments are on account of any Excluded Assets or Excluded Liabilities.  From and after the Closing Date, the Trustee shall refer all inquiries with respect to the Purchased Assets and the Assumed Liabilities to the Purchaser, and the Purchaser shall refer all inquiries with respect to the Excluded Assets and the Excluded Liabilities to the Trustee.

7.4    <u>Preservation of Records</u>.  The Trustee and the Purchaser agree that each of them shall preserve and keep the records held by them (including the Purchaser's Affiliates, in the case of the Purchaser) relating to the Purchased Assets, the Assumed Liabilities, the Excluded Assets and the Excluded Liabilities, as the case may be, for a period of five (5) years from the Closing Date, in the case of the Purchaser, and until the closing of the Chapter 7 Case in the case of the Trustee, and shall make such records available to the other party as may be reasonably required by such other party in connection with, among other things, any insurance claims by, Actions or Tax audits against or investigations by any Governmental Body of the Bankruptcy Estate or the Purchaser or in order to enable the Trustee or the Purchaser to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby.  In the event the Trustee or the Purchaser wishes to destroy such records at the end of such applicable period, such party shall first give sixty (60) days' prior written notice to the other party and such other party shall have the right at its option and expense, upon prior written notice given to such party within such sixty (60) day period, to take possession of the records within one hundred and twenty (120) days after the date of such notice, or such shorter period as the closing of the Chapter 7 Case shall permit.

7.5    Publicity.  The Trustee, Raymond James or the Purchaser may issue a press release, post information to its web site or make a public announcement concerning the transactions contemplated hereby after the Sale Motion is filed with the Bankruptcy Court.  The publishing party shall provide a copy of the proposed published information to the other before publishing.  The non-publishing party shall have the right, which must be exercised within 24 hours of receipt or is deemed waived, to disapprove of the proposed published information if and only if the proposed published information contains a material misstatement of fact.  No such press release shall refer to Deutsche Bank Trust Company Americas or the Senior Revolving Lenders without their express consent.

7.6    Notification of Certain Matters.  The Trustee shall give prompt notice to the Purchaser, and the Purchaser shall give prompt notice to the Trustee, of (i) any notice or other communication from any Person alleging that the consent of such Person which is or may be required in connection with the transactions contemplated by this Agreement is not likely to be obtained prior to Closing, (ii) any written objection or proceeding that challenges the transactions contemplated hereby or the entry of the approval of the Bankruptcy Court and (iii) any fact, event or condition that would cause or constitute a material breach of or make materially inaccurate any representation or warranty of such party in this Agreement or may make the satisfaction of the conditions in Article VIII impossible or unlikely.

7.7    No Solicitation.  Effective as of the Diligence Date, or such earlier date as Purchaser shall notify Trustee in writing that the Purchaser waives the right to terminate this Agreement pursuant to paragraph 3.5(e) hereof, until the termination of this Agreement in accordance with Section 3.5 herein:

(a)    None of the Trustee, the Senior Revolving Lenders or any officer, director, employee, agent or representative (including any investment banker, financial advisor, attorney, accountant or other representative) of the Trustee or the Senior Revolving Lenders shall directly or indirectly (i) solicit, initiate, encourage, facilitate (including by way of furnishing information) or take any other action designed to facilitate any inquiries or proposals regarding any merger, share exchange, consolidation, sale of assets, sale of shares of capital stock (including by way of a tender offer) or similar transactions involving the Bankruptcy Estate or any of the Purchased Assets that, if consummated, would constitute an Alternative Transaction (any of the foregoing inquiries or proposals, including the indication of any intention to propose any of the foregoing, being referred to herein as an "Alternative Proposal"), (ii) participate in any discussions or negotiations regarding an Alternative Transaction or (iii) enter into any agreement regarding any Alternative Transaction.

As used in this Agreement, "Alternative Transaction" means any of (i) a transaction pursuant to which any person (or group of persons) (other than the Purchaser, the Senior Revolving Lenders, or any of their respective Affiliates), directly or indirectly, acquires or would acquire the Purchased Assets, whether from the Trustee or otherwise, (ii) a merger, share exchange, consolidation or other business combination involving the Bankruptcy Estate, (iii) any transaction pursuant to which any person (or group of persons) (other than the Senior Revolving Lenders or their Affiliates) acquires or would acquire control of the Purchased Assets, or (iv) any other consolidation, business combination, recapitalization or similar transaction

18

involving the Bankruptcy Estate or the Purchased Assets other than the transactions contemplated by this Agreement.

(b)     The Trustee shall notify the Purchaser and Senior Revolving Lenders promptly (but in no event later than 24 hours) after receipt of any Alternative Proposal, or any material modification of or material amendment to any Alternative Proposal, or any request for nonpublic information relating to the Purchased Assets or for access to the properties, books or records of Company or the Trustee, other than any such request that does not relate to and would not reasonably be expected to lead to, an Alternative Proposal. Such notice to Purchaser and Senior Revolving Lenders shall be made orally and in writing, and shall indicate the identity of the person making the Alternative Proposal or intending to make or considering making an Alternative Proposal or requesting non-public information or access to the books and records of Company or the Trustee, and a copy (if in writing) and summary of the material terms of any such Alternative Proposal or modification or amendment to an Alternative Proposal. The Trustee shall use its best efforts to keep Purchaser and Senior Revolving Lenders fully informed, on a current basis, of any material changes in the status and any material changes or modifications in the terms of any such Alternative Proposal, indication or request. The Trustee shall also provide Purchaser and Senior Revolving Lenders 24 hours written notice before it enters into any discussions or negotiations concerning any Alternative Proposal in accordance with Section 7.7(a). The Bankruptcy Estate shall not enter into any confidentiality or other agreement that would impede its ability to comply with its obligations under this Section 7.7(b).

(c)     The Trustee and the Senior Revolving Lenders shall immediately cease and cause to be terminated any existing discussions or negotiations with any persons (other than Purchaser) conducted heretofore with respect to any of the foregoing, and the Trustee shall use reasonable best efforts to cause all persons other than the Purchaser who have been furnished confidential information regarding the Bankruptcy Estate or the Purchased Assets in connection with the solicitation of or discussions regarding an Alternative Proposal within the 12 months prior to the date hereof promptly to return or destroy such information. The Trustee agrees not to release any third party from the confidentiality and standstill provisions of any agreement to which the Trustee or the Company is or may become a party, and shall immediately take all steps necessary to terminate any approval that may have been heretofore given under any such provisions authorizing any person to make an Alternative Proposal.

(d)     The Trustee shall ensure that its officers, directors and all employees, agents and representatives (including any investment bankers, financial advisors, attorneys, accountants or other representatives) and the Senior Revolving Lenders are aware of the restrictions described in this Section 7.7 as reasonably necessary to avoid violations thereof. It is understood that any violation of the restrictions set forth in this Section 7.7 by any officer, director, employee, agent or representative (including any investment banker, financial advisor, attorney, accountant or other representative) of the Bankruptcy Estate shall be deemed to be a breach of this Section 7.7 by the Trustee.

(e)     Notwithstanding the provisions of this Section 7.7, at the hearing on the Sale Motion, the Trustee may respond to inquiries from Qualified Bidders by providing information that is not confidential information.

(f)     Nothing herein shall be deemed to prohibit the Trustee from delivering notice of the Sale Motion.

## ARTICLE VIII.

## CONDITIONS TO CLOSING

8.1     Conditions Precedent to the Obligations of the Purchaser and the Trustee.  The respective obligations of each party to this Agreement to consummate the transactions contemplated by this Agreement are subject to the satisfaction or written waiver, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by the Trustee and Purchaser in whole or in part to the extent permitted by applicable Law):

(a)     there shall not be in effect any statute, rule, regulation, executive order enacted, issued, entered or promulgated by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; and

(b)     the Bankruptcy Court shall have entered the Sale Order as provided in Article VI (which shall include a finding of good faith under section 363(m) of the Bankruptcy Code), and such order shall be a Final Order and otherwise in form and substance reasonably satisfactory to the Trustee, the Purchaser and the Senior Revolving Lenders.  On the Closing Date, the Sale Order shall be in effect, and shall not have been reversed, stayed, modified or amended without the prior written consent of Purchaser.

8.2     Conditions Precedent to the Obligations of the Trustee.  The obligations of the Trustee on behalf of the Bankruptcy Estate to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by the Trustee in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of the Purchaser set forth in Article V hereof shall be true and correct as of the Closing Date as though made on and as of the Closing Date (except for such representations and warranties made as of a certain date, which shall be true and correct as of such date as though made on and as of such date) except where the failure of such representations or warranties to be true and correct (without giving effect to any limitation or qualification as to "materiality" or "material adverse effect" set forth in such representations and warranties) has not had and would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the Purchaser's ability to consummate the transactions contemplated hereby, and the Trustee shall have received a certificate signed by an authorized officer of the Purchaser, dated the Closing Date, to the foregoing effect;

(b)     the Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by the Purchaser on or prior to the Closing Date,;

(c)    the Purchaser shall have delivered, or caused to be delivered, to the Trustee all of the items set forth in Section 3.4; and

(d)    the Purchaser shall have delivered to the Trustee certified copies of (i) its certificate of formation, (ii) limited liability company operating agreement and (iii) appropriate evidence of all necessary limited liability company action by the Purchaser in connection with the transactions contemplated by the Purchaser's Documents, including, without limitation: (A) resolutions duly adopted by the Purchaser's Managing Member approving the transactions contemplated by this Agreement and the Purchaser's Documents and authorizing the execution, delivery, and performance by the Purchaser of this Agreement and the Purchaser's Documents; and (B) a certificate as to the incumbency of officers of the Purchaser executing this Agreement, the Purchaser's Documents and any instrument or other document delivered in connection with the transactions contemplated by this Agreement.

8.3    Conditions Precedent to the Obligations of the Purchaser.  The obligations of the Purchaser to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by the Purchaser in whole or in part to the extent permitted by applicable Law):

(a)    The Trustee shall have delivered to the Purchaser (i) a certified copy of the Sale Order (which shall contain the terms described in Section 6.1 and be a Final Order as described in Section 8.1(b)) and (ii) copies of all affidavits of service of the Sale Motion or notice of such motion filed by or on behalf of the Trustee on behalf of the Bankruptcy Estate;

(b)    The representations and warranties of the Trustee set forth in Article IV hereof shall be true and correct as of the Closing Date as though made on and as of the Closing Date (except for such representations and warranties made as of a certain date, which shall be true and correct as of such date as though made on and as of such date) except where the failure of such representations or warranties to be true and correct (without giving effect to any limitation or qualification as to "materiality" or "material adverse effect" set forth in such representations and warranties) has not had and would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the value of the Purchased Assets and the Purchaser shall have received a certificate signed by the Trustee, dated the Closing Date, to the foregoing effect;

(c)    The Trustee shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by the Trustee on or prior to the Closing Date;

(d)    The Trustee shall have delivered, or caused to be delivered, to the Purchaser all of the items set forth in Section 3.3;

(e)    Title to the Purchased Assets shall be good and marketable and free of Encumbrances other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances and a national title insurer is willing to issue an Owner's Policy of title insurance to Purchaser insuring title to the Owned Real Property at standard rates; and

21

(f)     No Hazardous Materials have been discovered at any location on or under the Real Property in any manner or concentration that requires investigation, removal or remediation under Environmental Laws or would otherwise cause the Purchaser to incur material liability under Environmental Laws.

8.4     <u>Frustration of Closing Conditions</u>. Neither the Trustee nor the Purchaser may rely on the failure of any condition set forth in <u>Sections 8.1</u>, <u>8.2</u> or <u>8.3</u>, as the case may be, if such failure was caused directly by such party's failure to comply with any provision of this Agreement.

<div align="center">

**ARTICLE IX.**

**ADDITIONAL DEFINITIONS**

</div>

9.1     <u>Certain Definitions</u>. As used herein:

(a)     "<u>Accounts Receivable</u>" means (i) any and all accounts receivable, trade accounts and other amounts receivables (including overdue accounts receivable) owed with respect to the Contracts and any other rights to payment with respect to the Contracts and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of goods shipped, products sold or services rendered with respect to such Contracts and including any and all receivables relating to collateral held by insurance companies or premium financiers related to insurance policies or premiums therefor, in each case owing to the Company or otherwise comprising the property of the Bankruptcy Estate in the Chapter 7 Case; (ii) all other accounts or notes receivable of the Company from Contracts and the full benefit of all security for such accounts or notes receivable arising in the conduct of the Business; and (iii) any and all claims, remedies or other rights relating to any of the foregoing, together with any interest or unpaid financing charges accrued thereon, in each case existing on the Execution Date or arising in the Ordinary Course of Business after the Execution Date and in each case that have not been satisfied or discharged prior to the close of business on the Business Day immediately preceding the Closing Date or have not been written off or sent to collection prior to the close of business on the Business Day immediately preceding the Closing Date (it being understood that the receipt of a check prior to the close of business on the Business Day immediately preceding the Closing Date shall constitute satisfaction or discharge of the applicable account or note receivable to the extent of the payment represented thereby).

(b)     "<u>Action</u>" means any litigation, action, claim, suit, proceeding, investigation, examination, hearing, arbitration, inquiry or subpoena.

(c)     "<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

(d)    "Agreement" has the meaning specified therefor in the preamble hereto.

(e)    "Assumed Liabilities" has the meaning specified therefor in Section 1.3.

(f)    "Bankruptcy Code" has the meaning specified therefor in the recitals hereto.

(g)    "Bankruptcy Court" has the meaning specified therefor in the recitals hereto.

(h)    "Bankruptcy Estate" has the meaning specified therefor in the recitals hereto.

(i)    "Business" means any and all business activities of any kind that are conducted by the Company, including the operation of the Park.

(j)    "Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City, New York are authorized or required by Law to be closed.

(k)    "Cash and Cash Equivalents" means all of the cash of the Company or otherwise comprising the property of the Bankruptcy Estate in the Chapter 7 Case (including petty cash and checks received prior to the close of business on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper and government securities, cash or cash equivalents held as collateral by insurance companies or premium financiers related to insurance policies or premiums therefor, and other cash equivalents.

(l)    "Chapter 7 Case" has the meaning specified therefor in the recitals hereto.

(m)    "Closing" has the meaning specified therefor in Section 3.2.

(n)    "Closing Date" has the meaning specified therefor in Section 3.2.

(o)    "Code" means the Internal Revenue Code of 1986, as amended.

(p)    "Company" has the meaning specified therefor in the preamble hereto.

(q)    "Company Plan" means (i) all "employee benefit plans" (as defined in Section 3(3) of ERISA), including all employee benefit plans which are "pension plans" (as defined in Section 3(2) of ERISA) and any other employee benefit arrangements or payroll practices (including, without limitation, severance pay, vacation pay, company awards, salary continuation for disability, sick leave, death benefit, hospitalization, welfare benefit, group or individual health, dental, medical, life, insurance, survivor benefit, deferred compensation, profit sharing, retirement, retiree medical, supplemental retirement, bonus or other incentive

compensation, stock purchase, stock option, stock appreciation rights, restricted stock and phantom stock arrangements or policies) and (ii) all material employment, termination, bonus, severance, change in control, collective bargaining or other similar contracts or agreements, whether formal or informal, written or oral, in each case to which the Company or any ERISA Affiliate is a party, with respect to which the Company or any ERISA Affiliate has any obligation or which are maintained by the Company or any ERISA Affiliate or to which the Company or an ERISA Affiliate contributes or is obligated to contribute with respect to current or former directors, officers, consultants and employees of the Company.

(r)     "Contract" means any written contract, purchase order, service order, sales order, indenture, note, bond, lease, license, commitment or instrument or other agreement, arrangement or commitment that is binding upon a Person or its property.

(s)     "Conversion Date" means the date the order of the Bankruptcy Court converting the Company's case under Chapter 11 of the Bankruptcy Code to a case under Chapter 7 was entered on the docket.

(t)     "Deposit" has the meaning specified therefor in Section 3.1.

(u)     "Documents" means all of the Company's written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies and documents, Tax Returns, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

(v)     "Encumbrance" means any lien, encumbrance, claim (as defined in Section 101(5) of the Bankruptcy Code), right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, restrictive covenants, encroachments, rights of first refusal, preemptive rights, judgments, conditional sale or other title retention agreements and other impositions, imperfections or defects of title or restrictions on transfer or use of any nature whatsoever.

(w)     "Environmental Laws" means all Laws relating to pollution or protection of health, safety, natural resources or the environment, or the generation, use, treatment, storage, handling, transportation or Release of, or exposure to, Hazardous Materials, including, without limitation, the Federal Water Pollution Control Act (33 U.S.C. §1251 et seq.), Resource Conservation and Recovery Act (42 U.S.C. §6901 et seq.), Safe Drinking Water Act (42 U.S.C. §3000(f) et seq.), Toxic Substances Control Act (15 U.S.C. §2601 et seq.), Clean Air Act (42 U.S.C. §7401 et seq.), Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. §9601 et seq.) and other similar federal, state, provincial and local statutes.

(x) "Equipment" means all equipment, machinery, vehicles, storage tanks, furniture, fixtures and other tangible personal property of every kind and description and improvements and tooling used, or held for use, in connection with the operation of the Business and owned by the Bankruptcy Estate, located on the Park or held by another for the benefit of the Trustee, including but not limited to, the rides and associated hardware, communications equipment, the IT Assets, and any attached and associated hardware, routers, devices, panels, cables, manuals, cords, connectors, cards, and vendor documents, and including all warranties of the vendor applicable thereto, to the extent such warranties are transferable, but excluding software and any other intangibles associated therewith except to the extent embedded in such Equipment and required to operate it.

(y) "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

(z) "ERISA Affiliate" means any entity which is a member of (A) a controlled group of corporations (as defined in Section 414(b) of the Code), (B) a group of trades or businesses under common control (as defined in Section 414(c) of the Code), (C) an affiliated service group (as defined under Section 414(m) of the Code) or (D) any group specified in regulations under Section 414(o) of the Code, any of which includes or included the Company.

(aa) "Excluded Assets" has the meaning specified therefor in Section 1.2.

(bb) "Excluded Liabilities" has the meaning specified therefor in Section 1.4.

(cc) "Execution Date" has the meaning specified therefor in the preamble hereto.

(dd) "Final Order" means an order, judgment or other decree of the Bankruptcy Court or any other court or judicial body of competent jurisdiction entered by the Clerk of the Bankruptcy Court or such other court on the docket in the Chapter 7 Case or the docket of such other court, which has not been modified, amended, reversed, vacated or stayed.

(ee) "GAAP" means United States generally accepted accounting principles as in effect from time to time.

(ff) "Governmental Body" means any government, quasi governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

(gg) "Hazardous Materials" means petroleum and all derivatives thereof or synthetic substitutes therefor, asbestos and asbestos containing materials, and any and all materials now or hereafter defined, listed, designated or classified as, or otherwise determined to be, "hazardous wastes," "hazardous substances," "radioactive," "solid wastes," or "toxic" (or

words of similar meaning) under or pursuant to or otherwise listed or regulated pursuant to any Environmental Law.

(hh)    "Indebtedness" of any Person means, without duplication, (i) the interest in respect of, principal of and premium (if any) in respect of (x) indebtedness of such Person for money borrowed and (y) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property; (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; and (vi) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any Encumbrance (other than Permitted Encumbrances),  on any property or asset of such Person (whether or not such obligation is assumed by such Person).

(ii)    "Inventory" means all of the Bankruptcy Estate's inventories of raw materials, office supplies, works in progress, goods, spare parts and replacement and component parts and fuel that are used, or held for use, in connection with the operation of the Business and are located on the Park or held for the benefit of the Trustee by a third party, except for and excluding any perishable goods or inventory.

(jj)    "IT Assets" means all of the Bankruptcy Estate's computers, computer software and databases (including source code, object code and all related documentation), firmware, middleware, servers, workstations, routers, hubs, switches, data communications lines, and all other information technology equipment and elements, and all associated documentation that are used, or held for use, in connection with the operation of the Business.

(kk)    "Knowledge" means the actual knowledge of the Trustee.

(ll)    "Laws" means all federal, state, local or foreign laws, statutes, common law, rules, codes, regulations, restrictions, ordinances, orders, decrees, approvals, directives, judgments, rulings, injunctions, writs and awards of, or issued, promulgated, enforced or entered by, any and all Governmental Bodies, or court of competent jurisdiction, or other requirement or rule of law.

(mm)    "Liability" means, as to any Person, any debt, adverse claim, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed, including all costs and expenses relating thereto.

(nn)    "Leased Real Property" means all of the real property leased, subleased, licensed, used or occupied by the Seller, together with all buildings, structures,

fixtures and improvements erected thereon, and any and all rights privileges, easements, licenses, hereditaments and other appurtenances relating thereto, and used, or held for use, in connection with the operation of the Business

(oo)     "Ordinary Course of Business" means the ordinary and usual course of normal day to day operations of the Business; provided, however, that the Purchaser acknowledges that (i) the Company has commenced the Chapter 7 Case; and (ii) the Park has been closed since September 21, 2008.

(pp)     "Owned Real Property" has the meaning specified therefor in Section 1.1(b).

(qq)     "Park" means the Hard Rock Park theme park located in Myrtle Beach, South Carolina.

(rr)     "Parties" has the meaning specified therefor in Section 10.1(b).

(ss)     "Permits" means all notifications, licenses, permits (including environmental, construction and operation permits), franchises, certificates, approvals, consents, waivers, clearances, exemptions, classifications, registrations, variances, orders, tariffs, rate schedules and other similar documents and authorizations issued by any Governmental Body to the Company and used, or held for use, applicable to ownership of the Purchased Assets or assumption of the Assumed Liabilities.

(tt)     "Permitted Encumbrances" means (i) Encumbrances for utilities and current Taxes not yet due and payable or being contested in good faith; (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Purchased Assets which do not, individually or in the aggregate, materially adversely affect the operation of the Business, (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law which do not, individually or in the aggregate, materially adversely affect the operation of the Business, (iv) such other Encumbrances or title exceptions as are set forth on Schedule 9.1(ss) or which would be shown by an accurate updated survey of the Owned Real Property and (v) such other Encumbrances or title exceptions which do not render title unmarketable..

(uu)     "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group.

(vv)     "Pre-Petition Loan Documents" means the Pre-Petition Loan and all other Loan Documents (as defined therein) and all other documents, agreements and instruments executed or delivered in connection therewith.

(ww)     "Purchase Price" has the meaning specified therefor in Section 2.1(a).

(xx)     "Purchased Assets" has the meaning specified therefor in Section 1.1.

(yy)     "Purchaser" has the meaning specified therefor in the preamble hereto.

(zz)    "Purchaser's Documents" means collectively each agreement, document, instrument or certificate (i) contemplated by this Agreement and (ii) to be executed by the Purchaser in connection with the consummation of the transactions contemplated by this Agreement.

(aaa)    "Qualified Bidder" means a person or entity that has made a cash deposit in an amount of at least the amount of the Deposit and has provided to the Trustee evidence that such person has the ability to close an Alternative Transaction in the time frame contemplated by this Agreement.

(bbb)    "Representatives" has the meaning specified therefor in Section 7.2(a).

(ccc)    "Sale Motion" means the motion or motions of the Trustee on behalf of the Bankruptcy Estate, in form and substance reasonably acceptable to the Trustee and the Purchaser, seeking approval and entry of the Sale Order.

(ddd)    "Sale Order" means an order substantially in the form attached hereto as Exhibit B and otherwise in form and substance reasonably satisfactory to the Trustee and the Purchaser.

(eee)    "Schedules" means the Schedules attached to this Agreement, which schedules are incorporated into and form an integral part of this Agreement.

(fff)    "Senior Revolving Lenders" means the lenders party to the Revolving Credit Agreement, dated as of March 30, 2006, by and among the Company, as Borrower, Deutsche Bank Trust Company Americas, as Agent and a Lender, Deutsche Bank Securities Inc., as Joint Lead Arranger, Jefferies Finance LLC, as Joint Lead Arranger and a Lender and each of the other lenders party thereto (the "Pre-Petition Loan").

(ggg)    "Tax" and "Taxes" mean any and all taxes, charges, fees, tariffs, duties, impositions, levies or other assessments, imposed by any Governmental Body, and include any interest or penalties attributable to, or imposed upon, or with respect to, Taxes.

(hhh)    "Tax Return" means any return, report, information return, declaration, claim for refund or other document (including any schedule or related or supporting information) supplied or required to be supplied to any Governmental Body with respect to Taxes, including amendments thereto.

(iii)    "Transfer Taxes" has the meaning specified therefor in Section 10.1(a).

(jjj)    "Trustee" has the meaning specified therefor in the preamble hereto.

(kkk)    "Trustee's Documents" means collectively each agreement, document, instrument or certificate (i) contemplated by this Agreement and (ii) to be executed by the Trustee in connection with the consummation of the transactions contemplated by this Agreement.

# ARTICLE X.

# TAXES

10.1    <u>Additional Tax Matters</u>.

(a)    Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges (the "Transfer Taxes") which may be payable by reason of the sale of the Purchased Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated herein shall be borne and timely paid by the Purchaser as an Assumed Liability, and the Purchaser shall indemnify, defend (with counsel reasonably satisfactory to the Trustee), protect, and save and hold the Trustee and the Bankruptcy Estate harmless from and against any and all claims, charges, interest or penalties assessed, imposed or asserted in relation to any such Taxes. The Purchaser shall be responsible for preparing and filing all Tax Returns with respect to Transfer Taxes.

(b)    The Purchaser, the Trustee and the Company (the "Parties") shall use their respective reasonable best efforts to agree in good faith upon an allocation among the Purchased Assets of the sum of the Purchase Price and the Assumed Liabilities consistent with Section 1060 of the Code and the Treasury Regulations thereunder within thirty (30) days after the Closing Date. In the event that the Parties cannot agree on a mutually satisfactory allocation within such thirty (30) day period, the Parties shall appoint an independent accounting firm that shall, at the Bankruptcy Estate's and the Purchaser's joint expense, determine the appropriate allocation. In the event that the Parties cannot promptly agree on the selection of an accounting firm to act as the independent accounting firm, either Party may request the American Arbitration Association to appoint a nationally recognized independent accounting firm, and such appointment shall be final, binding and conclusive on the Company and the Purchaser. Resolution of any disagreements shall be made by the independent accounting firm in a writing addressed to all Parties within thirty (30) days following referral to it by the Parties of such disagreements in accordance with this Agreement. The finding of such independent accounting firm shall be final, binding and conclusive on the Parties. After determination of the allocation by agreement of the Parties or by binding determination of the independent accounting firm, the Purchaser shall prepare and deliver IRS Form 8594 to the Trustee and the Company within thirty (30) days after the allocation (as determined in this Section 10.1(b) to be filed with the Internal Revenue Service. The Company (or the appropriate Person on behalf of the Company) and the Purchaser shall report the transactions contemplated by this Agreement for U.S. Federal income Tax and all other Tax purposes in a manner consistent with the allocation determined pursuant to this Agreement. In any examination, audit or other proceeding related to the determination of any Tax, neither the Purchaser nor the Company shall contend or represent that such allocation determined under this Section 10.1(b) is not a correct allocation. The Purchaser, the Trustee and the Company shall notify and provide the other with reasonable assistance in the event of an examination, audit or other proceeding regarding the agreed-upon allocation of the Purchase Price and the Assumed Liabilities. Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 10.1(b) shall survive the Closing without limitation.

## ARTICLE XI.

### RISK OF LOSS

11.1    Trustee covenants that it will maintain the existing property or casualty insurance on the Owned Real Property, Inventory and Equipment until the Closing. In the event of any damage or destruction to any portion of the Owned Real Property, Inventory and Equipment prior to the date of Closing, the estimated cost of repair or replacement of which, as determined by a third party selected by Trustee and approved by Purchaser, is in excess of Five Hundred Thousand Dollars ($500,000.00), Purchaser shall have the option to terminate this Agreement upon written notice to the Trustee prior to Closing, whereupon the deposit shall be immediately refunded to Purchaser, and neither the Trustee nor Purchaser shall have any further right or obligation to the other under this Agreement unless expressly provided otherwise herein. If Purchaser does not exercise its option under the immediately preceding sentence of this Section 11.1 to terminate this Agreement, then the Agreement shall remain in full force and effect; and all of the Trustee's and/or the Bankruptcy Estate's right to all insurance proceeds resulting from such damage or destruction shall be assigned in writing by the Trustee to Purchaser, the Trustee shall provide a credit to Purchaser at Closing in the amount of any applicable deductible, and the Trustee shall have no further obligation to Purchaser with regard to such damage or destruction. In the event of any damage or destruction to the Owned Real Property, Inventory and Equipment prior to the date of Closing, the estimated cost of repair or replacement of which, as determined by a third party contractor selected by the Trustee and approved by Purchaser, is Five Hundred Thousand Dollars ($500,000.00) or less, Purchaser shall have no right to terminate this Agreement as a result thereof; and all of the Trustee's and/or the Bankruptcy Estate's right to all insurance proceeds resulting from such damage or destruction shall be assigned in writing by the Trustee to Purchaser, the Trustee shall provide a credit to Purchaser at Closing in the amount of any applicable deductible, and the Trustee shall have no further obligation to Purchaser with regard to such damage or destruction.

11.2    In the event of a taking by condemnation or similar proceedings or actions of all of the Owned Real Property or any material portion of the Owned Real Property being ten percent (10%) or more of the land or any portion of the improvements, prior to the date of Closing, Purchaser shall have the option to terminate this Agreement upon written notice to the Trustee prior to Closing whereupon the deposit shall be immediately refunded to Purchaser. If Purchaser does not exercise its option under the immediately preceding sentence of this Section 11.2 to terminate this Agreement, then the Agreement shall remain in full force and effect and the Trustee shall assign or pay to Purchaser at Closing, the Trustee's and/or the Bankruptcy Estate's entire interest in and to any and all condemnation awards or proceeds from any such proceedings or actions in lieu thereof.

## ARTICLE XII.

### MISCELLANEOUS

12.1    <u>Payment of Expenses</u>. Except as otherwise provided in this Agreement and whether or not the transactions contemplated hereby are consummated, the Trustee and the Purchaser shall bear their own expenses incurred or to be incurred in connection with the

30

negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.  Notwithstanding the foregoing, the Trustee shall be responsible for any investment banking, brokerage, finder's or similar fee or commission payable to Raymond James & Associates, Inc. in connection with this Agreement on the transactions contemplated hereby.

12.2    Survival of Representations and Warranties; Survival of Covenants.  The parties hereto agree that the representations and warranties contained in this Agreement shall expire upon the Closing Date.  The parties hereto agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive in accordance with the terms of the particular covenant or until fully performed.

12.3    Entire Agreement; Amendments and Waivers.  This Agreement (including the schedules and exhibits hereto) represents the entire understanding and agreement between the parties hereto with respect to the subject matter hereof.  This Agreement may be amended, supplemented or changed, and any provision hereof may be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  No action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of any party shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by applicable Law.

12.4    Counterparts.  For the convenience of the parties hereto, this Agreement may be executed (by facsimile or PDF signature) in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

12.5    Governing Law.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

12.6    Jurisdiction, Waiver of Jury Trial.

(a)    THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY; PROVIDED, HOWEVER, THAT IF THE

BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE COURTS OF THE STATE OF NEW YORK AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN THE SOUTHERN DISTRICT OF THE STATE OF NEW YORK WILL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.

(b)    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

12.7    Notices.    Unless otherwise set forth herein, any notice, request, instruction or other document to be given hereunder by any party to the other parties shall be in writing and shall be deemed duly given (i) upon delivery, when delivered personally, (ii) one (1) Business Day after being sent by overnight courier or when sent by facsimile transmission (with a confirming copy sent by overnight courier), and (iii) three (3) Business Days after being sent by registered or certified mail, postage prepaid, as follows:

If to the Trustee:

Alfred Giuliano,
Chapter 7 Trustee on behalf of the Bankruptcy Estate
Giuliano Miller & Company, LLC
Berlin Business Park
140 Bradford Drive
West Berlin, NJ 08091
Facsimile: 856.767.3500
Electronic mail: atgiuliano@giulianomiller.com

With a copy (which shall not constitute effective notice) to:

Cozen O'Connor
1201 North Market Street
Suite 1400
Wilmington, DE 19801
Attn:  John T. Carroll, III
Facsimile:  302.295.2013
Electronic mail:  jcarroll@cozen.com

With a copy (which shall not constitute effective notice) to:

Deutsche Bank Trust Company Americas,
as Agent to the Senior Revolving Lenders
60 Wall Street
New York, NY 10005

Attn: Michael Meagher
Facsimile: 212.797.5695
Electronic mail: Michael.meagher@db.com

With a copy (which shall not constitute effective notice) to:

White & Case LLP
1155 Avenue of the Americas
New York, NY 10036
Attn: Scott Greissman, Esq.
Facsimile: 212.354.8113
Electronic mail: sgreissman@whitecase.com

If to the Purchaser:

FPI MB Entertainment LLC
C/o Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111
Attn: Bennett G. Young
Facsimile: 415.951.1180
Electronic mail: byoung@dl.com

With a copy (which shall not constitute effective notice) to:

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111
Attn: Bennett G. Young
Facsimile: 415.951.1180
Electronic mail: byoung@dl.com

And to:

Diamond McCarthy LLP
120 Elm Street, 34th Floor
Dallas Tx 75270
Attn: Walter (Skip) Scott
Facsimile: 214.389.5399
Electronic mail: SScott@diamondmccarthy.com

or to such other Persons or addresses as may be designated in writing by the party to receive such notice.

12.8   <u>Binding Effect; Assignment</u>. This Agreement shall be binding upon the Purchaser and, subject to entry of the Sale Order, the Trustee, and inure to the benefit of the parties and their respective successors and permitted assigns. Nothing in this Agreement shall create or be

33

deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement except as provided below. No assignment of this Agreement or of any rights or obligations hereunder may be made by the Trustee or the Purchaser (by operation of law or otherwise) without the prior written consent of the other party and any attempted assignment without the required consents shall be void; provided, that the Purchaser may assign its rights and obligations hereunder in whole or in part to one or more Affiliates of the Purchaser (subject to the next succeeding sentence). No assignment of any obligations hereunder shall relieve the parties hereto of any such obligations. Upon any such permitted assignment, the references in this Agreement to the Purchaser shall also apply to any such assignee unless the context otherwise requires.

12.9    Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in a manner adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible..

12.10    Non-Recourse. Except as expressly contemplated by this Agreement, no past, present or future director, officer, employee, incorporator, member, partner, lender or equity holder of the Trustee or the Company shall have any liability for any obligations or liabilities of the Trustee under this Agreement or Trustee's Documents of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby.

12.11    LIMITATION ON DAMAGES. IN NO EVENT SHALL EITHER PARTY OR THEIR RESPECTIVE AFFILIATES HAVE ANY LIABILITY TO THE OTHER PARTY OR ANY OTHER PERSON FOR ANY SPECIAL, CONSEQUENTIAL, INDIRECT, EXEMPLARY OR PUNITIVE DAMAGES (INCLUDING ANY DAMAGES ON ACCOUNT OF LOST PROFITS OR OPPORTUNITIES OR BUSINESS INTERRUPTION AND THE LIKE), WHETHER BY STATUTE, IN TORT OR UNDER CONTRACT, AND ANY SUCH CLAIM, RIGHT OR CAUSE OF ACTION FOR ANY SUCH DAMAGES IS HEREBY FULLY WAIVED, RELEASED AND FOREVER DISCHARGED.

12.12    Certain Interpretations.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)    All references in this Agreement to Articles, Sections, Schedules and Exhibits shall be deemed to refer to Articles, Sections, Schedules and Exhibits to this Agreement.

(ii)    All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.

Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iii)    The Article, Section and paragraph captions herein are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions hereof.

(iv)    The words "include," includes" and "including," when used herein shall be deemed in each case to be followed by the words "without limitation" (regardless or whether such words or similar words actually appear).

(v)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day.

(vi)    Any reference in this Agreement to $ shall mean U.S. dollars.

(vii)    Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(viii)    The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(b)    The parties hereto agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefor, waive the application of any Law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

(c)    The Purchaser acknowledges hereby that the Trustee may not comply with the provisions of any bulk transfer laws of any jurisdiction in connection with the transactions contemplated by this Agreement.

*[Remainder of page intentionally left blank]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement, or a counterpart hereof, to be executed by their respective duly authorized officers as of the date first above written.

<div style="margin-left:40%">

**TRUSTEE:**
**ALFRED GIULIANO,**
**as Chapter 7 Trustee on behalf of the**
**Bankruptcy Estate**

_____

**PURCHASER:**

**FPI MB ENTERTAINMENT LLC**

By:  _____
      Name:
      Title:

By:  _____
      Name:
      Title:

</div>

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement, or a counterpart hereof, to be executed by their respective duly authorized officers as of the date first above written.

**TRUSTEE:**
**ALFRED GIULIANO,**
**as Chapter 7 Trustee on behalf of the**
**Bankruptcy Estate**

_____

**PURCHASER:**

**FPI MB ENTERTAINMENT LLC**

By: _____
    Name: *Alexey Sidnew*
    Title: DIRECTOR

By: _____
    Name:
    Title:

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement, or a counterpart hereof, to be executed by their respective duly authorized officers as of the date first above written.

**TRUSTEE:**
**ALFRED GIULIANO,**
**as Chapter 7 Trustee on behalf of the**
**Bankruptcy Estate**

_____

**PURCHASER:**

**FPI MB ENTERTAINMENT LLC**

By: _____
    Name:
    Title:

By: _____
    Name: DAVID WASSON
    Title: DIRECTOR